UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BUNN ENTERPRISES, INC,                    :
13589 State Route 550                     :
Fleming, Ohio 45729-5235                  :     Case No.:       2:13-cv-00357
                                          :
        and                               :
                                          :     Judge:  Algenon L. Marbley
KEVIN W. BUNN                             :
2844 Deming Rd.                           :     Magistrate Judge:  Terence P. Kemp
Vincent, Ohio 45784                       :
                                          :
        and                               :
                                          :
DELBERT G. NEWLON                        :     **PLAINTIFFS' NOTICE OF MOTION**
10775 State Route 550                     :     **AND MOTION FOR**
Vincent, Ohio 45784                       :     **<u>TEMPORARY RESTRAINING ORDER</u>**
                                          :
        and                               :
                                          :
DANIEL J. LANTZ                          :
23380 Dixon Rd.                           :
Coolville, Ohio 45723                     :
                                          :
        and                               :
                                          :
MARK A. MORGAN                           :
2149 Center Rd.                           :
Hinckley, Ohio 44233                      :
                                          :
        and                               :
                                          :
MICHAEL S. SCHAU                         :
151 Cornerstone Dr.                       :
Marietta, Ohio 45750                      :
                                          :
        and                               :
                                          :
DAVID E. WELCH                           :
25851 Main St.                            :
Coolville, Ohio 45723                     :
                                          :
              Plaintiffs,                 :
                                          :

v.                                          :
                                            :
OHIO OPERATING ENGINEERS                    :
FRINGE BENEFIT PROGRAMS                     :
c/o Brian Barch                             :
1140 Dublin Road                            :
P.O. Box 12009                              :
Columbus, Ohio 43212-0009                   :
                                            :
                    Defendants.             :
                                            :
                                            :
                                            :

Pursuant to Fed. R. Civ. P. 65(b) Plaintiffs, Bunn Enterprises, Inc. ("Bunn"), Kevin W. Bunn ("K.W. Bunn"), Delbert G. Newlon ("Newlon"), Daniel J. Lantz ("Lantz"), Mark A. Morgan ("Morgan"), Michael S. Schau ("Schau") and David E. Welch ("Welch"), move for a temporary restraining order against the Defendant, Ohio Operating Engineers Fringe Benefit Program (the "Fund"), as follows:

A.      Enjoin Defendants from seeking contributions for all hours worked by each employee.

B.      Order Defendant to seek contributions for only those hours in which employees perform covered work under the CBA.

C.      Enjoin Defendant from withholding pension benefits to Plaintiff Newlon.

D.      Order Defendant to reimburse Plaintiff Newlon the pension payments which were unlawfully withheld.

E.      Enjoin Defendant from withholding health insurance benefits to Plaintiffs K.W. Bunn, Lantz, Morgan, Schau and Welch.

F.      Order Defendant to reimburse Plaintiffs K.W. Bunn, Lantz, Morgan, Schau and Welch the amount of money each was required to pay out of pocket to maintain the health insurance benefits Defendant unlawfully withheld.

The grounds for this motion are set forth in the Complaint filed contemporaneously herewith and the Memorandum attached hereto.

Respectfully submitted,

/s/ Ronald L. Mason
Ronald L. Mason (0030110)
(Trial Attorney)
Aaron T. Tulencik (0073049)
Mason Law Firm Co., L.P.A.
425 Metro Place North, Suite 620
Dublin, Ohio 43017
t: 614.734.9450
f:  614.734.9451
rmason@maslawfirm.com
atulencik@maslawfirm.com

*Counsel for Plaintiffs*

<div align="center">MEMORANDUM</div>

## I.  THE PARTIES

Bunn is an Ohio Corporation and union employer engaged primarily in the business of highway construction.  Bunn is an "employer" within the meaning of Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 and Section 3(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(5).

K.W. Bunn is the owner of Bunn and a "participant" in the Fund within the meaning of Section 3(7) of ERISA, 29. U.S.C. § 1002(7).  K.W. Bunn first paid into the Fund's Health and Welfare Plan in January 1996.  K.W. Bunn is a member of the International Union of Operating Engineers, Local 18 ("Local 18").

Newlon was a part-time employee of Bunn and "participant" in the Fund within the meaning of Section 3(6) and (7) of ERISA, 29 U.S.C. § 1002(6)(7).  Newlon retired from Local 18 in or about March 2008.  Newlon is no longer employed by Bunn and his last day of employment was March 9, 2012.

Lantz is an employee of Bunn and "participant" in the Fund within the meaning of Section 3(6) and (7) of ERISA, 29 U.S.C. § 1002(6)(7).  Lantz's date of hire was April 6, 2009. Lantz first paid into the Fund's Health and Welfare Plan in April 2009.  Lantz is a member of Local 18.

