**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **BUNN ENTERPRISES, INC.,** *et al*. | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:13-CV-357** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **OHIO OPERATING ENGINEERS** | : | **Magistrate Judge Terence P. Kemp** |
| **FRINGE BENEFIT PROGRAMS,** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter is before the Court on Plaintiffs' request for preliminary injunction, (Doc. 10). For the reasons set forth below, Plaintiffs' Motion is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

### A. Factual Background

Plaintiff Bunn Enterprises, Inc. ("Bunn") is an employer under both the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, *et seq.*, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002, *et seq*. Bunn is signatory to, among other collective bargaining agreements, the Ohio Heavy Highway Agreement (the "CBA"), P. Ex. A,[1] with the International Union of Operating Engineers Local 18 and its various branches ("Local 18"). By the terms of the CBA, Bunn Enterprises pays "fringe benefit contributions" for hours worked by its employees into Defendant Ohio Operating Engineers Fringe Benefit Programs ("Defendant" or the "Fund"), an ERISA fund for Local 18 members. *Id*., Article V, ¶¶ 34-41.

---

[1] "P. Ex." refers to Plaintiff's Exhibits admitted into evidence at the May 2-3, 2013 Preliminary Injunction hearing. "D. Ex." refers to Defendant's Exhibits admitted into evidence at the same proceeding.

The Fund administers the Ohio Operating Engineers' benefits pursuant to the Ohio Operating Engineers Health and Welfare Plan, as amended August 1, 2011 (the "Plan"). D. Ex. 1. Plaintiff Kevin W. Bunn ("K.W. Bunn") is the owner of Bunn Enterprises, as well as a participant in the Plan. Plaintiffs Delbert G. Newlon ("Newlon"), Daniel J. Lantz ("Lantz"), Mark A. Morgan ("Morgan"), Michael S. Schau ("Schau") and David E. Welch ("Welch") are current or former employees of Bunn, as well as current or former participants in the Plan.

<u>1. Benefit Eligibility Rules</u>

Under the Plan, employees become eligible for various health and pension benefits once the Fund has received employer contributions for a certain number of hours worked. These eligibility rules are incredibly complex.

For example, Class 1 members – those working for contributing employers within the geographic and work jurisdiction of Local 18 – gain initial eligibility for benefits on the first day of the calendar month following the month in which the 450th hour of employer contributions is credited to his or her record within a period of 12 consecutive months. Once initially eligible, a Class 1 member can retain eligibility by meeting any one of a number of thresholds. Continued eligibility for any given month can be achieved, for instance, by being credited with at least 225 hours in the first 3 months of the 4 preceding months or 900 hours in the first 12 of the 13 preceding months. A Class 1 member can also earn eligibility for a 12-month period beginning August 1, if he or she has accumulated 1,200 hours during the 12-month period ending on the preceding May 31, 2012. Other rules govern the reinstatement of Class 1 members whose eligibility has lapsed. D. Ex. 1 at 6.

The Plan also provides that a member who has been previously eligible can make up a shortfall in employer hours during a particular period by remitting self-contributions in the amount necessary to maintain his or her eligibility. *Id*.

### 2. 2011 Audit and Resulting Deficiency

Following an audit in late 2011, Defendant informed Bunn that it owed the Fund more than $51,000 in unpaid contributions. *March 9, 2012 Billing Letter*, P Ex. G. Bunn does not dispute approximately $4,000 of the cited deficiency, and, as of May 2, 2013, has paid that amount.  K.W. Bunn Test.[2] Bunn does, however, contest the Fund's findings with respect to the other monies allegedly owed, the bulk of which arise from Bunn's nonpayment of contributions for certain hours worked by Newlon.

Bunn asserts that, with respect to the disputed hours, Newlon did not perform work covered by the CBA. Therefore, in Bunn's view, it is not required to make contributions for those hours.  It is the Fund's position that the CBA requires an employer to pay fringe benefit contribution for all hours worked by a particular employee, irrespective of the nature of the work performed.  Bunn has refused to remit the remainder of the unpaid balance cited by the Fund. Because these funds have not been paid, Newlon has not been credited with the hours necessary to qualify him for pension benefits.  Newlon alleges that approximately $14,000 in monthly pension benefits have been withheld from him as a result.

---

[2] This refers to the testimony of Kevin W. Bunn, as given at the preliminary injunction hearing held on May 2-3, 2013.

<u>3. Oldest Outstanding Balance Policy</u>

Where an audit finds deficiencies in employer contributions, it is the Fund's policy to apply future employer contributions to the oldest outstanding balance.  Glenn Test;[3] Wilkins Test.[4] The Fund explains that this policy (the "Oldest Outstanding Balance Policy" or the "Policy") has been in place since the inception of the Fund and is intended to operate as a neutral, uniform system of crediting hours to employees.  This approach, in the Fund's view, is necessary to avoid giving the employer or the Fund the power to "pick and choose" which employees get credit and which do not.  Wilkins Test. Although not explicitly authorized in the provisions of the CBA or the Plan, the Fund contends that the Fund trustees have instituted the Policy pursuant to their fiduciary responsibilities under ERISA.

In this case, the Fund has implemented the Policy to apply all of Bunn's contributions to the alleged Newlon deficiency, irrespective of whether Bunn identified such payments as corresponding to other employee hours.  In particular, Bunn's contributions on behalf of Morgan, K.W. Bunn, Lantz, Shau and Welch have not been credited to those individuals.  Glenn Test.