Morgan is an employee of Bunn and "participant" in the Fund within the meaning of Section 3(6) and (7) of ERISA, 29 U.S.C. § 1002(6)(7).  Morgan's date of hire was July 9, 2009. Morgan first paid into the Fund's Health and Welfare Plan in July 2009.  Morgan is a member of Local 18.

Schau is an employee of Bunn and "participant" in the Fund within the meaning of Section 3(6) and (7) of ERISA, 29 U.S.C. § 1002(6)(7). Schau's date of hire was July 5, 2010. Schau first paid into the Fund's Health and Welfare Plan in October 2011.

Welch is an employee of Bunn and "participant" in the Fund within the meaning of Section 3(6) and (7) of ERISA, 29 U.S.C. § 1002(6)(7). Welch's date of hire was August 23, 2010. Welch first paid into the Fund's Health and Welfare Plan in August 2010. Welch was a member of Local 18 until April 2012.

The Fund is located in Columbus, Ohio and upon information and belief is organized for the benefit of workers throughout the state of Ohio. Upon information and belief, the Fund is the collective agent for the International Union of Operating Engineers, Local 18. The Fund administers a pension fund, a health and welfare plan, an apprenticeship fund and an education and safety fund which may be impacted by the matters set forth herein. The Fund is an "employee benefit plan" within the meaning of Section 3(3) and 502 of ERISA, 29 U.S.C. §§ 1002(3) and 1132.

## II.   FACTS

### A.   The Audit

Bunn is signatory to the Ohio Heavy Highway Agreement ("CBA") effective May 1, 2010 through April 30, 2013 between Local 18 and the Labor Relations Division of the Ohio Contractors Association.[1]   Local 18 is a labor organization with a geographic jurisdiction covering 85 counties in Ohio and four counties in Northern Kentucky, and is a "labor organization" under Section 301 of LMRA, 29 U.S.C. § 185. Under the terms of the CBA, "[f]ringe benefit contributions shall be paid…for all hours paid to each employee by the

---

[1] Bunn is also signatory to the Associated General Contractors ("AGC") of Ohio Building Agreement between the International Union of Operating Engineers Local 18 and its Branches, (AFL-CIO) and the Labor Relations of the AGC of Ohio.

Employer under this Agreement[.]" Per the terms of the CBA, the Fund is permitted to audit the books and records of any Employer obligated to make these contributions.

Bunn received two requests (October 2011 and November 2011) from the Fund requesting an audit of its payroll records from January 2008 to the present. On or about January 3, 2012 the Fund conducted an audit of Bunn's payroll records and on January 19, 2012 sent the results of its audit to Bunn ("first audit report"). Based upon its audit, the Fund determined that Bunn failed to pay certain fringe benefit contributions due to the Fund, as well as Union Administrative Dues which had been withheld from employees' wages but not remitted. Including late charge fees, the Fund determined that Bunn owed a total of $9,134.41 and if the Fund did not receive payment before February 15, 2012 more late charges would ensue.

On February 1, 2012 Bunn sent a letter to the Fund disputing the results set forth in the Fund's first audit report. Bunn instructed the Fund that the 177.5 hours noted in the Fund's first audit report for January 2008 was work performed by Newlon and was not covered work under the CBA. As such, no contributions were required. Bunn also noted that because the employee whose hours were in dispute was retired (Newlon), Bunn erroneously paid the required contribution benefits for any covered work Newlon did perform directly to Newlon, instead of the Fund. Bunn also disputed the late charge assessment. All told, Bunn asserted that it owed $4,107.88 in unpaid contributions and various Union Administrative Dues to the Fund, not $9,134.41.

On March 9, 2012, the Fund sent Bunn a second set of audit findings ("second audit report"). The Fund was now asserting that Bunn owed $51,297.53 in unpaid fringe benefit contributions, Union Administrative Dues and late fees. The Fund further asserted that if it did

not receive payment of $51,297.53 before March 15, 2012 additional late fees would be forthcoming.

On March 13, 2012, the Fund sent a letter to Bunn stating that it would not address the arguments set forth in Bunn's February 1, 2012 letter (Newlon did not perform covered work in January 2008) because the Fund's second audit report superseded the first audit report. The Fund also asserted that under the provisions of the CBA, Bunn is obligated to pay fringe benefit contributions for all hours worked by each employee, not just those hours performing covered work under the CBA.

On March 29, 2012, Bunn responded to the Fund's March 13, 2012 correspondence. Bunn reiterated that that the majority of the work performed by Newlon was not covered work as is expressly defined in the CBA. Bunn also noted that the CBA only requires fringe benefit contributions for all hours paid to each employee by the employer under the CBA, i.e. covered work.