### a. Mark Morgan

Mark Morgan is a current Bunn employee.  Although Morgan previously received health insurance through the Fund, the Fund has determined that he is not currently eligible for such benefits.  Morgan Test.[5] Based on his conversation with an unnamed Fund employee, Morgan believes that he would have eligible but for the Fund's refusal to credit Bunn's contributions to

---

[3] This refers to the testimony of Amanda Rae Glenn, the Fund's Contributions Department Supervisor, as given at the preliminary injunction hearing held on May 2-3, 2013.
[4] This refers to the testimony of Carol Wilkins, the Fund's Assistant Administrator, as given at the preliminary injunction hearing on May 3, 2013.
[5] This refers to the testimony of Mark A. Morgan, as given at the preliminary injunction hearing held on May 2-3, 2013.

him. *Id.* Morgan testified that he has worked approximately 285 hours for which he has not been credited by the Fund.

In July 2012, the Fund sent Morgan a letter informing him that he would be ineligible for coverage as of August 2012 due to insufficient employer contributions. *July 2012 Self-Pay Letter*, D. Ex. 2. The letter indicates that Morgan needed 4 additional hours worth of contributions in order to qualify for coverage. *Id.* Accordingly, had Bunn's contributions to the Fund been credited to Morgan for the preceding period, he would have been eligible for benefits. Glenn Test. Subsequently, another operating engineers local transferred to the Fund employer contributions it had collected for hours worked by Morgan in its jurisdiction. *July 2012 Self-Pay Letter*, D. Ex. 2. The transferred amounts were sufficient to re-qualify Morgan for health benefits and his coverage was extended. Glenn Test.

In January 2013, the Fund sent Morgan another letter, informing him that he would be ineligible for coverage as of February 2013, again due to insufficient employer contributions. *January 2013 Self-Pay Letter*, D. Ex. 2. The January letter indicated that Morgan needed an additional 66.74 hours worth of contributions to qualify him for coverage. *Id.* Although the Fund once again received a transfer of employer contributions for Morgan from another local, the amount was not sufficient to make Morgan eligible. *Id.*; Glenn Test. Morgan's health benefits were terminated as of February 2013. Glenn Test. The parties dispute whether Morgan would now be eligible for benefits were he credited with Bunn contributions made on his behalf.

Morgan did not initiate any administrative appeal to challenge the Plan's eligibility decision. Morgan Test. He also declined to make self-pay contributions to Fund to make up for the shortfall in employer contributions, and declined to buy into Cobra for health coverage. *Id.*

### b. Michael Shau

Shau is a current Bunn employee.  He is not, however, a member of Local 18.  Shau

Test.[6] Accordingly, he is currently receiving health care coverage through his home local's

health and welfare fund, rather than through the Fund. *Id*.; D. Ex. 3. To get credit with his home

fund for hours worked in Local 18's jurisdiction, the Fund must transfer contributions received

on Shau's behalf to Shau's home fund. Glenn Test.; Shau Test. Shau estimates that Bunn has

made 115 hours worth of contributions to the Fund on his behalf, which have not been credited

to him nor transferred to his home fund.  Shau contacted the Fund to transfer his Local 18 hours

to his home fund, but did not fill out or submit any of the transfer forms required by the Fund to

make such a transfer.  Glenn Test.; Shau Test.

Shau estimates that, under his home fund's rules, 115 hours of credit would garner him

approximately one additional month of eligibility. Moreover, because a higher number of

threshold hours is required to reinstate eligibility than to continue eligibility, Shau asserts that –

should his eligibility lapse – the resulting gap in coverage has the potential to be much more than

a month.  Shau has not received any indication from his home fund that his benefits will be

terminated in the near future. Shau Test.

### c. Danny Lantz

Lantz is a former employee of Bunn Enterprises, and retired in January 2013.  Lantz

received health insurance through the Fund on the basis of qualifying employer contributions

through July 2012. Lantz Test.[7] In July 2012, received a letter from the Fund informing him that

he would be ineligible for benefits as of August 2012 due to in sufficient employer contributions.

*July 16, 2012 Self-Pay Letter*, D. Ex. 4.   The July letter indicated that Lantz needed an

---

[6] This refers to the testimony of Michael Shau, as given at the preliminary injunction hearing held on May 2-3, 2013.
[7] This refers to the testimony of Daniel Lantz, as given at the preliminary injunction hearing held on May 2-3, 2013.

additional 66 hours worth of contributions to qualify him for continued coverage. *Id*.  Lantz chose to make self-contributions to make up the employer shortfall and thereby continued to receive health benefits through the Fund.  Lantz testified that he paid the Fund $439.57 in July 2012, $1,058.94 in August 2012, and $1,498.50 in November 2012.  Lantz Test; *see also* D. Ex. 4.  These payments were made from Lantz's Plan medical reimbursement fund, a fund which is generally used to cover miscellaneous uncovered medical expenses, such as glasses and contact lenses. Lantz Test. Some of portion of those payments was refunded due to contributions transferred to the Fund on Lantz's behalf from other local's fund. D. Ex. 4. Nevertheless, Lantz testified that these self-contributions have largely used up Lantz's medical reimbursement fund reserves. Since retiring, Lantz has maintained his health care coverage through a $350 deduction from his monthly pension payment. *Id*. Lantz is not currently at any risk for losing his health coverage. *Id*.

Lantz asserts that, were he credited with the hours Bunn had paid on his behalf, he would have health insurance through July 2013, without any cost to himself. *Id*. The Fund's representative, however, testified that if the Bunn hours had been credited to Lantz in full, his coverage would not have extended past March 31, 2013.  Glenn Test.  The Fund concedes that, were Lantz credited with employer contributions for all hours worked for Bunn, he would be entitled to a refund in the full amount of those contributions. *Id*.

### d. Kevin Bunn

Kevin W. Bunn is the owner of Bunn, as well as a member of Local 18.  K.W. Bunn Test.[8] He currently has healthcare coverage through the Fund and will continue to be eligible through July 31, 2013. Glenn Test.  K.W. Bunn previously qualified for a full year of coverage

---

[8] This refers to the testimony of Kevin W. Bunn, as given at the preliminary injunction hearing held on May 2-3, 2013.