### B.    <u>Delbert Newlon</u>

Newlon was an employee of Bunn for over thirty (30) years. Newlon retired from Local 18 in or about March 2008. Subsequent to his retirement from Local 18, Newlon remained employed with Bunn performing work not covered under the CBA such as farm work, errands and/or deliveries. Newlon has since left his employment with Bunn.

On October 12, 2011, Newlon received correspondence from the Fund notifying him that they had become aware that he may be working full time as an operating engineer while receiving pension benefits from the Fund. The Fund further requested certain documents from Newlon in order to verify that he was not working in excess of forty (40) hours per month.

On April 12, 2012, Newlon received correspondence from the Fund enclosing a check in the amount of $5,617.50 for his monthly premium from October 2008 through July 31, 2009. The Fund further asserted that due to the audit findings Newlon was no longer eligible for his pension effective July 31, 2009.  Consequently, Newlon has not received any payments from the Fund since that time.  As of December 2012 approximately $14,000 has been withheld from Newlon.

Admittedly, Newlon did perform limited covered work subsequent to his March 2008 retirement.  In August 2008, Newlon accumulated a total of fifty-two (52) hours of covered work while working on the U.S. Route 422 project in Geauga County and the Interstate 75 Duncannon Road Interchange.  In September 2008, Newlon accumulated a total of thirty-one (31) hours of covered work while working on the Interstate Route 71/State Route224/Interstate Route 76 project in Medina County and the Fairmont Connector Interchange projects in Marion County. In October 2008, Newlon accumulated a total of sixty-seven (67) hours of covered work while working on three separate projects.  Newlon performed covered work on the State Route 39 project in Tuscarawas County, the Interstate Route 71/State Route224/Interstate Route 76 project in Medina County and a project in Putnam County.  Newlon did not perform any other covered work in 2008.  In total, Newlon performed 150 hours of covered work in 2008.

Notwithstanding, the Fund asserts that Bunn owes fringe benefit contributions totaling $6,225.00 and local 18 administrative dues totaling $279.62 for 408.5 hours of work performed by Newlon in 2008.  Specifically, The Fund asserts Newlon performed 177.5 hours of work in January 2008, thirty-seven (37) hours of work in June 2008, 146.5 hours of work in August 2008, 137.5 hours of work in September 2008 and eighty-seven and one half (87.5) hours of work in October 2008.

In April 2009, Newlon accumulated a total 112.5 hours of covered work while working on the Interstate Route 77 project in Summit County.  In June 2009, Newlon accumulated a total of twenty-three (23) hours of covered work while working on the State Route 39 project in Tuscarawas County.  In July 2009, Newlon accumulated a total of forty-eight (48) hours of covered work while working on the Interstate Route 690 project in Lake County and The Ohio State University Airport Rehab S. Runway Ramp project.  Newlon did not perform any other covered work 2009.  In total, Newlon performed 183.5 hours of covered work in 2009.

However, the Fund asserts that Bunn owes fringe benefit contributions totaling $6,478.45 and local 18 administrative dues totaling $306.41 for 580 hours of work performed by Newlon in 2009.  Specifically, the Fund asserts Newlon performed 193 hours of work in April 2009, 105.5 hours of work in June 2009, eighty-seven and one half (87.5) hours of work in July 2009 and ninety-four (94) hours of work in September 2009.

Newlon did not perform any covered work in 2010.  Nevertheless, the Fund asserts that Bunn owes fringe benefit contributions totaling $10,640.25 and local 18 administrative dues totaling $357.00 for 894 hours of work performed by Newlon in 2010.  Specifically, the Fund asserts Newlon performed forty (40) hours of work in January 2010, 160 hours of work in February 2010, 160 hours of work in March 2010, 172.5 hours of work in April 2010 and 360 hours of work in May 2010.

In May 2011, Newlon accumulated a total of fifteen (15) hours of covered work while working on the Interstate Route 76 project in Medina County.  Newlon did not perform any other covered work in 2011.  In total, Newlon performed fifteen (15) hours of covered work in 2011.

Notwithstanding, the Fund asserts that Bunn owes fringe benefit contributions totaling $14,359.25 and local 18 administrative dues totaling $467.92 for 1,148.5 hours of work

8

performed by Newlon in 2011.  Specifically, the Fund asserts Newlon performed 170 hours of work in January 2011, 152 hours of work in February 2011, 149 hours of work in March 2011, 150 hours of work in April 2011, 135 hours of work in May 2011, 166.5 hours of work in June 2011, 186 hours of work in July 2011 and forty (40) hours of work in August 2011.