7

because he worked 1,200 hours in the preceding qualifying 12-month period.  K.W. Bunn Test. K.W. Bunn estimates that, under the Policy, he has not been credited for 1,000 hours' worth of contributions.  He asserts that, as a result, he will not be eligible to receive a subsequent year of coverage under the 1,200-hour rule.

### e. David Welch

Welch alleges also alleges that, under the Policy, Defendant has not credited him for certain hours for which Bunn made contributions on his behalf.  Based on representations made to the Court at the Rule 65.1 Conference on Plaintiffs' motion for temporary restraining order, it appears that Welch is no longer employed by Bunn and thus is not currently eligible to receive health care benefits through the Fund.  No new evidence was presented as to Welch at the preliminary injunction hearing.

### B. Procedural History

On April 16, 2013, Plaintiffs filed a verified complaint asserting claims against the Fund for Declaratory Judgment and a Preliminary and Permanent Injunction. Specifically, Plaintiffs seek declaratory judgment that the CBA does not require contributions for all hours worked, but rather only those hours performing the covered work specified in the CBA.  They also seek declaratory judgment that the Fund may not withhold hours and/or benefits from K.W. Bunn, Lantz, Morgan, Schau and Welch by crediting Bunn contributions intended for them to the Newlon deficiency.

Simultaneously, Plaintiffs moved for a Temporary Restraining Order ("TRO") against the Fund, seeking, *inter alia*, to: (i) enjoin Defendants from seeking contributions for all hours worked by each employee;  (ii) order Defendant to seek contributions for only those hours in which employees perform covered work under the CBA; (iii) enjoin Defendant from withholding

pension benefits to Plaintiff Newlon; (iv) order Defendant to reimburse Newlon the withheld pension payments; and, (v) enjoin Defendant from withholding health insurance benefits to Plaintiffs K.W. Bunn, Lantz, Morgan, Schau and Welch. (Doc. 2.)  On April 24, 2013, this Court held a conference pursuant to Local Rule 65.1, in which counsel for both parties participated. On April 25, this Court granted in part and denied in part Plaintiffs' motion. (Doc. 8.) Specifically, this Court enjoined Defendant from withholding certain health insurance benefits, but denied the other requested injunctive relief on the grounds that Plaintiffs' had not demonstrated irreparable harm. (*Id*. at 4.) The Court also scheduled a preliminary injunction hearing and ordered the parties to submit simultaneous opening and responsive briefs.

On April 26, 2013, Plaintiffs' submitted their opening preliminary injunction briefing in which they moved that the Court provide the following injunctive relief: (1) Enjoin Defendants from seeking contributions (past and future) for all hours worked by each employee; (2) Order Defendant to seek contributions (past and future) for only those hours in which employees perform covered work under the CBA; (3) Enjoin Defendants from crediting contributions (past and future) towards the alleged delinquent amount in dispute (4) Order Defendant to credit the contributions (past and future) towards the employees for whom the contributions were made; (5) Enjoin Defendant from withholding health insurance benefits to Lantz, Morgan, Schau and Welch; and (6) Order Defendant to reimburse Plaintiffs Lantz, Morgan, Schau and Welch the amount of money each was required to pay out of pocket to maintain the health insurance benefits Defendant unlawfully withheld. (Doc. 10.)

On May 2 and 3, 2013, this Court held a preliminary injunction hearing in which both parties participated.  The preliminary injunction matter is, therefore, ripe for review.

## II. STANDARD OF REVIEW

A preliminary injunction is a remedy used by the court to preserve the status between the parties pending trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). When determining whether to grant a preliminary injunction, this Court must balance the following four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). These factors are to be balanced against one another other and should not be considered prerequisites to the grant of a preliminary injunction. *United Food & Commercial WorkersUnion, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). As an extraordinary remedy, a preliminary injunction is to be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

## III. LAW AND ANALYSIS

### A. Likelihood of Success on the Merits

The first factor of the preliminary injunction analysis considers the movant's likelihood of success on the merits.  "At the preliminary injunction stage, 'a plaintiff must show more than a mere possibility of success,' but need not 'prove his case in full.'" *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 1997) (citations omitted)). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate

10

investigation." *Id*. (alterations original) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,* 119 F.3d 393, 402 (6th Cir. 1997)).

<u>1. Whether Contributions Required for All Hours Worked</u>

Plaintiffs argue that Bunn is not, under the terms of the CBA, required to make contributions for employee hours where the work performed is not of the type covered by the CBA. The Fund asserts that an employer is required to make contributions for all employee hours, irrespective of the type of work performed.

The CBA, in paragraph 35 of Article V, *Fringe Benefit Programs*, provides:

> Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

This precise CBA language has come before this Court on several occasions, and this Court has repeatedly held that fringe benefit contributions are required for all hours worked by covered employees, even if some of those hours are spent performing non-covered work. As this Court explained in *Orrand v. Shoppe*, No. 2:00-cv-1161, 2001 WL 1763437, at * 2 (S.D. Ohio Jan. 30, 2001),

> The language of the [CBA] strongly supports [the Fund's] position. It requires fringe benefit[] [contributions] to be made for 'all hours paid to each employee by the employer' without making a distinction between hours paid for covered employment and hours paid for other work. If an employer were entitled to receive a reduction in the amount of benefits paid based upon hours spent in non-covered work, and it were the sole arbiter of what type of work was performed and its records were the only source of that information, it would be exceedingly difficult for a fund to dispute an employer's allocation of hours between covered and non-covered work, and it would therefore be possible for an employer to skew its records in such a way as to minimize its contributions. By providing that benefits are due for all hours worked and paid, whether for covered or non-covered work, the ability to manipulate the facts is reduced or eliminated, and the audit process is much simpler. Of course, these benefits would not permit the

> Court to rewrite the parties' agreement, but the language in this agreement appears unambiguously to obligate the employer to make contributions for all hours paid.