     C.     **Bunn Has Continued To Remit Monthly Contributions to the Fund For Covered Work**

Despite the disputed findings of the second audit report, Bunn has continued to remit its required contributions to the Fund for the employees who perform covered work under the CBA. On February 13, 2012, Bunn remitted contributions to the Fund in the amount of $2,197.88 for the employees who performed covered work under the CBA in January 2012.  On March 12, 2012, Bunn remitted contributions to the Fund in the amount of $2,428.92 for the employees who performed covered work under the CBA in February 2012.  On April 6, 2012, the Fund sent correspondence to Bunn acknowledging receipt of check # 11302 in the amount of $119.48 and check # 11304 in the amount of $2309.44, as well as Bunn's February 2012 report.  Rather than credit the payments for which they were intended, the Fund credited the payments towards the amount set forth in the second audit report notwithstanding Bunn's assertions that the second audit report was erroneous.

On April 12, 2012, Bunn sent correspondence to the Fund instructing them that the checks immediately referenced above were the contributions for hours of covered work performed in February 2012 by K.W. Bunn and Chad L. Karcher ("Karcher") and should be credited as such.  Bunn also directed the Fund not to credit any future contributions towards the disputed second audit report.   In crediting the payments towards the "delinquency" noted in the disputed second audit report rather than credit the payments towards the employees for which they were intended, K.W. Bunn and Karcher did not receive credit for hours worked with respect

to the Fund's Health and Welfare pension.  K.W. Bunn and Karcher subsequently lost their health insurance because the Fund continued to credit the payments towards the amount set forth in the second audit report.  Employee/participants Lantz, Morgan, Schau and Welch lost their health insurance benefits for the same reasons.  K.W. Bunn, Karcher, Lantz, Morgan, Schau and Welch have accumulated the necessary hours to remain eligible to receive health insurance benefits but for the Fund's withholding of all hours and crediting any and all contribution payments received by Bunn towards the amount listed in the second audit report.

On April 13, 2012, Bunn remitted contributions to the Fund in the amount of $3598.55 for the employees who performed covered work under the CBA in March 2012.  On May 15, 2012, Bunn remitted contributions to the Fund in the amount of $6502.00 for the employees who performed covered work under the CBA in April 2012.  On June 19, 2012, Bunn remitted contributions to the Fund in the amount of $8931.41 for the employees who performed covered work under the CBA in May 2012.  On or about July 15, 2012, Bunn remitted contributions to the Fund in the amount of $5404.99 for the employees who performed covered work under the CBA in June 2012.  On August 15, 2012, Bunn remitted contributions to the Fund in the amount of $12,696.48 for the employees who performed covered work under the CBA in July 2012.

On September 12, 2012, Bunn received a call from then current employee, Karcher. Karcher informed Bunn that the Fund's office in Columbus told him he needed to pay $299.00 for insurance coverage because his union hours were not being credited to him.  The last report the Fund's office had for Karcher's hours at that time was December 2011.  The Fund informed Karcher that all 2012 hours were being withheld due to the Newlon case.  Company records indicate Karcher had accumulated 673 hours to his credit from January 2012 through July 2012. Karcher is no longer an employee of Bunn.  Karcher has since been credited for all his hours

because he terminated his employment with Bunn and was subsequently reimbursed for money spent out of pocket to pay for his health insurance.

On September 17, 2012, Bunn remitted contributions to the Fund in the amount of $6,699.17 for the employees who performed covered work under the CBA in August 2012. On October 17, 2012, Bunn remitted contributions to the Fund in the amount of $6,341.71 for the employees who perform covered work under the CBA in September 2012. On November 13, 2012, Bunn remitted contributions to the Fund in the amount of $4,283.02 for the employees who perform covered work under the CBA in October 2012. On December 17, 2012, Bunn remitted contributions to the Fund in the amount of $886.35 for the employees who perform covered work under the CBA in November 2012.

On or about January 5, 2013, Bunn remitted contributions to the Fund in the amount of $224.10 for the employees who perform covered work under the CBA in December 2012. On January 15, 2013, the Fund sent correspondence to Bunn's Counsel (at that time) acknowledging receipt of check # 12608 in the amount of $834.12, check # 12609 in the amount of $52.23, check # 12667 in the amount of $12.26, check # 12669 in the amount of 211.84, as well as Bunn's November and December 2012 reports. Again, rather than credit the payments for which they were intended, the Fund again credited the payments towards the amount set forth in the second audit report notwithstanding Bunn's April request to refrain from doing so.

On February 12, 2013, Bunn remitted contributions to the Fund in the amount of $2960.36 for the employees who perform covered work under the CBA in January 2013. On March 13, 2013, Bunn remitted contributions to the Fund in the amount of $2265.60 for the employees who perform covered work under the CBA in February 2013. On March 20, 2013, the Fund sent correspondence to Bunn's Counsel acknowledging receipt of check # 12574 in the

11

amount of $193.20, check # 12756 in the amount of $2767.16, check # 12818 in the amount of $2118.40, check # 12819 in the amount of $147.20, as well as Bunn's January and February 2013 reports.  See, Exhibit MM attached hereto.  Yet again, rather than credit the payments for which they were intended, the Fund again credited the payments towards the amount set forth in the second audit report notwithstanding Bunn's April request to refrain from doing so.