*See also Noe v. R.D. Jones Excavating*, 787 F. Supp. 759, 765 (S.D. Ohio 1992) (holding employer "obligated to contribute to the Fringe Benefit Funds based on all the hours worked by the employees, no matter the totality of their assignments"); *Orrand et al. v. Keim Concrete Pumping*, No. 2:08-cv-1046, 2010 WL 3447647, at *16 (S.D. Ohio Aug. 30, 2010) ("The language of the CBAs is clear that fringe benefit contributions are to be made for all employees performing work covered by the CBA for all hours paid."); *Orrand et al. v. Maintenance Unlimited, Inc.*, No. 2:96-cv-766, at 4-5 (S.D. Ohio Feb. 25, 1998) ("[A] signatory employer is required to pay fringe benefit contributions in connection with all hours worked and paid, even for non-covered hours.").

Plaintiffs also assert that the CBA limits contributions to covered work in paragraph 3 of Article II, *Provisions and Limitations*.[9] Plaintiffs' reliance on this provision is misplaced. Although Paragraph 3 operates to bind signatory employers to make the required fringe benefit contributions, the scope of the hours for contributions are required is defined in Article V, *Fringe Benefit Programs*. As discussed above, the language of that section is clear that contributions must be made for "all hours worked" by an employee covered by the CBA.

---

[9] Paragraph 3 states:

> All members of the Labor Relations Division of the Ohio Contractors Association, and any person, firm or corporation who as an Employer becomes signatory to this Agreement, shall be bound by all terms and conditions of this Agreement as well as any future amendments which may be negotiated by the Labor Relations Division of the Ohio Contractors Association and the Union, and furthermore, shall be bound to make Health and Welfare payments, Pension payments, Apprenticeship Fund and Safety and Educational Fund payments required under Article V for all work performed within the work jurisdiction outlined in Article I of this Agreement, or any other payment established by the appropriate Agreement.

12

Finally, Plaintiffs cite *Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692 (6th Cir. 1994), for the proposition that employers are not required to pay fringe benefit contributions for hours worked by employees performing any type of work which is not covered by the agreement. In that case, the Sixth Circuit held that, where an employer fails to maintain adequate records to allow a plan to determine the type of work performed, the burden shifts to the employer to demonstrate that the particular work was not covered. *Id.* at 695-96. As Defendant points out, however, the content of the CBA at issue in *Grimaldi* differed significantly from that issue here; indeed, in *Grimaldi*, "[t]he parties [] stipulated that driveway and sidewalk work was covered by the agreement, and [] also stipulated that contributions were not required for other concrete-pouring work." *Id.* at 694. Nothing in *Grimaldi* stands for the proposition that a CBA may not require contributions for both covered and non-covered work. Accordingly, Bunn is not likely to succeed on the merits of its argument that, under the CBA, and employer is not required to make contributions for all employees hours worked.

In addition, although Bunn disputes the nature of the work performed by Newlon, Bunn does not dispute that Newlon worked those hours in its employ. Therefore, Bunn in not likely to succeed on the merits of its argument that it does not owe the monies cited by the Fund in the audit. Finally, Bunn does not dispute that it has not made contributions to the Fund for Newlon's purportedly non-covered hours. Accordingly, to the extent that Newlon asserts that the Fund should have credited him for the hours cited in the audit such, thereby making him eligible for pension benefits, he is unlikely to succeed on that argument.

<u>2. Allocation of Contributions Under the Policy</u>

A participant in or beneficiary of an ERISA plan may bring a civil action "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Likewise, a participant or beneficiary may bring a civil action to enjoin any act or practice that violates ERISA or the terms of the plan, or obtain other appropriate equitable relief.  29 U.S.C. § 1132(a)(3).  Here, the individual plaintiffs challenge the Fund's Policy of applying employer contributions to the oldest outstanding balance identified with that employer – here, the Newlon deficiency.

### a. Administrative Exhaustion

As a threshold matter, Defendant argues that the individual plaintiffs may not bring suit because they failed to exhaust their administrative remedies under the Plan. "[D]espite the fact that ERISA does not explicitly command exhaustion," the Sixth Circuit has held that "the administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court." *Coomer v. Bethesda Hosp., Inc*., 370 F.3d 499, 504 (6th Cir. 2004) (quoting *Ravencraft v. UNUM Life Ins. Co*., 212 F.3d 341, 343 (6th Cir. 2000); *Miller v. Metropolitan Life Ins. Co*., 925 F.2d 979, 986 (6th Cir. 1991)). This exhaustion requirement "enables plan fiduciaries to efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions." *Ravencraft*, 212 F.3d at 343 (quoting *Makar v. Health Care Corp*., 872 F.2d 80, 83 (4th Cir. 1989)).

Nevertheless, a district court is "obliged to exercise its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would be futile or the

14

remedy inadequate." *Fallick v. Nationwide Mutual Insurance Co.,* 162 F.3d 410, 419 (6th Cir. 1998) (citing *Constantino v. TRW, Inc.* 13 F.3d 969 (6th Cir. 1994)).  The standard for adjudging futility is whether "a clear and positive indication of futility" can be demonstrated: "[a] plaintiff must show that 'it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision.'" *Id.* (quoting *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir. 1996)).  Among other cases, the Sixth Circuit has affirmed findings of futility where Plaintiffs' suit was "directed to the *legality* of [Defendant's] amended Plan, not to a mere *interpretation* of it," such that, "if Plaintiffs were to resort to the administrative process, [Defendant] would merely recalculate their benefits and reach the same result."  *Constantino*, 13 F.3d at 975 (emphasis original).