## III.  <u>LAW AND ARGUMENT</u>

A temporary restraining order is an extraordinary remedy courts use to preserve the status between the parties until a trial on the merits can be carried out.  See, *Wilkins v. Daniels,* 2012 U.S. Dist. LEXIS 180321, *35 (S.D. Ohio 2012).   When determining whether to grant a TRO/preliminary injunction, the court must balance the following factors:

> (1)     whether the movant has shown a strong likelihood of success on the merits;
>
> (2)     whether the movant will suffer irreparable harm if the injunction is not issued;
>
> (3)     whether the issuance of the injunction would cause substantial harm to others; and
>
> (4)     whether the public interest would be served by the issuing the injunction.

Id. at *36.  These factors are to be balanced against one another and are not prerequisites which must be met.  The decision whether or not to issue a TRO/preliminary injunction falls within the sensible discretion of the court.  Id.  The essential question is whether the harm caused to the plaintiff without an injunction, in light of the plaintiff's likelihood of success on the merits, outweighs the harm the requested injunction will cause defendants.  See, *United Steelworkers, AFL-CIO v. Textron, Inc.,* 836 F.2d 6, 7 (1st Cir. 1987).   A party is entitled to a permanent injunction upon showing after a trial on the merits of a continuing irreparable injury if the court

does not issue the injunction, and the lack of an adequate remedy at law.  See, *Wilkins v. Daniels*, 2012 U.S. Dist. LEXIS 180321 at \*37.

**A.      There Is A Substantial Likelihood of Success That Plaintiffs Will Prevail On The Merits of Their Claim**

The Defendant, as noted in its March 13, 2012 letter to Bunn, has taken the position that Bunn is obligated to pay fringe benefit contributions for *all* hours worked by each employee, not just those hours performing covered work under the CBA.  Conversely, Plaintiffs assert that the CBA requires fringe benefit contributions for only the hours worked performing the type of work that is covered under the CBA.  Paragraph 35 of the CBA states as follows:  "Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer **under this Agreement**[.]"  (Emphasis added).  Necessarily, an Employer will only pay employees "under this Agreement" when the employees perform the type of work expressly outlined in Article I of the CBA.  Additionally, paragraph 3 set forth in Article II, *Provisions and Limitations*, of the CBA also limits contributions to covered work.  Paragraph 3 states:

> 3.      All members of the Labor Relations Division of the Ohio Contractors Association, and any person, firm or corporation who as an Employer becomes signatory to this Agreement, shall be bound by all terms and conditions of this Agreement as well as any future amendments which may be negotiated by the Labor Relations Division of the Ohio Contractors Association and the Union, and furthermore, shall be bound to make Health and Welfare payments, Pension payments, Apprenticeship Fund and Safety and Educational Fund payments required under Article V for all work performed within the work jurisdiction outlined in Article I of this Agreement, or any other payment established by the appropriate Agreement.

Article I of the CBA is entitled *Geographical and Industrial Scope of Agreement* and states as follows:

> 1.      The provisions of this Agreement shall govern the employment of and conditions under which employees shall work and rates of pay they shall receive on work as defined herein for all counties of the State of Ohio, except

Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

<div align="center">

**SCOPE**

</div>

2.    The word "work" when used herein means "Highway Construction, Airport Construction, Heavy Construction, Railroad Construction, Sewer, Waterworks and Utility Construction, Hazardous Waste Site Remediation, Industrial and Building Site, Power Plant, Amusement Park, Athletic Stadium Site and Pollution Control, Sewage Plant, Waste Plant and Water Treatment Facilities Construction" as hereinafter defined within the jurisdiction.

A.    "Highway Construction" work is defined as work performed to provide a facility to accommodate vehicular or pedestrian traffic and includes, but is not limited to, the construction of all streets, roads, expressways, turnpikes, bridges, drainage structures, grade separations, parking lots, rest areas, alleys, sidewalks, guardrails and fences, but shall not include construction of buildings.

B.    "Airport Construction" work is defined as including site preparation, grading, paving, drainage, fences, sidewalks, driveways, parking lots and similar work incidental to the construction of airfields, but shall not include the construction of buildings.

C.    "Heavy Construction" work is defined as including, but not limited to, excavation for underground garages, grade separations, foundations, abutments, retaining walls, shafts, tunnels, subways, elevators, drainage projects, flood control projects, reclamation projects, reservoirs, water supply projects, pedestrian tunnels, water development projects, hydroelectric development, utility transmission lines, including right-of-way clearing, demolition of buildings on a highway right-of-way, locks, dams, dikes, levees, revetments, channels, channel cutoffs, intakes, dredging projects, jetties, breakwater, docks, harbors and all municipal and utility construction, except construction classified as building construction, and including hazardous waste site remediation work.