Here, the Fund has made adverse eligibility determinations against Morgan, Lantz (although he was able to retain coverage through the self-pay mechanism), Welch and Shau. Both Morgan and Lantz assert that they would have been eligible for benefits but for the Policy applying Bunn's contributions to the oldest outstanding balance. Welch and Shau do not challenge the determination that they are not eligible for benefits, but do challenge the Fund's decision not to credit them with hours pursuant to the Policy.  No adverse eligibility determination has been made with respect to K.W. Bunn, and he will continue to receive benefits through July 31, 2013.  Nevertheless, Bunn challenges the application of the Policy, which he asserts will render him ineligible for health benefits for the subsequent 12-month period. None of the individual plaintiffs availed themselves of the Plan's administrative procedures prior to bringing this federal action.

The Court finds that any attempt to challenge administratively the Fund's policy of crediting contributions to the oldest outstanding balance would have been futile. Plaintiffs'

action does not assert that the Fund applied the Policy incorrectly when it calculated their hours, but rather challenges the legality of the Policy itself.  Defendant does not dispute the existence of the Policy or its consistent application in all cases where an audit determines a delinquency.  Nor does Defendant dispute that the Fund applied the Policy here by crediting Bunn's payments to Newlon's unpaid hours instead of to Lantz, Morgan, Schau, Welch and K.W. Bunn.  Moreover, Defendant's representative testified that the Policy was correctly applied according to its terms.  Thus, Plaintiffs have definitively established that, were they to resort to the Plan's administrative process, the Fund would "merely recalculate … and reach the same result" as to the number of hours that should be credited to each employee.  Plaintiffs have, therefore, met their burden of showing a clear and positive indication of futility with respect to any appeal challenging the Policy.  Accordingly, this Court is obliged to excuse Plaintiffs' nonexhaustion.

### b. Ripeness

Defendant also argues that, with the exception of those claims brought by Morgan, the individual plaintiffs' claims are not ripe. As the Supreme Court has explained, the basic rationale of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agricultural Products Co*., 473 U.S. 568, 580 (1985) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148 (1967)). The Sixth Circuit has refined this sentiment, explaining: "The ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances." *Brown v. Ferro Corp*., 763 F.2d 798, 801 (6th Cir. 1985). In undertaking a ripeness analysis, courts weigh several factors, including the likelihood that the harm alleged by plaintiffs will ever come to pass. *Thomas*, 473 U.S. at 580-81 (a case is

not ripe where it involves "contingent future events that may not occur as anticipated, or indeed may not occur at all") (quoting 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532 (1984)).

Morgan was found ineligible for benefits due to insufficient employer contributions, and his health care coverage has been terminated. Lantz was subject to an adverse determination that he was not eligible for benefits based on employer contributions, but choose to make self-contributions to continue his coverage.  K.W. Bunn currently receives health insurance through the Fund, but, after July 31, 2013, will not be eligible for the next full year benefits based on employer contributions alone. Shau has not been credited with hours from Bunn in Local 18's jurisdiction, but is currently receiving healthcare benefits through his home fund and is not at risk of losing eligibility in the near future.  Welch has not been credited with certain hours worked for Bunn. He is not, however, currently employed by Bunn and thus will not be affected by that lack of credit unless he rejoin returns to work for Bunn.

Defendant concedes that Morgan's claims are ripe.  With respect to the other individual plaintiffs, however, Defendant argues that their claims are not ripe because they have not been harmed by the Fund's decision to credit them with the contributions made by Bunn in their names.  The Fund's argument assumes that, for the purposes of evaluating ripeness, the harm alleged (or, rather, the only sufficient harm alleged) is loss of benefits.  Under ERISA, however, a plan participant may bring a civil action not only to recover benefits, but also "to enforce [] rights under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B), "clarify [] rights to future benefits," *id*., "enjoin any act or practice that violates [ERISA] or the terms of the plan," 29 U.S.C. § 1132(a)(3), or "obtain other appropriate relief." *Id*.  While the question of whether a plaintiff has a cause of action is distinct from whether his or her claims are ripe, the ERISA

17

statute speaks to the types of injury which give rise to cognizable claims.  Here, as the statue makes clear, this includes harms well-short of benefit termination.

Shau, Lantz, Morgan, Welch and K.W. Bunn allege that the very application of the Oldest Outstanding Balance Policy to deny them credit for hours worked violates their rights under the Plan, 29 U.S.C. § 1132(a)(1)(B), and/or violates ERISA and/or the Plan's terms, 29 U.S.C. § 1132(a)(3).  Because the Policy has already been applied to each plaintiff, the alleged harm is not contingent on future events that may or may not come to pass.  Therefore, the individual plaintiffs' claims challenging the Policy are ripe for review.

Even if application of the Policy to deny hours were not sufficient harm to state a claim under ERISA, Lantz and K.W. Bunn would still have ripe claims.  Lantz's choice to make self-contributions does not negate the fact that the Fund made an adverse determination as to his eligibility to receive benefits based on employer contributions.  This creates a ripe controversy as to whether that determination was consistent with ERISA and the terms of the Plan. *See* 29 U.S.C. § 1132(a)(1)(B), (a)(3). Furthermore, although K.W. Bunn has yet to lose benefits, the Fund's decision not to credit him with 1,000 credit hours will render him ineligible for continued benefits based on employer contributions as of August 1, 2013.  Because ERISA gives plan participants a cause of action to "clarify [] rights to future benefits." 29 U.S.C. § 1132(a)(1)(B), K.W. Bunn's dispute is at minimum ripe with respect to that claim.