D.    "Railroad Construction" work is defined as new construction including grading, drainage, placing of rails, crossties, ballast and the construction of bridges and other incidentals for railroads, street railways construction projects and rapid transit system projects, but shall not include the construction of buildings.

E.    "Sewer, Waterworks and Utility Construction" work is defined as including construction of all storm sewers, sanitary sewers, supplying of all storm sewers, sanitary sewers, supplying and distributing waterlines, gas lines, telephone and television conduit, underground electrical lines and similar utility construction.  Main waterline and trunk sewers connecting water works and/or sewage disposal plants are included within this definition.

F.     "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level, but shall not Include the actual excavation for the buildings for foundations and footers on the construction of buildings.

G.     "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line but outside the actual building construction. Such work shall include, but is not limited to, the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit, underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site, but shall not include the actual excavation for the buildings, foundations or footers in construction of the buildings.

H.     "Pollution Control, Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

L     Any work under F, G and H above, the Employer shall pay a rate determined by the Operating Engineers Building.  Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

Similarly, the Building Agreement sets forth the defined scope of work in Article I.

Article I is entitled *Geographical Jurisdictional Area* and states as follows

1.     The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2.     All counties in the State of Ohio except Ashtabula, Cuyahoga, Erie, Geauga, Huron, Lake, Medina, Lorain, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3.     "Building Construction work is defined as the erection and construction of building structures, including modifications thereof, or additions

15

or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

The Scope of Work in the Building Agreement is comprised of "Industrial and Building Site" work, "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work and "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work. The description of the work is identical to that already set forth above. Accordingly, Employers are not required to pay fringe benefit contributions for hours worked by employees performing work not covered under the agreement. The U.S. Court of Appeals for the Sixth Circuit agrees.

In *Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.,* 30 F.3d 692, 695-696 (6th Cir. 1994) the Court concluded that when an Employer fails to maintain adequate records that would allow the plan to determine the benefits due or which may become due to such employees as is required by 29 U.S.C. § 1059, the burden shifts to the Employer to prove what work was covered under the agreement and what work was not covered. Thus, under *Grimaldi*, an Employer is potentially liable for contributions on all hours worked during a period in which it is demonstrated some covered work is performed if, as a result of poor record keeping it is impossible to determine the amount due. Id at 697. Nevertheless, *Grimaldi* does not stand for the proposition that if an Employer fails to keep adequate records as reflected by 29 U.S.C. § 1059, the Employer is automatically liable for contributions on all hours worked. See, *Trustees for Michigan BAC Health Care Fund v. Spencer*, 2008 U.S. Dist. LEXIS 117014, *8 (E.D. Mich. 2008). Consequently, "[e]vidence that falls short of the clarity and specificity required by § 1059, but nonetheless allows the number of covered hours to be discerned, satisfies the burden." Id.

Bunn's records were more than adequate to determine the amount owed to Newlon for the covered work he performed as noted in the certified payroll reports and monthly contribution reports remitted to the union.  At the very least, *Grimaldi* provides an Employer the opportunity to prove the amount of covered work performed by a given employee versus the amount of work performed that is not covered.  Accordingly, the Funds proclamation in its March 19, 2012 correspondence to Bunn that Bunn is required to pay contributions for all hours worked by each employee is not accurate and should not be the basis to withhold insurance benefits and monthly pension benefits.

The District Courts have both recognized and followed the burden shifting approach set forth in *Grimaldi*.  In *Plumbers Local 98 Defined Benefit Pension Fund v. M & P Master Plumbers of Michigan, Inc.*, 608 F.Supp.2d 873, 881 (E.D. Mich. 2009), Judge Rosen, citing *Grimaldi* as "Sixth Circuit precedent," recognized an Employer's right to dispute the Fund's allegations of delinquent contributions by producing evidence that the work was not covered under the CBA.  Likewise, in *Trustees for Michigan BAC Health Care Fund v. Spencer*, *supra,* the Court determined that evidence proffered by the Employer (daily planner, Employer affidavit and Employer self-audit) was sufficient to satisfy its burden under *Grimaldi* and create a question of fact regarding the amount of covered work for which contributions are owed.[2]

In *Trustees of the Northwestern Ohio Plumbers and Pipefitters Pension Plan v. Helm and Associates,* 2012 U.S. Dist. LEXIS 93446 (N.D. Ohio 2012), the pension plan sought to rely upon *Grimaldi* and hold the Employer liable for the entire amount calculated in its audit because