In light of the above, the Court finds that the claims brought by Morgan, Lantz, K.W. Bunn, Shau and Welch contesting the legality of the Policy are ripe for review.

### c. Legality of Fund Policy

Morgan, Lantz, K.W. Bunn, Shau and Welch have alleged that the Fund's Oldest Outstanding Balance Policy violates ERISA and/or their respective rights under the Plan.

18

Briefing on merits of this argument by both parties, however, was minimal.  Plaintiffs argued at the preliminary injunction hearing that the Fund has not been able to point to specific authority for the Policy in the CBA, any of the Plan documents, or in statute.  Defendant argues that, in the absence of a particular provision in the Plan, the CBA or ERISA dictating the allocation of contributions among outstanding balances, such a determination is left to the Fund's discretion as an ERISA fiduciary.  At the preliminary injunction hearing, Defendant's representative testified that, in order to maintain the Fund's fiscal solvency, the Fund must administer the Plan in accordance with neutral, uniform rules that: 1) ensure that all benefits have been paid for, and 2) do not privilege certain employees over others equally entitled to employer contributions under the CBA.  The Fund contends that its Policy is intended to accomplish this end.

Plaintiffs here bear the burden of showing a likelihood of success on the merits of their argument that the Policy is contrary to the CBA, the Plan or ERISA.  They have not, however, identified any CBA, Plan, or ERISA provision that prohibits such a policy, either directly or indirectly.   The Court's own review of the documents in evidence uncovered nothing in the CBA or the Plan that dictates how employer contributions should be allocated among outstanding balances.  Nor does there appear to be any provision that permits an employer to designate particular contributions to particular employees.  This makes sense: such a rule would essentially give employers the ability to "pick and choose" who should receive credit.  Wilkins Test. It is easy to imagine how such a power could be abused.  For example, on the pretext of disputing an employee's hours, an employer might withhold contributions – or simply threaten such withholding – for troublesome union activists, individuals who file employment complaints or grievances, or simply those the employer does not like.

More intuitive is the proposition that individual employees should not be penalized for their employers' delinquency and that, therefore, the Fund should continue to provide coverage to employees who have put in the requisite hours.  Nevertheless, Plaintiffs offer no textual or legal support for the idea that employees are entitled to continued benefits even when their employer fails to make required contributions under the CBA.  Indeed, the Plan itself explicitly predicates a participant's benefit eligibility not on the number of hours worked, but on the number of "Employer contributions … credited to his or her record." *See, e.g.,* Plan, Section II.A.2. Likewise, the CBA imposes on employers the obligation to make fringe benefit contributions for all hours worked, CBA Art. V, but is silent as to the rights of members whose employers decline to make such contributions.  Finally, Plaintiffs have not identified any provision of ERISA that requires a plan to award benefits based on hours worked, or which obligates a multi-employer group health plan to continue coverage for employees whose employer does not make required fringe benefit contributions.[10]

In light of the above, Plaintiffs have not met their burden of showing the Policy is contrary to the Plan, the CBA or ERISA.  Accordingly, on the record before the Court, the Court finds that Plaintiffs are unlikely to succeed on the merits of their argument that the Policy violates ERISA and/or the individual plaintiffs' rights under the Plan.

*B. Irreparable Harm*

The second factor of the preliminary injunction analysis considers whether the Distributors would suffer irreparable injury without the injunction. Such harm must be "likely,"

---

[10] In fact, if an employer fails to make contribution, a multiemployer group health plan is permitted by statute to deny renewal of coverage for an employer entirely.  29 U.S.C. § 1183(1)("A group health plan which is a multiemployer plan or which is a multiple employer welfare arrangement may not deny an employer whose employees are covered under such a plan continued access to the same or different coverage under the terms of such a plan, other than … for nonpayment of contributions…).

not just possible. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network,* 511 F.3d at 550 (quoting *Overstreet v. Lexington–Fayette Urban Cnty. Gov't,* 305 F.3d 566, 578 (6th Cir. 2002)). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Id.* (quoting *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992)).

### 1. Harms from Contributions for "All Hours Worked" and Non-Payment Newlon Pension Benefits

Plaintiffs have not alleged irreparable harm with respect to their claims disputing whether fringe benefit contributions are required for all employee hours worked.  As this Court explained in its temporary restraining order, "[s]ince the dispute between [Bunn] and [the Fund] is only a matter of money owed, monetary compensation will suffice and the alleged injury is not irreparable." (Doc. 8 at 3.)  Therefore, injunctive relief is not appropriate as to Bunn's claims regarding required fringe benefit contributions under the CBA.

Likewise, if successful, Newlon's claims for unpaid pension benefits would be fully compensable through money damages. Accordingly, Newlon's individual claims in that respect are likewise an inappropriate subject for injunctive relief.

### 2. Harms from the "Oldest Outstanding Balance" Policy

Plaintiffs also seek to enjoin the Policy and its application to Lantz, Morgan, Schau, Welch and K.W. Bunn.  Although, as discussed above, the application of the Policy itself may be sufficient injury to state a cognizable claim under ERISA, the resulting denial of credit for

contributions certain hours amounts to a monetary harm that is easily quantified.  Thus, Plaintiffs have not established irreparable injury with respect to application of the Policy generally.

Plaintiffs may, however, establish irreparable harm to the extent that loss of credit hours translates into a loss of health benefits to which they would otherwise be entitled.  Indeed, courts have repeatedly acknowledged that the loss of health care benefits – or, in some circumstances, even the imposition of cost-sharing for such benefits – constitutes "irreparable harm."