---

[2] There are two opinions originating from this Court finding that an Employer must contribute for all hours worked by an employee if he splits time between work covered under the CBA and work not covered under the CBA.  See, *Noe v. R.D. Jones Excavating, Inc.,* 787 F. Supp. 759 (S.D. Ohio 1992) and *Orrand, et al. v. Shope,* 2002 U.S. Dist. LEXIS 28766 (S.D. Ohio 2012).  Notably, *Noe* was decided two (2) years prior to *Grimaldi*.  *Orrand*, in turn, relied upon *Noe* (and did not even mention *Grimaldi*) in denying the Employer the opportunity to put on evidence that the employee in question did not perform covered work.  As noted above, *Grimaldi* is Sixth Circuit precedent and, as such, *Noe* and *Orrand* hold no precedential value in this case.

17

the Employer had failed to maintain adequate records as required by 29 U.S.C. §1059. The Court ultimately determined that even though the Employer's daily reports were "sometimes incomplete, vague, blank or otherwise inadequate to calculate liability with mathematical exactness, they do provide enough information from which a reasonably certain calculation can be made, and they do provide detailed information about the vast majority of Defendant's total work hours during the audit period." Id. at 16. The Court further noted that even though the Employer's records allowed for a reasonably accurate calculation, the pension fund's audit was excessive and not fully credible. Id. Ultimately, the court conducted its own audit using the documents submitted at trial and ordered the Employer to pay $52,735.63 in delinquent contributions, interest and liquidated damages to the pension plan, an amount significantly lower than the $399,305.13 figure noted in the pension plan's audit. The court reasoned as follows:

> Case law suggests a mathematically precise number is not necessary so long as there is reasonable data from which the amount of damages can be ascertained with reasonable certainty. And unlike in *Grimaldi*, in this case it is not utterly impossible to determine with reasonable certainty the extent of Defendant's liability using the records Defendant kept.
>
> *****************************************************************
>
> In sum, because Plaintiff's Audit Report is mostly unreliable, the Court believes holding Defendant liable for the entire amount calculated by the Audit Report would be unjust and contrary to the backbone premise of *Grimaldi* -- that ERISA plans be enabled to collect what they are actually owed at the cost of sometimes collecting more when Defendant's failure to meet a statutory obligation deprives them of the ability to calculate their actual damages. Moreover, despite the flaws and incompleteness of the daily reports, Plaintiffs have not shown the kind of manifest failure to maintain adequate records that the court found in *Grimaldi*. But unlike cases where the amount of covered work could not be determined without reliance upon an audit, here the amount of covered work performed by covered employees can be determined with reasonable certainty using the evidence admitted at trial. The Court has therefore undertaken its own calculation and determined an amount owed based on the daily reports, the testimony presented at trial, and the hourly contribution rates used in the Audit Report.

Id. at 18-20. (Internal quotations and citations omitted). Bunn has provided more than enough evidence such that there is reasonable data from which the amount of damages can be ascertained with reasonable certainty. Newlon performed limited covered work as expressly illustrated by the certified payroll reports and monthly contribution reports remitted to the union. Nonetheless, the Fund's audit is unreasonable and unreliable. For instance, the Fund alleges that Newlon performed 360 hours of work in May 2010, meaning Newlon worked 11.6 per day including Saturdays and Sundays. Additionally, Newlon performed only fifteen (15) hours of covered work in 2011, yet, the Fund is demanding contributions for 1,148.5 hours of work.

**B.     Plaintiffs Will Be Irreparably Harmed Absent a Temporary Restraining Order**

Defendant is seeking contributions for all hours worked by Newlon. Accordingly, Defendant asserts that Bunn owes delinquent contributions with respect to those hours. Bunn has continued to remit monthly contributions for all of its employees who perform covered work. Nonetheless, rather than credit the individuals for whom the contributions were made, the Fund is applying these contribution payments towards the findings of the disputed audit. In doing so, individual Plaintiffs have been denied medical benefits for which they are otherwise eligible to receive. Similarly, Newlon is being denied monthly pension premiums even though Bunn has submitted records enabling the Fund to determine the proper amount of covered work he has performed and, therefore, determine his eligibility to receive monthly pension payments.

Irreparable injury is an injury for which a monetary award is not adequate. See, *Chartier v. J & F Management Corp.,* 1992 U.S. Dist. LEXIS 17853, *12 (S.D. N.Y. 1992). The harm must be actual and imminent. Id. Courts have regularly held the loss of medical benefits establishes "irreparable harm." For example, in *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2nd Cir. 1979) the court concluded that "the threatened termination of benefits such as medical coverage

19

for workers and their families obviously raises the specter of irreparable injury." In *Whelan*, the Employer trustees blocked the payment of medical and welfare benefits by the Fund to striking employees. Id at 1061. The union designated trustees sought injunctive relief and the court subsequently granted the requested injunction. Id.