In *Whelan v. Colgan*, 602 F.2d 1060, 1061 (2nd Cir. 1979), the Second Circuit considered the propriety of a preliminary injunction where employer trustees of a health and welfare fund "'blocked payment' of various medical and welfare benefits by the Fund to [union] employees who went out on strike."  On appeal, the fund challenged the district court's finding of irreparable harm.  The *Whelan* Court affirmed, explaining that, "[i]n fact, the threatened termination of benefits such as medical coverage for workers and their families obviously raises the specter of irreparable injury."  *Id.* at 1062. Similarly, in *United Steelworkers of America v. Textron, Inc.*, 836 F. Supp.2d 6, 7 (1st Cir. 1987), the First Circuit considered the District Court's issuance of a preliminary injunction where an employer refused to continue to pay health and life insurance premiums for its retirees.  Taking notice of the "specific, undisputed, fact" that the employer had not paid retirees' medical insurance premiums, "and add[ing] … such general facts as (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life," the *Textron* Court "conclude[d] that retired workers would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities (in order to keep

up in insurance payments)." *Id*. at 8. Taken together, the First Circuit explained, "these facts would show harm that, in this sort of case, is 'irreparable.'" *Id. See also United Steelworkers of America, AFL-CIO v. Fort Pitt Steel Casting,* 598 F.2d 1273, 1280 (3d Cir. 1979) ("[S]urely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute 'substantial and irreparable injury.'").

The Sixth Circuit has also upheld preliminary injunctions where findings of irreparable harm are based on the imposition of health insurance cost-sharing for employees on fixed incomes. *See Schalk v. Teledyne, Inc.,* 751 F.Supp. 1261, 1267-68 (W.D. Mich. 1990) (finding irreparable harm where affidavits demonstrate that new retiree health plan "would impose a financial hardship" and raise "the distinct possibility that retirees living on such limited means might chose to forego necessary medical treatment if they are required to pay co-pays and deductibles which are obviously well outside their means."), *aff'd* 948 F.2d 1290 (6th Cir. 1991) (Table); *Golden v. Kelsey Hayes Co*., 845 F.Supp. 410, 412 (E.D. Mich. 1994) (finding irreparable harm where employer sought to "modify retiree and surviving spouse health care benefits so as to require payment of premiums and deductibles"), *aff'd* 73 F.3d 648, 657 (6th Cir. 1996). *See also Mamula v. Satralloy, Inc.,* 578 F. Supp. 563, 577 (S.D. Ohio 1983) (finding irreparable harm where employer terminated group insurance plan, despite opportunity to convert group coverage to individual policies). With these principles in mind, we examine potential harms to each individual plaintiff.

### a. Shau and Welch

Neither Shau nor Welch have established a loss of health benefits attributable to the Policy. Shau is still receiving healthcare coverage through his home local. Moreover, he testified

that he is not at risk for losing such coverage in the near future, despite his lack of credit for hours worked for Bunn.  Therefore Shau has not alleged any irreparable harm.

Welch, in contrast, currently has no healthcare coverage.  He is not, however, currently employed by Bunn and would not be eligible for benefits even had he received credit from the Fund for hours already worked in Bunn's employ.  Therefore, Welch has also not established that the Policy will cause him irreparable harm.

### b. Lantz, Morgan and K.W. Bunn

Lantz, Morgan, and K.W. Bunn are harder cases.  Defendant argues that there is no irreparable harm here because these plaintiffs can retain coverage during the pendency of the litigation through the self-pay mechanism and then be reimbursed for such expenses in the unlikely event that they prevail.  Indeed, Lantz already elected to make self-contributions and thereby continued his health pay coverage.  Nevertheless, even the imposition of insurance cost-sharing can result in irreparable harm when it results in financial hardship, for example, for retirees on fixed incomes.  *See Schalk*, 751 F.Supp. at 1267-68 (finding that retirees of limited incomes would suffer irreparable harm from the imposition of substantial additional expense in the form of co-pays and deductibles); *Kelsey Hayes*, 845 F.Supp. at 412 (E.D. Mich. 1994) (finding retirees of limited income would suffer irreparable harm from the imposition of premiums and deductibles).

Lantz is a retiree on a fixed income.  He has paid thousands of dollars to continue his health coverage through the Fund, largely using up his medical reimbursement fund, and now pays a $350 premium deducted from his monthly pension.  This caused him financial hardship and stress, which is not fully compensable by money damages.  *Textron, Inc.*, 836 F. Supp.2d at 8 (finding irreparable harm from "emotional distress, concern about potential financial disaster,

24

and possibly deprivation of life's necessities (in order to keep up in insurance payments)"). Nevertheless, irrespective of the Policy, Lantz would still be required to pay $350 per month from his pension to continue his health care coverage as of March 31, 2012.  Thus, Lantz can point to no ongoing irreparable harm attributable to the Policy.

Morgan is currently without health care coverage. As explained above, "the possibility that a worker would be denied adequate medical care as a result of having no insurance … constitute[s] 'substantial and irreparable injury.'" *Fort Pitt Steel Casting,* 598 F.2d at 1280. Moreover, the fact that Morgan had the option to make self-contributions does not negate this harm.  *See Mamula,* 578 F. Supp. at 577 (finding irreparable harm where employer terminated group insurance plan, despite opportunity to convert group coverage to individual policies, because "many of the plaintiffs were not able financially to afford to convert their policies or, at best, they were able to convert only part of the coverage").  Although Morgan is not on a fixed income, he testified that he was unable to afford the self-contributions required to continue his health coverage in light of his other expenses.