In *United Steelworkers of America v. Textron, Inc.*, 826 F. Supp.2d 6 (1st Cir. 1987) the court upheld the District Court's issuance of a preliminary injunction. The court stated as follows:

> Neither Textron nor JL has paid medical insurance premiums for approximately 200 retired Waterbury Division workers. Suppose we take this specific, undisputed, fact and add general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm; such general facts as (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life. *See, e.g., Zotto v. Scovill, Inc.*, Slip Op. No. 85-494 (D. Conn. Nov. 7, 1985) ("a reduction in medical benefits 'establishes the threat of irreparable harm' because 'the practical effect of the reductions could well be to preclude retirees from seeking needed medical treatment'"); *United Steelworkers of America, AFL-CIO v. Fort Pitt Steel Casting, 598 F.2d 1273, 1280 (3d Cir. 1979)* ("surely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute 'substantial and irreparable injury'"); *Whelan v. Colgan, 602 F.2d 1060, 1062 (2d Cir. 1979)* ("the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury."). We should then conclude that retired workers would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities (in order to keep up in insurance payments). In short, taken together, these facts would show harm that, in this sort of case, is 'irreparable.'

Id. at 8. (Quotations and citations in original). See also, *Mamula v. Satralloy, Inc.,* 578 F. Supp. 563, (S.D. Ohio 1983) (In granting employees' motions for preliminary injunction Court noted that persons on limited incomes who are not covered by health insurance often forego needed medical attention and being denied health insurance which was promised under the CBA results

in harm that is not readily measurable, but clearly present.)  Bunn has remitted the required monthly contributions, but the Fund continues to block the men's health and welfare benefits.

### C.    The Balance of Harm Strongly Favors the Plaintiffs

The Fund is denying health insurance benefits to Plaintiffs even though Bunn is remitting the required contributions on their behalf as is required by the CBA.  Rather than credit the individuals for whom the contributions were made, the Fund is applying these contribution payments towards the findings of the disputed audit.  There is only one employee (Newlon) whose hours are in dispute and he is suffering the consequences by not receiving much needed monthly pension premiums despite the fact he has regained eligibility under the terms of the plan.  Additionally, once Karcher terminated his employment with Bunn he regained his health insurance benefits and was subsequently reimbursed for any out of pocket/personal expenses to pay for health insurance.  It would appear that the Fund is attempting to exert external pressures upon Bunn to pay the disputed amount listed in the second audit report by unlawfully withholding insurance benefits to Bunn employees.  Accordingly, the Fund continues to harm Bunn's current employees due to a dispute over the hours of a retired member of Local 18.  Lastly, the Fund should be crediting the monthly payments towards the employees for which the contributions are intended.  See, *Operating Engineers Local 324 Health Care Plan v. Dalessandro Contracting Group, LLC*, 2012 U.S. Dist. LEXIS 32551, *20 (E.D. Mich. 2012) (The court concluded that the Fund's "audit must calculate Defendant's owed contributions on a monthly basis and the audit must account for [Employer's] timely payments made on behalf of an employee in that given month").  The Fund will suffer no harm in reinstating the health insurance benefits as it continues to receive monthly contributions for these employees.

D.    **The Public Interest Favors Granting a Temporary Restraining Order**

Plaintiffs have a contractual right to health insurance per the terms of CBA.  The Plaintiffs have abided by those terms by working the requisite hours and remitting the necessary monthly contributions in order to obtain and retain eligibility.  Granting Plaintiffs the requested injunction will deter this Fund and others from unlawfully withholding health insurance benefits from persons who are otherwise eligible to receive them.

IV.    **CONCLUSION**

For the reasons outlined above, Plaintiffs respectfully request that this Court grant the temporary restraining order in its entirety.

Dated this 16th day of April, 2013.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Ronald L. Mason
Ronald L. Mason (0030110)
(Trial Attorney)
Aaron T. Tulencik (0073049)
Mason Law Firm Co., L.P.A.
425 Metro Place North, Suite 620
Dublin, Ohio 43017
t: 614.734.9450
f:  614.734.9451
rmason@maslawfirm.com
atulencik@maslawfirm.com

*Counsel for Plaintiffs*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2013, I electronically filed the foregoing with the clerk of Court using the CM/ECF system which will send notification of such filing to all counsel registered to receive electronic notices, and I hereby certify that I have sent, via First Class U.S. Mail and e-mail to the following:

Mr. Bryan C. Barch, Esq.
Ohio Operating Engineers Fringe Benefit Programs
1180 Dublin Road
P.O. Box 120009
Columbus, Ohio 43212-0009
BryanBarch@ooefbp.com

*In-House Counsel for Defendants*

/s/ Aaron Tulencik
Aaron Tulencik (0073049)