As of August 1, 2013, K.W. Bunn will no longer be eligible for health coverage based on employer contributions alone.  He will, however, have the opportunity to make self-contributions to maintain his benefits. As the working owner of Bunn Enterprises, K.W. Bunn is not on a fixed income. No evidence was offered as to his financial status or whether electing the self-pay mechanism will cause him financial hardship.  On these facts, the Court cannot conclude either that there is a strong likelihood that K.W. Bunn will lose coverage as of August 1, 2013, or that the expenditure to maintain such coverage will subject him to "emotional distress, concern about potential financial disaster, [or] possibly deprivation of life's necessities." *Textron, Inc.*, 836 F. Supp.2d at 8. Thus, K.W. Bunn has not met his burden of establishing irreparable harm.

Based on the above, the Court finds irreparable harm with respect to Morgan only.

*C. Harm to Others*

Defendant asserts that the issuance of an injunction here will cause substantial harm to the Fund and its participants.  In particular, the Fund argues that Bunn's contributions do not simply fund benefits fund current employees on a month-by-month basis. Rather, employer contributions from employers across the state are pooled to provide benefits to all employees, retirees, and their families. As such, risk and costs are shared by all contributing employers. The Fund's fiscal solvency depends on receiving contributions from all employers for "all hours paid." Plaintiffs' interpretation of the CBA therefore has the potential to undermine the fiscal integrity of the Fund, harming everyone who receives health and welfare benefits under the Plan. Accordingly, the Court finds that this factor weighs strongly against enjoining the Fund from demanding contributions for all hours worked.

The potential harm to others from reinstating health benefits for Morgan, without requiring self-contributions, is more contained.  Although the Fund is marginally depleted without the corresponding employer contributions, it is unlikely that such premium payments on behalf of a lone employee would destabilize a multi-employer group health plan like the Fund. Moreover, the evidence adduced for the preliminary injunction hearing indicates that Bunn has made payments the value of which, if credited to Morgan, would be equal to the contributions needed to him eligible for continued employer-funded benefits.  Given that the Fund is not currently paying out benefits to Newlon, any harm to the Fund from providing health benefits to Morgan would be minimal.  Given that Morgan faces irreparable harm in the absence of such coverage, the balance of harms weighs strongly in his favor.

*D. Public Interest*

The final factor to consider is whether the public interest would be served by granting injunctive relief.  ERISA's underlying policy purpose is to "protect the interests of participants in employee benefit plans ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, ... by providing for appropriate remedies, sanctions, and ready access to the Federal Court." 29 U.S.C. § 1001(b).  ERISA's policy goals therefore weigh against issuing an injunction that would undermine the fiscal integrity of the Fund. To the extent that an injunction would not jeopardize other participants' benefits, however, ERISA's underlying policies weight in favor of protecting the interests of individual beneficiaries.  Thus, the Court finds that the public interest weighs against enjoining the Fund's ability to collect contributions for all hours worked, but in favor of continuing Morgan's access to benefits until the ultimate resolution of this case on the merits.

*E. Balance of Factors*

In determining whether to grant a preliminary injunction, the Court balances the above factors, and no one factor is a prerequisite to granting such relief. *United Food & Commercial WorkersUnion, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). Here, the Court finds that all factors weigh heavily against enjoining the Fund from collecting contributions for all hours worked, including with respect to the Newlon deficiency.  Likewise, the preliminary injunction factors weigh against an injunction reinstating Newlon's pension benefits, enjoining the Policy in its entirety, or enjoining the application of the Policy as to Shau, Welch, Lantz or K.W. Bunn.  Plaintiffs' request for a preliminary injunction as to these matters is, therefore, **DENIED**.

27

The Court finds, however, that the balance of factors weighs in favor of enjoining the Fund to continue Morgan's health benefits without requiring corresponding self-contributions. Although Plaintiffs have not established a likelihood of success on the merits in their challenge to the Policy, that issue was largely unaddressed by the briefings of either party. Moreover, in the period before this case is resolved on the merits, Morgan will be subject to irreparable harm that cannot be remedied by mere money damages. In contrast, the harms to the Fund and its participants from continuing Morgan's health care coverage is negligible. Finally, the public interest favors protecting plan participants' interest in ERISA benefits. Accordingly, the Court finds that the circumstances clearly demand preliminary injunctive relief in this narrow instance. *Leary*, 228 F.3d at 739. Plaintiffs' request for a preliminary injunction reinstating benefits to Morgan is, therefore, **GRANTED**.

### *D. Bond*

Pursuant to Rule 65(c), no "preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered" by defendant. Fed.R.Civ.P. 65(c). A district court must expressly consider the question of requiring a bond before issuing a preliminary injunction. *Roth v. Bank of the Commonwealth,* 583 F.2d 527 (6th Cir. 1978). The amount of security required and whether a bond is needed is up to the discretion of the district court.

If Defendant is required to reinstate health benefits to Morgan, the additional cost to the Fund will be minimal. Morgan's January Letter from the Fund indicates that he would have to make a self-contribution of $444.49 to continue his health coverage for the following month. That number was later reduced to $70.46 per month based on contributions transferred from another local's fund on Morgan's behalf. D. Ex. 2. Thus, at most, providing continued coverage

to Morgan without any self-pay contribution will cost the Fund an additional $450 per month. Under these circumstances, the Court finds that a bond of $1,000 is appropriate.

## V. CONCLUSION

Based on the foregoing, Plaintiff's Motion for Preliminary Injunction is **GRANTED** with respect to Morgan, and **DENIED** in all other respects.  The Court hereby **ORDERS** that the Fund continue Morgan's health care benefits, without any corresponding self-pay contribution, pending final resolution of this action on the merits.  The Court further **ORDERS** Plaintiffs to post with the Court a bond in the amount of **$1,000**, no later than June 28, 2013, as security for any damages to Defendant as a result of this injunction.    Defendant's Motion to Vacate this Court's prior Temporary Restraining Order is **MOOT.**

**IT IS SO ORDERED.**

 **s/ Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Judge**

**Dated: June 19, 2013**