UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


BUNN ENTERPRISES, INC.,          .
et al.,                          .
                                 .
  PLAINTIFFS.                    .       CASE NO. 2:13-CV-357
                                 .
          vs.                    .       COLUMBUS, OHIO
                                 .       MAY 2, 2013
OHIO OPERATING ENGINEERS         .       9:00 A.M.
FRINGE BENEFIT PROGRAMS,         .
                                 .
  DEFENDANT.                     .
. . . . . . . . . . . . . . . .


**VOLUME I**

***TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS***
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS:          RONALD L. MASON, ESQ.
                             AARON TULENCIK, ESQ.


FOR THE DEFENDANT:           BRYAN C. BARCH, ESQ.
                             DANIEL J. CLARK, ESQ.


— — —


SHAWNA J. EVANS, OFFICIAL FEDERAL COURT REPORTER
614-719-3316

```
 1                    THURSDAY MORNING SESSION
 2                    MAY 2, 2013
 3                         - - -
 4          THE COURT:  Mrs. Clark, would you please call the
 5     case.
 6          THE DEPUTY CLERK:  13-CV-357, Bunn Enterprises, et
 7     al., versus Ohio Operating Engineers Fringe Benefit
 8     Programs.
 9          THE COURT:  Would counsel please identify themselves
10     for the record beginning with counsel for the plaintiff.
11          MR. MASON:  Counsel for the plaintiff is Ronald L.
12     Mason, Mason Law Firm, 425 Metro Place North, Suite 620,
13     Dublin, Ohio, 43017.
14          MR. TULENCIK:  Aaron Tulencik for the plaintiff,
15     Your Honor, same address as Mr. Mason.
16          THE COURT:  And counsel for the defense.
17          MR. CLARK:  Your Honor, I'm Dan Clark of Vorys Law
18     Firm on behalf of the defendant.  I'm joined by co-counsel
19     Brian Barch, who is in-house counsel for the defendants.
20     With us at counsel table is Carol Wilson who is the
21     assistant administrator of the fringe benefit funds.
22          THE COURT:  Thank you.
23          Mr. Mason, this is your motion for a preliminary
24     injunction.  Are you ready to proceed?
25          MR. MASON:  We are, Your Honor.
```

Vol. I                    3

```
 1              THE COURT:  Would you call your first witness,

 2      please.

 3              MR. MASON:  Yes, sir.  We'll call Mark Morgan.

 4              THE COURT:  Mr. Morgan, please come forward and be

 5      sworn.

 6              Is there a motion for separation of witnesses by

 7      either side?

 8              MR. MASON:  I believe that we have our parties in

 9      our case.

10              THE COURT:  Okay.

11              MR. MASON:  I don't know about the other side.

12              MR. CLARK:  We have one witness, and then Ms. Wilson

13      may testify.

14              MR. MASON:  Okay.  I guess we'll move for separation

15      of non-parties, Your Honor.

16              THE COURT:  What is the lady's name on the front

17      row?

18              MR. CLARK:  Amanda Glenn.

19              THE COURT:  Ms. Glenn, you can wait out in the

20      hallway or we have places for witnesses-in-waiting.

21              MR. MASON:  Your Honor, on a preliminary matter,

22      there are a number of documents that have been attached to

23      both the complaint, as well as the various motions that

24      have been submitted for you.  It would move this hearing

25      along if we could simply stipulate on both sides on all
```

1    documents as admissible and admitted into evidence so that

2    we don't have to go through those with you through the

3    hearing and get each one admitted separately.

4              THE COURT:  Mr. Clark.

5              MR. CLARK:  I guess I haven't had --

6              THE COURT:  Please stand.

7              MR. CLARK:  I haven't had a chance to go through

8    each of the pleadings to see what was attached to them and

9    respond to that immediately.

10             THE COURT:  Well --

11             MR. CLARK:  Are there specific documents?

12             MR. MASON:  It's whatever was attached to the

13   complaint that was correspondence and documents, and

14   whatever you attached to your briefs that were documents

15   making reference to whatever correspondence and whatever

16   from our side.  We're willing to just put them in as

17   opposed to having them attached to the briefs, and then we

18   can just have the witnesses testify to the facts.

19             MR. CLARK:  I'm looking through the complaint now,

20   Your Honor.

21             THE COURT:  I'm sorry?

22             MR. CLARK:  I'm just looking at the documents now.

23   It appears that these documents are documents generated by

24   the defendant.  We're not going to contest the authenticity

25   of our own documents; we don't have any objection, but --

VOL. I 5

```
 1              THE COURT:  All right.  If there are objections, you

 2      can interpose them; otherwise, it may save a few minutes.

 3      But given the amount of time that I've set aside for this,

 4      the amount of time saved might be marginal.

 5              Mr. Witness, these come forward.

 6        (Witness sworn.)

 7              THE COURT:  Mr. Mason, please proceed, sir.

 8              MR. MASON:  Thank you, Your Honor.

 9                                - - -

10                            MARK MORGAN

11      Called as a witness on behalf of the Plaintiff, being first

12      duly sworn, testified as follows:

13                         DIRECT EXAMINATION

14      BY MR. MASON:

15      Q    Would you state your name for the record.

16      A    Mark Anthony Morgan.

17      Q    And what's your home address?

18      A    2149 Center Road, Hinckley, Ohio  43223.

19      Q    Who are you currently employed with?

20      A    Bunn Enterprises.

21      Q    What position do you hold at Bunn Enterprises?

22      A    Operating engineer.

23      Q    How long have you worked for Bunn Enterprises?

24      A    This is the fifth year.

25      Q    Can you tell me whether or not you work other than as
```

```
 1    an operating engineer for Bunn Enterprises?

 2    A    For Bunn, no.

 3    Q    Can you tell me whether or not you're aware of

 4    contributions made for you to the operator engineers funds

 5    on your behalf by Bunn Enterprises?

 6    A    Yes.

 7    Q    And which local is it that this money is being

 8    contributed to on your behalf?

 9    A    Eighteen.

10    Q    Local 18.

11         Can you tell me whether or not you're getting any

12    paystubs from Bunn Enterprises that you can look at to

13    determine whether or not you're getting credit for the

14    hours that you work?

15    A    The paystubs just got the taxes and your hours that

16    you've worked on site.  But I actually get a statement

17    quarterly from the union that shows your contributions on

18    the employer's behalf.

19    Q    Do you currently have health insurance from the

20    pension fund?

21    A    I do not at the current moment.

22    Q    Have you in the past?

23    A    Yes.

24    Q    Has the fund credited all of your hours for your

25    health insurance?
```

1   A    They did at one point, I believe.

2   Q    Did they stop it at another point?

3   A    They -- the fund itself, they took them back or

4   removed them.  They were there and then they took them

5   back.

6   Q    Okay.  And do you know where they went to?

7   A    From -- I learned that -- I believe they were taken

8   away to pay a prior balance.

9   Q    If the fund had properly credited your account for all

10  the hours that you worked at Bunn that showed on your

11  paystub, would you have health insurance today?

12  A    I would.

13  Q    I'm sorry?

14  A    I would.

15  Q    Can you explain to me briefly how the insurance

16  coverage works with respect to the hours and the

17  contributions that are made?

18  A    I can explain to the best of my knowledge.  You work a

19  certain set of hours in a certain given time period.  I

20  believe they're 225 or 250; I don't remember.

21  Q    Is that a quarterly basis?

22  A    Yeah, four months.  But there's also stipulations

23  on -- I don't know what all -- on certain time periods in

24  that four months prior and after, and then you can also do

25  it per -- if you work a set number of hours an entire

1    season, June to the following --

2    Q    May 31?

3    A    Yeah, or June.  Then it's -- I can't give you a great

4    explanation of it.  I don't know it by heart.  You work for

5    a certain set of hours and it gives you a certain time

6    period of insurance, and it can roll over if you work over.

7    Q    Let's say, for example, if you worked a thousand hours

8    within a short time period, do you know approximately how

9    much insurance, health insurance, that would cover?

10   A    I think close to the full year.

11   Q    Okay.

12   A    I believe.

13   Q    Now, you made reference to the fact that the fund had

14   taken your hours and applied them someplace else?

15   A    Right.

16   Q    How do you know this?

17   A    I called them and had inquired about why my health

18   insurance had come to an end.

19   Q    And you learned that from the fund?

20   A    Correct.

21   Q    Can you tell me whether or not in that conversation

22   you learned anything about Bunn paying for your benefits?

23   A    During that conversation, I specifically asked were my

24   benefits paid based -- were my hours paid specifically for

25   myself, Mark Morgan, and they told me that -- I learned

1    that they had been, and then based on their policy -- they

2    were having an audit and their policy was to take away

3    hours to pay back a prior balance for my employer.

4    Q    Now, when you had that conversation, did the

5    individual express to you that this was a policy or not of

6    the fund?

7    A    It was a policy.

8    Q    Did they express to you any ability of yours to appeal

9    and change that policy?

10   A    No.

11   Q    Can you tell me whether or not you're concerned that

12   you do not have today health insurance that was taken away

13   from you by the hours?

14   A    Absolutely I'm concerned.

15   Q    Why is that?

16   A    I mean, with medical costs and expenses, if something

17   were to happen, you know, get up on my ladder cleaning

18   gutters at the house and I fall off and break an arm, there

19   is no insurance or workers' comp to cover an accident like

20   that at home, or a car accident.  There is a reason I work,

21   and those hours are supposed to be paid into this fund.

22   It's a concern.  I don't want to end up working the next

23   ten years to pay a hospital bill off.

24        MR. MASON:  No further questions from this witness,

25   Your Honor.

```
 1              THE COURT:  Thank you, Mr. Mason.

 2          Mr. Clark.

 3          MR. CLARK:  Thank you, Your Honor.

 4                      - - -

 5                  CROSS-EXAMINATION

 6   BY MR. CLARK:

 7   Q    Mr. Morgan, you testified that you've been employed by

 8   Bunn Enterprises for five years?

 9   A    I think.  I'm in the fifth year, I believe.

10   Q    Over those five years, have you been employed by any

11   other employers as well?

12   A    No.

13   Q    Are you currently employed by anyone other than Bunn

14   Enterprises?

15   A    No, sir.  No.

16   Q    You testified that if the fund had properly

17   credited -- your words -- were properly credited to you,

18   the hours that you worked for Bunn Enterprises, that you

19   would currently be eligible for coverage.  Do you recall

20   that testimony?

21   A    Yes.

22   Q    Why do you believe that would be the case?

23   A    I asked what hours I needed -- let's back up.  I had a

24   doctor's appointment.  I was concerned about not having any

25   insurance, so when I called and discussed that, I was
```

1    informed that they took approximately two hundred some --

2    280-some hours away from me.  And if I had those hours, I

3    would currently have insurance.

4    Q    When did you hear that?

5    A    When did I call?  When was my doctor's appointment?

6         I would say it's been within the past month because I

7    had been to the doctor's appointment before I went back to

8    work this year.

9    Q    Do you recall who you spoke to at the fund office?

10   A    I do not.

11   Q    Do you recall who you called at the fund office?

12   A    I called and got the operator and asked who I needed

13   to speak to about the benefits, in the fringe.

14   Q    How many hours do you believe you worked for Bunn

15   Enterprises that were not properly credited to you?

16   A    The number I remember in my mind was 285.

17   Q    In January of 2013, did you receive a correspondence

18   from the fund office advising you that your coverage would

19   lapse as of February 1st of 2013?

20   A    I believe it did.  I started getting the COBRA forms.

21   I don't know the date specifically.  I got something that

22   my coverage would lapse.

23   Q    You received that letter before your coverage lapsed,

24   correct?

25   A    Whatever time frame my coverage lapsed.  I don't know.

1    I couldn't tell you yes or no.

2    Q    But before your coverage lapsed, you received a letter

3    from the fund office telling you it was going to lapse?

4    A    I got the COBRA paperwork.

5    Q    Did that letter identify for you the opportunity to

6    make self-contributions to the fund to continue your

7    coverage?

8    A    That would be the COBRA paper, right.

9    Q    Are you familiar with the concept of self-pay

10   contributions that's different than COBRA?

11   A    I kind of thought they were about the same thing.

12   Q    Do you know what the COBRA premium that you would have

13   to pay to continue your coverage beyond February 1st of

14   2013 was?

15   A    I do not.

16   Q    Do you know what the self-pay contribution was that

17   you would have to pay to continue your coverage beyond

18   February 1st of 2013?

19   A    When I spoke to them -- I do not recall.

20   Q    If you were concerned about your health insurance

21   lapsing in February of 2013, why did you not make self-pay

22   contributions?

23   A    I have other bills that need to be paid like the house

24   payment, that kind of thing, you know.  That's why.

25   Q    Do you have any other -- do you have bills other than

```
 1    your house payment?

 2    A    Of course.  Obviously.  You take the money you make

 3    and you divvy it up to where it needs to go.  And I hate to

 4    say, you know, if you don't have it, you don't have it.

 5    What do you want me to tell you?

 6    Q    Did you determine that paying to have your health

 7    insurance continue beyond February 1st of 2013 was not the

 8    best use of your money?

 9         MR. MASON:  Objection, Your Honor.  At this point in

10    time, it would seem that we're getting far beyond --

11         THE COURT:  Your objection is relevance?

12         MR. MASON:  Yes, sir.

13         THE COURT:  Sustained.

14         MR. CLARK:  Your Honor, if I may respond?

15         THE COURT:  With your next question, yes.

16    BY MR. CLARK:

17    Q    What other bills did you elect to pay instead of

18    paying to continue your health insurance?

19         MR. MASON:  Your Honor, same objection.

20         THE COURT:  Sidebar.

21                        - - -

22      Thereupon, the following proceeding was held at sidebar

23    out of hearing of open court:

24         THE COURT:  Go ahead, Mr. Mason.

25         MR. MASON:  Your Honor, it seems to me that this
```

1    gentleman has already testified that he has bills to pay

2    and he doesn't have the ability to pay the funds, that he

3    made this decision not to pay the fund.  Any specific bill

4    or payment in the weighing of that -- this individual made

5    those decisions.  He's got a right to make that decision.

6    If he feels that he couldn't afford to pay it, he couldn't

7    afford to pay it.  Any other question about which bill,

8    everything from a credit card, even if it's a 25-dollar

9    payment to a credit card --

10        THE COURT:  Your objection is relevance?

11        MR. MASON:  Absolutely.

12        THE COURT:  Mr. Clark.

13        MR. CLARK:  Thank you, Your Honor.  The witness has

14   testified that his -- this goes to irreparable harm.  He's

15   testified he's very concerned about losing his coverage,

16   that he could be injured at any point.  He could fall off

17   his house and be injured.  This witness had the option to

18   continue that health coverage by paying either self-pay

19   contributions to the fund or by paying a COBRA premium.

20   That's purely a monitary decision on his part.  If the

21   witness has chosen to pay his cable TV as opposed to

22   continuing his health insurance --

23        THE COURT:  Here's what we're not going to do.  This

24   is not like a bankruptcy proceeding where we parse out his

25   monthly budget and say why didn't you pay this and why

```
 1    didn't you pay that.  If your point is that -- he can

 2    ascertain the extent of his injury in monitary terms, okay,

 3    you can make that point because you establish those facts

 4    for the record.  And then you're going to argue, well,

 5    money damages would be appropriate and so there's no

 6    irreparable harm, right?  But we aren't going to get so

 7    granular as to go through all of the bills and why he

 8    didn't pay this.  I don't know that that's relevant, unless

 9    I missed something in the issues in this case.

10         MR. CLARK:  I think it's a bit of impeachment as

11    well.  He's going to testify this coverage is extremely

12    important to him, he needs to continue it, and he's greatly

13    harmed here today, yet he had the option to keep that going

14    and chose to let it lapse.

15         THE COURT:  Well, he said he had other bills to pay.

16         MR. CLARK:  I think if he's paying for a cable TV

17    bill, that impeaches the credibility.  How important is it?

18    That's the relevance.

19         THE COURT:  This is like -- it's almost like a

20    debtors' prison-type of inquiry and I'm not going to allow

21    it.  That's just it.  I'm not going to allow that.  You've

22    made your point, but that's not the point of this hearing.

23    We're not going to go through each individual and say, what

24    were all of your bills, what did you pay, and what did you

25    not pay.  No.  There are a lot of other issues.  This is a
```

1    relatively short witness, and you've established for the

2    record, I think, what you need to establish for your

3    irreparability injury argument, that his damages are

4    calculable in terms of money damages.  Isn't that your

5    point in the first place?

6          MR. CLARK:  Yes.

7          THE COURT:  Your objection is sustained.

8      (Back in open court.)

9          THE COURT:  Please continue, Mr. Clark.

10         MR. CLARK:  Thank you, Your Honor.

11   BY MR. CLARK:

12   Q    Mr. Morgan, you had testified a moment ago regarding

13   the COBRA notice you received in the mail from the fund

14   office, correct?

15   A    Right.

16   Q    Did you elect to continue your coverage under COBRA?

17   A    I did not.

18   Q    Did you elect to make a self-pay contribution to the

19   fund to continue your coverage?

20   A    I did not.

21   Q    Why did you not?

22         MR. MASON:  Objection, Your Honor.  We've already

23   been down this road.  He's already explained it and

24   counsel's already asked questions on it.

25         THE COURT:  I don't know that this particular

```
 1    question has been asked and answered.  Overruled.

 2          MR. WILSON:  Can you repeat the question?

 3    BY MR. CLARK:

 4    Q    Why did you not elect COBRA coverage?

 5    A    Again, you pay your bills with the money you have and

 6    you have to make a decision based on where you believe you

 7    need the moneys to go.  And on top of that, it's -- if my

 8    hours had not been revoked, I wouldn't need to make that

 9    decision.  So I don't understand how that can be relevant

10    to why I made the decision.

11    Q    Is that the same reason you did not make any self-pay

12    contributions to the fund?

13          MR. MASON:  Objection, Your Honor.  Now we are asked

14    and answered.

15          THE COURT:  Overruled.  You may answer, Mr. Morgan.

16          THE WITNESS:  Can you ask the question one more

17    time?

18    BY MR. CLARK:

19    Q    You just explained the reason you didn't continue your

20    coverage under COBRA, and my question was, is that the same

21    reason you did not continue your coverage through a

22    self-pay contribution to the fund?

23    A    If I had my hours that were removed, would I need to

24    make a self-pay?

25    Q    Are you aware that you have a medical reimbursement
```

```
1    account?

2    A    I am.

3    Q    Are you aware that the funds held in that account can

4    be used by you to make self-pay contributions?

5    A    I was not.

6    Q    When you received the notice from the fund office that

7    your health and welfare coverage would be lapsing, did you

8    appeal that eligibility determination to the fund office?

9    A    Appeal what?

10   Q    Let me take a step back.  You received a letter at

11   some point before your coverage lapsed telling you that as

12   of a certain date you would no longer be eligible for

13   health and welfare benefits; is that correct?

14   A    As you asked me earlier, I believe I got a notice at

15   some point.

16   Q    When you received that notice that your eligibility

17   was going to lapse, did you appeal that determination to

18   the fund office?

19   A    I didn't appeal anything.  I called to find out why my

20   insurance was lapsing.  Is that -- I didn't know that was

21   an option I could do.

22        MR. CLARK:  No further questions, Your Honor.

23        THE COURT:  Thank you, Mr. Clark.

24        Any redirect, Mr. Mason?

25        MR. MASON:  Just a couple, Your Honor.
```

VOL. I       19

- - -

REDIRECT EXAMINATION

BY MR. MASON:

Q    The medical reimbursement fund that you have some
money in that was made reference to, what is that to be
spent on typically?  Why do you have that kind of a fund?

A    I believe it's for -- like we don't have dental.  If I
go to the dentist, I use it to reimburse -- almost like a
medical reimbursement thing.  When I go to the dentist,
I've used it to pay the dentist bill since we don't have
dental.

Q    If you took money out of that fund to pay for a
premium, you would then not have any money for the
reimbursement -- the other side, right?

A    Right.

        MR. MASON:  No further questions.

        THE COURT:  Thank you.  Any recross, Mr. Clark?

        MR. CLARK:  Nothing, Your Honor.

        THE COURT:  Mr. Morgan, thank you very much, sir.
You may be excused.

        Mr. Mason, your next witness.

        MR. MASON:  Michael Schau.

        THE COURT:  Mr. Schau, please come forward and be
sworn.

        I need just a couple of minutes.

```
 1        (Brief recess taken.)

 2                           - - -

 3                       MICHAEL SCHAU

 4   Called as a witness on behalf of the Plaintiff, being first

 5   duly sworn, testified as follows:

 6                    DIRECT EXAMINATION

 7   BY MR. MASON:

 8   Q    Would you state your name for the record.

 9   A    Michael Shane Schau.

10   Q    How do you spell your last name, please?

11   A    S-C-H-A-U.

12   Q    Where do you live?

13   A    121 Cornerstone Drive, Marietta, Ohio.

14   Q    Where do you work?

15   A    Bunn Enterprises.

16   Q    If you would, please, when did you start working at

17   Bunn?

18   A    July 5th, 2011.

19   Q    Can you tell me, what kind of work do you do for Bunn?

20   A    Operator engineers.

21   Q    Do you do any other work other than operating

22   engineers for Bunn?

23   A    No.

24   Q    Can you tell me whether or not you're aware of

25   contributions made for you to the operators' funds on your
```

1    behalf by Bunn?

2    A     Yes, I'm aware that he contributes for me.

3    Q     Can you tell me whether or not you receive a paystub

4    from Bunn showing your hours worked?

5    A     Yes, I receive one.

6    Q     Do you receive reports from the fund with respect to

7    showing credit for you with respect to those hours worked?

8    A     Yes.

9    Q     Can you tell me whether or not at one time you were

10   with Local 18?

11   A     No, I was not.

12   Q     Never been with Local 18?

13   A     No.

14   Q     Have you ever had any hours that were paid into Local

15   18's fund?

16   A     Yes.

17   Q     Can you tell me whether or not those hours were ever

18   transferred to your home local?

19   A     No, they haven't.

20   Q     Can you tell me whether or not -- do you know

21   approximately how many hours that hasn't been transferred?

22   A     I believe it's 115 hours.

23   Q     Can you tell me whether or not you're concerned about

24   the fact that those hours have not been transferred from

25   Local 18 to your home local?

1    A    Yes, I'm concerned.

2    Q    Why?

3    A    It's part of my retirement plus my insurance.  I mean,

4    I got to keep my insurance for the family.

5    Q    What is this hundred-and-some hours?  How does that

6    affect that?

7    A    It's actually a month of insurance for me.

8         THE COURT:  Mr. Mason, could you hold the next

9    question?

10   BY MR. MASON:

11   Q    Mr. Schau, are you aware of what happens if -- let's

12   say that your 115 hours would carry you for an additional

13   month and you didn't have those hours because Local 18

14   didn't transfer those credits to your home local, what

15   would happen to your insurance if you then had a break and

16   had to work to get more insurance?

17   A    I'd lose my insurance till I worked, I think it's 225

18   or 250 hours to get it back.

19   Q    So it would be actually a bigger break, then, because

20   once you had a break in your insurance, then you've got to

21   work at least one or two months to get to 250 hours in

22   order to get your insurance reinstated; is that correct?

23        MR. CLARK:  Objection.

24        THE COURT:  Sustained.  Rephrase your question in a

25   non-leading manner.

```
 1    BY MR. MASON:

 2    Q    How does it work for you to get your insurance

 3    reinstated after you've lost it due to the fact that the

 4    115 hours is not credited?

 5    A    I would have to work 225 hours, or 250 hours, to get

 6    it back.  And then you know, I'll have to work even more to

 7    get it built back up for a year, to cover me for a year.

 8    Q    How long would it typically take you to just even get

 9    the 250 hours?

10    A    At least a month.

11    Q    It depends upon where it falls as to how long that

12    might take?

13    A    Yes.

14    Q    What if it fell in December?

15    A    I wouldn't get anything at all, then.

16    Q    Until when?

17    A    Till we start back up after layoff season.

18    Q    When does that usually get recalled for operators'

19    work after the winter layoff?

20    A    Around March, April.

21    Q    What's the earliest that you wind up getting laid off

22    where you can't get any hours?

23    A    November, December.

24         MR. MASON:  No further questions, Your Honor.

25         THE COURT:  Mr. Clark, cross.
```

1                              - - -

2                       CROSS-EXAMINATION

3     BY MR. CLARK:

4     Q     Mr. Schau, you testified that you are not a member of

5     Local 18 of the operating engineers union, correct?

6     A     Right.

7     Q     Have you ever been a member of Local 18?

8     A     No, I haven't.

9     Q     Have you ever been enrolled in the Ohio Operating

10    Engineers Health and Welfare Fund?

11    A     Not to my knowledge, I haven't.

12    Q     So you've never received health and welfare coverage

13    from the defendant?

14    A     Yeah, I have, but it's through my local out of 181.

15    Q     Your local is 181?

16    A     Yeah.

17    Q     That's your operating engineer local?

18    A     Yes.

19    Q     Where is Local 181 located?

20    A     Henderson, Kentucky.

21    Q     Where is the health and welfare fund located for Local

22    181?

23    A     Henderson, Kentucky.

24    Q     Do you understand that the Ohio Operating Engineer

25    Fund is a separate fund located in Columbus Ohio?

1    A    Yes.

2    Q    You understand you've never received health and

3    welfare coverage from the Ohio fund, correct?

4    A    True.

5    Q    You have never requested that hours or contributions

6    be transferred from the Ohio Operating Engineers Fringe

7    Benefit fund to the Local 181 fund, correct?

8    A    I called the fund office to get them transferred.

9    Q    And when did you do that?

10   A    I'm going to say January, I believe.

11   Q    Of 2013?

12   A    Yes.

13   Q    You currently have health insurance through Local

14   181's health and welfare fund?

15   A    Yes.

16   Q    How long has that coverage been in place?

17   A    I'll say 2011.

18   Q    Has Local 181's health and welfare fund told you that

19   your health and welfare coverage will terminate at any

20   point in the future?

21   A    Not right now, no.

22   Q    Do you have any reason to believe that your health and

23   welfare coverage through Local 181 will terminate in the

24   near future?

25   A    No.

```
 1              MR. CLARK:  No further questions, Your Honor.

 2              THE COURT:  Thank you, Mr. Clark.  Mr. Mason, any

 3     redirect?

 4              MR. MASON:  Yes, sir.

 5                             -  -  -

 6                      REDIRECT EXAMINATION

 7     BY MR. MASON:

 8     Q    When you called the Local 18 fund to get the hours

 9     transferred to your home local in Kentucky, were those

10     hours transferred?

11     A    No, sir.

12     Q    What did you understand as to the reasons why they

13     were not transferred?

14     A    They was holding them for -- where Bunn Enterprises

15     was being audited.

16     Q    Did they tell you anything about it being a policy of

17     Local 18 to do this?

18     A    No.

19              MR. CLARK:  Objection.  Leading.

20              THE COURT:  Sustained.  Rephrase your question,

21     Mr. Mason.

22     BY MR. MASON:

23     Q    Can you tell me whether or not the fund of Local 18

24     that you talked to made any reference to any appeal rights

25     that you may have with respect to their refusal to
```

1    transfer?

2    A    No.

3    Q    Can you tell me whether or not the fund gave you any

4    documents that established what your appeal rights were if

5    you objected to the fund not transferring?

6    A    No.

7          MR. MASON:  No further questions.

8          THE COURT:  Thank you, Mr. Mason.

9          Anything further, Mr. Clark?

10         MR. CLARK:  Just one, Your Honor.

11                        - - -

12                RECROSS-EXAMINATION

13   BY MR. CLARK:

14   Q    Sir, did you complete a transfer authorization form

15   authorizing the Ohio Operating Engineers Health and Welfare

16   Fund to transfer contributions to Local 181's health and

17   welfare fund?

18         MR. MASON:  Objection, Your Honor.  That's beyond

19   the scope of my redirect.

20         THE COURT:  Overruled.  You specifically asked, "Can

21   you tell me whether or not the fund gave you any documents

22   that established what your appeal rights were if you

23   objected to the fund not transferring?"

24         Mr. Clark simply asked, "Did you complete a transfer

25   authorization form authorizing the Ohio Operating Engineers

1    Health and Welfare Fund to transfer contributions to Local

2    181's health and welfare fund?"

3         I think that's within the ambit of your question.

4    You may answer, Mr. Schau.

5         THE WITNESS:  Yes.

6    BY MR. CLARK:

7    Q    Yes, you did fill out a transfer authorization form?

8    A    No.  Excuse me.  No, I did not.

9         MR. CLARK:  That's all I had, Your Honor.  Thank

10   you.

11        THE COURT:  Thank you, Mr. Schau.  You may be

12   excused.

13        Mr. Mason, do you have any additional witnesses?

14        MR. MASON:  We do, Your Honor.  Mr. Danny Lantz.

15                        - - -

16                      DANNY LANTZ

17   Called as a witness on behalf of the Plaintiff, being first

18   duly sworn, testified as follows:

19                   DIRECT EXAMINATION

20   BY MR. MASON:

21   Q    Would you state your name and address for the record.

22   A    Danny Joe Lantz, 23380 Dixon Road, Coolville, Ohio.

23        THE COURT:  Where?

24        THE WITNESS:  Coolville, Ohio.

25        THE COURT:  How do you spell your last name,

1    Mr. Lantz?

2         THE WITNESS:  L-A-N-T-Z.

3    BY MR. MASON:

4    Q    Can you tell me if you have ever worked for Bunn

5    Enterprises?

6    A    Yes.

7    Q    What years did you work for Bunn?

8    A    2009 to 2012.

9    Q    In 2012, what happened?

10   A    I lost my insurance through the operating engineers.

11   Q    And with respect to Bunn, did you retire or did you

12   get --

13   A    Yes.

14   Q    -- laid off?

15   A    I worked part of the year and then I retired.

16   Q    When did you retire?

17   A    I actually started on my retirement January of this

18   year.

19   Q    Of 2013?

20   A    2013, yes.

21   Q    When did you lose your health insurance with Bunn and

22   the fund?

23   A    July of 2012.

24   Q    Okay.  And what, if anything, did you do as a result

25   of this notice that you were losing your health insurance?

1   A    I started making self-payments to the fringe benefit

2   program.

3   Q    Do you know approximately how much this has been

4   costing you on a monthly basis?

5   A    I can tell you exactly what it's cost me.

6   Q    Okay.  Please do.

7        MR. MASON:  Let the record reflect that the

8   gentleman is pulling a piece of paper out of his wallet.

9        THE COURT:  The record will so reflect.

10       THE WITNESS:  7-30 of 2012, I paid $439.56.

11       8-28 of 2012, I paid $1,058.94.

12       11-29 of 2012, I paid $1,498.50.  And now I'm paying

13  $350 a month for my retirement.

14  BY MR. MASON:

15  Q    With respect to this money that you're paying for your

16  retirement, can you tell me whether or not if you had --

17  let me strike that.  Let me ask another question.

18       Did you have any hours that were banked with the fund

19  that were not credited to you by Local 18's fund?

20  A    Yes.

21  Q    Had the fund fully paid those hours, how long would

22  your insurance have lasted where it would have been paid?

23  A    July of 2013.

24  Q    So with respect to the money that's coming out of your

25  retirement fund, why is it coming out of your retirement

1    fund as opposed to the fund paying it?

2    A    Because my hours have been frozen from the fringe

3    benefits.

4    Q    Can you tell me whether or not, when you were working

5    for Bunn, you received any sort of documentation showing

6    that Bunn was working -- that as you worked for Bunn, the

7    hours that you worked were being credited to you for the

8    pension fund and health fund?

9    A    Repeat that again.

10    Q    No problem.  I will rephrase that.  During the time

11    period that you worked for Bunn, did you receive any

12    documents from Bunn on a weekly basis that would show how

13    many hours you worked?

14    A    Yes, my paystub.

15    Q    Did you receive any reports from the union's fund of

16    Local 18 as to whether or not you were getting credited for

17    the moneys that Bunn was paying in for those hours?

18    A    No written, no.

19    Q    They did not send you a quarterly report?

20    A    No.  I've got mine set up on the Internet.

21    Q    Can you tell me whether or not you ever contacted the

22    fund about a loss of your insurance in July of 2012?

23    A    Yes.

24    Q    Who did you talk to?

25    A    I talked to one of the women up at the fringe benefits

1    office.

2    Q    What were you told?

3    A    That I had enough hours, that my insurance would be

4    good until July of 2013, but my hours was being frozen

5    until the audit with Bunn was completed.

6    Q    Did you ever have a follow-up after the audit was

7    completed as to what happened to those hours and that

8    credit to July of 2013?

9    A    They've never been credited to my account yet.

10   Q    How has it affected you with respect to having to come

11   up with this cash since July of 2012 in order to pay the

12   health insurance costs that the fund has denied?

13   A    It's taken away most of my medical reimbursement fund,

14   and now I'm 350-some dollars a month short on my income.

15   Q    So you had a medical reimbursement fund?

16   A    Yes.

17   Q    And you were using that to pay the insurance that the

18   fund was denying you?

19   A    Yes.

20   Q    So I gather now you do not have a medical reinsured

21   fund?

22   A    I have some in there, yes.

23   Q    What is that medical reinsured fund for?  Why did you

24   have it?  Why were you putting money to it?

25   A    The contractor contributes to that.  It's like 25

1    cents an hour.

2    Q    What have you in the past been using that fund for?

3    A    I use it for my deductible on my insurance,

4    eyeglasses, eyeglasses for my wife, and contact lenses, and

5    stuff like that.

6    Q    Can you tell me whether or not you would like to have

7    that money reimbursed for those kinds of future expenses?

8    A    Absolutely.

9         MR. MASON:  No further questions.

10        THE COURT:  Mr. Clark, cross?

11                          - - -

12                    CROSS-EXAMINATION

13   BY MR. CLARK:

14   Q    Mr. Lantz, your retirement date from Bunn Enterprises,

15   was that effective January 1st of 2013?

16   A    Yes.

17   Q    And as a retiree, did you elect to participate in

18   what's called senior member coverage through the health and

19   welfare fund?

20   A    Yes.

21   Q    And senior member coverage is a package of health

22   insurance available to operating engineer retirees; is that

23   correct?

24   A    Yes.

25   Q    When did you go on senior member coverage?

1    A    Last month or the month before.  I'm not for sure.

2    They've just started taking it out of my check.  Some of

3    the money that I paid out of my MRA covered it.

4    Q    You understand that the premiums for the senior member

5    coverage are paid out of your monthly pension check that

6    you receive from the operating engineers pension fund?

7    A    Yes.

8    Q    Are you aware that that same monthly premium

9    contribution is paid out of the pension checks for all

10   retired operating engineers who elect to participate in

11   senior member coverage?

12   A    Yes.

13   Q    Are you aware that you have the ability to continue

14   your senior member coverage through the Ohio Operating

15   Engineers Health and Welfare Fund for the rest of your

16   life?

17   A    Yes.

18   Q    Do you intend to continue that coverage?

19   A    Yes.

20   Q    In 2012, you testified that you used funds out of your

21   medical reimbursement account?

22   A    Yes.

23   Q    Was that to make self-pay contributions?

24   A    Yes.

25   Q    And by making those contributions, did your health and

1    welfare coverage continue uninterrupted in 2012 through the

2    date of your retirement in 2013?

3    A    Yes.

4    Q    Was there ever a lapse in coverage between your health

5    and welfare coverage as a working operating engineer and

6    when you transitioned to senior member coverage as a

7    retiree?

8    A    No.

9    Q    Have you been told that you're in any jeopardy of

10   losing your eligibility for senior member coverage at any

11   point in the future?

12   A    No.  I'm paying it.

13   Q    How did you know that you could pay self-pay

14   contributions from your medical reimbursement account?

15   A    Fringe benefits sent me a letter.

16   Q    Was that the same letter that advised you of the

17   opportunity to make self-pay contributions?

18   A    Yes.

19   Q    In March of 2013, are you aware that you received a

20   refund of some of your self-pay contributions in the amount

21   of $202.52?

22   A    Yes.

23   Q    Did you receive that refund on March 12th, 2013?

24   A    I'm not for sure when it was.  I just seen it on my --

25   I've got an Internet account set up and I seen it was

```
1    posted.

2    Q    Are you aware that you received that refund as a

3    result of contributions made by Bunn Enterprises that were

4    credited to your account?

5    A    To my understanding, it was -- it came from where I

6    contacted Washington D.C.  They had some money there and

7    they was supposed to transfer it back to my local.  That's

8    what I assumed it was.

9    Q    Do you know?

10   A    No.

11   Q    Are you aware that if contributions are received by

12   the fringe benefit funds for all your hours worked for Bunn

13   Enterprises, that you're eligible for a refund of any and

14   all self-pay contributions that you made in 2012?

15   A    Yes.

16   Q    Do you intend to pursue such a refund?

17   A    Yes.

18   Q    In 2012, when you received the self-pay contribution

19   letter from the fringe benefit fund office indicating that

20   your health and welfare coverage was going to lapse, did

21   you appeal that determination of your eligibility at that

22   time?

23   A    I called up to the fringe benefit office.

24   Q    Did you appeal that decision?

25   A    No.
```

```
 1              MR. CLARK:  I have no additional questions, Your
 2    Honor.  Thank you.
 3              THE COURT:  Thank you, Mr. Clark.
 4              Mr. Mason, do you have any redirect?
 5              MR. MASON:  I do, Your Honor.
 6              THE COURT:  All right.
 7                                - - -
 8                        REDIRECT EXAMINATION
 9    BY MR. MASON:
10    Q    Let's start with the senior coverage.
11    A    Yes.
12    Q    The fund told you that you were fully paid for health
13    insurance on the hours that you worked for Bunn until July
14    of 2013; is that correct?
15    A    Yes.
16    Q    With respect to that, can you tell me whether or not
17    you would have elected the senior coverage before or after
18    that had been exercised if your hours had been fully
19    credited?
20    A    If my hours had been fully credited, then it wouldn't
21    have started until August of this year, my payment,
22    self-payment.
23    Q    And why is that?
24    A    Because I would have had enough hours in the program
25    to cover my insurance up through July.
```

1    Q    Would it have cost you any money, then, up through

2    July?

3    A    No.

4    Q    But senior coverage, can you tell me whether or not

5    that does cost you money?

6    A    Yes.  They deduct it out of my pension check.

7    Q    Now, turning your attention now to the time when you

8    called the fringe benefit office, can you tell me whether

9    or not anybody there told you that you had a right to

10   appeal any decision that they made?

11   A    No.

12   Q    Can you tell me whether or not they told you it was

13   the policy of the company or of the fund to deduct that

14   money and give it to the older balance before you got

15   credit for it?

16   A    No.

17   Q    They didn't tell you any reasons why.  They just said

18   this is why you're not getting it?

19   A    They just told me that the benefits from Bunn was

20   being frozen until the audit was done, which would take

21   about two months.

22   Q    And after the two-months' time period, did you call

23   them back?

24   A    I've got it set up on my computer where I can look at

25   everything and see what's going on.

```
 1              MR. MASON:  No further questions.

 2              THE COURT:  Mr. Clark, do you have any recross?

 3              MR. CLARK:  Nothing further, Your Honor.

 4              THE COURT:  Mr. Lantz, thank you very much, sir.

 5     You may be excused.

 6              Mr. Mason, do you have any additional witnesses?

 7              MR. MASON:  Kevin Bunn, Your Honor.

 8              THE COURT:  Mr. Bunn, please come forward and be

 9     sworn.

10                            - - -

11                          KEVIN BUNN

12     Called as a witness on behalf of the Plaintiff, being first

13     duly sworn, testified as follows:

14                       DIRECT EXAMINATION

15     BY MR. MASON:

16     Q    Would you state your name and address for the record.

17     A    Kevin Wayne Bunn, 2844 Demming Road, Vincent, Ohio

18     45784.

19     Q    Tell me, where do you work.

20     A    Bunn Enterprises.

21     Q    When did you start work at Bunn?

22     A    When it was formed, roughly '96.

23     Q    What is your current title today at Bunn?

24     A    President.

25     Q    Can you tell me whether or not you're a member also of
```

1    Local 18?

2    A    Yes, since roughly 1996.

3    Q    Can you tell me whether or not you've paid into the

4    health and welfare and pension funds from that time

5    forward?

6    A    Yes.

7    Q    Was there a point in time when you stopped paying into

8    the fund?

9    A    Yes.

10    Q    When was that?

11    A    Roughly late of last year.

12    Q    Can you tell me whether or not you have any hours that

13    you were -- that were paid by Bunn into the Local 18 funds

14    that have not been properly credited to you?

15    A    Yes.

16    Q    Do you know approximately how many hours?

17    A    Roughly from, I believe, January of 2012 to current.

18    Q    Do you know about how many hours you would have paid

19    in on that?

20    A    I sure don't.

21    Q    Was it 40 hours a week?

22    A    Forty hours a week.

23    Q    So 40 hours a week for -- you would have paid from

24    January until you stopped paying at the end of 2012?

25    A    That's correct.

1    Q    Can you tell me whether or not you've been advised

2    that your health insurance will expire?

3    A    Yes.

4    Q    When will your health insurance currently expire?

5    A    July of this year.

6    Q    And if the fund had given you full credit for the

7    insurance -- for the amount of moneys you paid into the

8    fund, would your insurance have continued beyond July 1 of

9    2013?

10   A    Yes.

11        MR. CLARK:  Objection.  Lack of foundation and

12   speculation.

13        THE COURT:  Well, I'm going to overrule it.  As

14   president of the company, he would be in a position to know

15   that.  So I'm --

16        MR. CLARK:  I guess the foundational element was the

17   ability to -- he's not president of the funds.

18        THE COURT:  He's not president of that fund, but he

19   makes contributions into that fund.

20        MR. CLARK:  He doesn't know how -- there's no

21   evidence that he knows how those contributions would affect

22   his coverage or not.

23        THE COURT:  I see.  Establish that foundation,

24   Mr. Mason.  Your objection is sustained, Mr. Clark.

25

1    BY MR. MASON:

2    Q    How do your contributions affect your qualification

3    for insurance?

4    A    Well, if the hours aren't being credited, obviously I

5    won't get coverage health insurance.

6    Q    How many hours do you have to have in order -- to be

7    credited in order to have a full year's health insurance?

8    A    I'm not certain on the exact number, but I think

9    roughly a thousand.

10   Q    And if you have 40 hours a year for almost the entire

11   year, approximately how many hours would you have been paid

12   into the fund in 2012?

13   A    Off the top of my head, a little over 2,000.

14   Q    So with respect to, if it's a thousand hours that

15   gives you a full health insurance credit year, does the

16   extra thousand hours, does it go away or do you get extra

17   insurance into the following year?

18   A    It carries over.

19   Q    So with respect to that, then, if you had two thousand

20   hours in the year of 2012, how many years of health

21   insurance would you have had that you would have earned in

22   2012?

23   A    Definitely been available for 2012 and probably all

24   2013, if not further.

25   Q    Are you getting all of that credit?

1    A    It's my understanding I'm getting no credit from at

2    least January of last year.

3    Q    Tell me whether or not the loss of your health

4    insurance effective July 1 of 2013, concerns you?

5    A    Definitely.

6    Q    Can you tell me whether or not Local 18 did an audit

7    of your company with respect to the payment into the funds

8    in early 2012?

9    A    Yes.

10   Q    Do you recall what the audit report showed?

11   A    I believe it showed that they claimed there is hours

12   for benefits due.

13   Q    Approximately how much money was due?

14   A    They came back with approximately, I believe 9,000,

15   give or take.

16   Q    What was this issue over, on this issue of this

17   determination?

18   A    It was over a part-time employee that was retired from

19   my company.

20   Q    What was his name?

21   A    Delbert Newlon.

22   Q    And who was Mr. Newlon?

23   A    He's a retired operator.

24   Q    With respect to that audit report, what did it concern

25   with respect to why they thought that you owed money for

1    Mr. Newlon?

2    A    Could you say that again, please?

3    Q    Yes.  With respect to the audit report, and you said

4    there was a determination you owed $9,000.

5    A    Right.

6    Q    What was it that you failed to do, as far as this

7    report goes, that you owed this money?

8    A    When he was working under covered work, we mistakenly

9    paid him the benefits instead of the operators.

10   Q    So you paid him what, then, the full contract rate and

11   the benefits directly to him?

12   A    That's correct.

13   Q    Why did you do that instead of paying the fund the

14   fund's money that would be owed under the contract for

15   covered work?

16   A    Well, that was our first operator we've ever had

17   retire from the operators, and we assumed that since he was

18   retired that the benefits went to him instead of the union.

19   Q    Outside of Mr. Newlon, with respect to all of your

20   other employees, can you tell me whether or not you pay the

21   operating engineers for covered work under the collective

22   bargaining agreement for all the hours that they work as

23   operating engineers under the agreement?

24   A    Yes.

25   Q    Can you tell me whether or not you fill out any

```
 1    particular paperwork to send them?

 2    A    Yes.

 3    Q    What kind of paperwork do you fill out?

 4    A    The fringe benefits sends a form that we have to put

 5    the employee's name, hours worked and whatnot, and remit

 6    with the payment.

 7    Q    Have you consistently done that?

 8    A    Yes.

 9    Q    With respect to the audit report, was there any

10    determination with respect to any other person in your

11    company that you're aware of that you had shorted the fund

12    money on?

13    A    No.

14    Q    When you got this determination from the fund for

15    $9,000, can you tell me whether or not you paid it?

16    A    No.  The nine thousand, no.

17    Q    What did you do when you got this audit report?

18    A    We went back through our records and payroll and

19    determined the amount was roughly 4,000 and some change

20    that we owed them.

21    Q    So you did a self-audit and you came up with a

22    different number?

23    A    Correct.

24    Q    Do you have any explanation as to why you come up with

25    a number around 4,200 and the auditor came up with a number
```

VOL. I    46

1    around 9,000?

2    A    I believe they were picking up some hours that he

3    performed that was not covered work.

4    Q    When you say it was not covered work, what kind of

5    work was Mr. Newlon doing for you after he retired from

6    Bunn Enterprises?

7    A    It could have been multiple things, running parts,

8    farm work, ordering parts.

9    Q    You said farm work?

10   A    Correct.

11   Q    What does that mean?

12   A    Farm work.

13   Q    I'm not a farmer.  I'm a city boy.  Is he cutting

14   grass?

15   A    Cutting grass, helping fix fence, labor work.

16   Q    When you paid him for this work, did you pay him a

17   straight hourly rate?

18   A    Yes.

19   Q    Approximately what was the straight hourly rate?

20   A    I can't remember.  Fifteen, sixteen dollars an hour.

21   Q    Did you pay him any benefits on top of that or was it

22   straight dollar hour?

23   A    Straight dollar hour.

24   Q    Now, after you did your self-audit and you determined

25   that you owed 4,200, how did you come up with that number?

1    What documents did you look at?

2    A   We went through our certified payroll.

3    Q   What is a certified payroll?

4    A   For the type of work we do, which is primarily state

5    contracts, we have to submit a report to the state stating

6    who the employee was and what they were paid, and we

7    forward that on to the state.

8    Q   So any covered work under the operating engineers

9    contract that you have with Bunn Enterprises, can you tell

10    me whether or not that work would show up on all of those,

11    I believe they're called prevailing wage reports?

12    A   Yes.

13    Q   In checking those prevailing wage reports during the

14    time period when Mr. Newlon was retired, that's what you

15    looked at, then, when you did your audit?

16    A   Correct.

17    Q   Now, after doing this self-audit and determining here

18    are the hours that he worked under the contract of the

19    collective bargaining agreement for the hours that he

20    worked, what did you do next?

21    A   We submitted a letter to the Local 18 fringe

22    department stating what we felt we owed.

23    Q   You sent a letter to them and I believe it's an

24    exhibit that's part of the record.

25        With respect to that document, what did the fund do in

1    response?

2    A    They re-audited our records again.

3    Q    And did they agree with you that you owed 4,200?

4    A    No.  They went from 9,000 to I believe roughly 50,000.

5    Q    And what was the explanation as to why they thought

6    that you now owed 50,000 after you showed them your audit

7    which said that for all the covered work it was 4,200?

8    A    I'm not certain.  I believe that they were picking up

9    all hours worked, including not covered work.

10        THE COURT:  Mr. Mason, Mr. Clark, could I see you

11   both at sidebar?

12     (Thereupon, Court and counsel conferred out of the

13   hearing of open court and off the record.)

14        THE COURT:  Mr. Mason, if you're at a convenient

15   breaking point, we can break here and you can pick up after

16   lunch.

17        MR. MASON:  It looks like I have a few more

18   questions than I thought.  So we can stop right here.

19        THE COURT:  We'll break now, we'll stand in recess

20   until 1:30.

21     (Lunch recess taken from 12:00 p.m. to 1:30 p.m.)

22                              - - -

23

24

25

```
 1                        TUESDAY AFTERNOON SESSION

 2                            May 2, 2013

 3                              -  -  -

 4            THE COURT:  Please proceed, Mr. Mason.

 5            MR. MASON:  Thank you, Your Honor.

 6      BY MR. MASON:

 7      Q    Mr. Bunn, do you have accurate records that show the

 8      amount that should have been paid to the fund regarding

 9      Mr. Delbert -- what is his last name?

10      A    Newlon. -- yes.

11      Q    Did you offer to pay the fund the approximate $4,200

12      on the self-audit that you did?

13      A    Yes.

14      Q    And I believe you've already testified what happened

15      after you notified them, right?

16      A    Yes.

17      Q    With respect to the information that you give to the

18      union, do you designate to the union the specific location

19      and the individuals that should be receiving the funds

20      credit for work on hours that they perform?

21      A    Yes.

22      Q    Outside of this one issue with respect to Delbert

23      Newlon, have you fully paid all the other funds owed to all

24      the employees for all hours worked?

25      A    Yes.
```

```
1    Q    Now, with respect to your self-audit money that you

2    determined on your own that you owe, what have you done

3    with respect to that fund that you say that you owe under

4    what the union claims is the contract for hours worked

5    under the contract?

6    A    I'm not following your question.

7    Q    Have you paid that money to anybody?

8    A    What we determined that we self-audited, yes.

9    Q    Who did you pay that to?

10   A    The fringe department at the operators.

11   Q    When did that money go out?

12   A    Today.

13        THE COURT:  Let me clarify one thing, Mr. Bunn.  The

14   amount that you paid today is the amount that you

15   determined to be due and owing as a result of the

16   self-audit; is that right?

17        THE WITNESS:  Correct.

18        THE COURT:  That amount differs from the amount that

19   the operating engineers fund claimed that you owe?

20        THE WITNESS:  Correct.

21        THE COURT:  What is the numerical difference?

22        THE WITNESS:  Round numbers, I would say

23   approximately 46,000.

24        THE COURT:  Is the difference?

25        THE WITNESS:  Correct.
```

1     THE COURT:  How much did you pay today?

2     THE WITNESS:  4,107 and some change.

3     THE COURT:  And they claim that you owe 87?

4     MR. MASON:  I think it's closer to 57.

5     THE WITNESS:  Fifty something is the latest figure.

6     THE COURT:  So it's a $16,000 difference?

7     MR. MASON:  No, sir.  He paid $4,170.

8     THE COURT:  I thought he said he paid 47,000.

9     MR. MASON:  No, sir.

10    THE COURT:  I got you.  So the fund claims that you

11    owe $57,000, and based on your oral audit you claim you

12    owe -- how much did you say?

13    THE WITNESS:  4,107 and some change.

14    MR. TULENCIK:  Your Honor, if I may, I believe it

15    was $51,000.

16    MR. MASON:  From the first audit.  But the second

17    audit was 50-some thousand.

18    MR. TULENCIK:  We just received an audit in April of

19    this year, and I believe it's up to 52,000.

20    THE COURT:  Please continue.

21    BY MR. MASON:

22    Q    Now, throughout this dispute with the fund, have you

23    continued to use operators that are union for Bunn

24    Enterprises?

25    A    Yes.

1    Q    Can you tell me whether or not Bunn Enterprises has

2    paid to the fund all moneys owed to the fund for these

3    employees?

4    A    Yes.

5    Q    Can you tell me whether or not you turned in reports

6    to the fund where this money should be credited and to

7    whom?

8    A    Yes.

9    Q    And has the fund properly credited these employees for

10   the money paid for the work they performed?

11   A    No.

12   Q    As a result of the fund not crediting these employees

13   the money that you've paid to the fund for the hours that

14   they've worked, what, as a consequence of the fund doing

15   that, has happened to Bunn Enterprises and the impact of

16   that decision by the fund?

17   A    Well, obviously our employees are not getting their

18   health insurance or their credit for their pension.  It's

19   hard to hire new people to come to work under those

20   conditions knowing that they may not have health insurance,

21   and you know, possibly could be losing people because of

22   that issue as well.

23   Q    Can you tell me whether or not any employees are

24   transferring or have transferred from Local 18 to other

25   locals as a result?

VOL. I    53

```
1    A    Yes, sure have.
2         MR. MASON:  Your Honor, I have no further questions.
3         THE COURT:  Thank you, Mr. Mason.
4         Mr. Clark.
5                        - - -
6                   CROSS-EXAMINATION
7    BY MR. CLARK:
8    Q    Good afternoon, Mr. Bunn.  I'd like to start by going
9    back to your testimony a few moments ago where you
10   indicated that Bunn Enterprises currently employs operating
11   engineers.
12   A    Correct.
13   Q    How many operating engineers are currently employed by
14   Bunn Enterprises?
15   A    Currently -- I mean, it varies obviously from workload
16   demand, but I'd say right now, approximately four to five.
17   Q    You indicated that Bunn Enterprises continues to make
18   fringe benefit contributions based on the work of those
19   four to five operators who are currently working; is that
20   right?
21   A    Correct.
22   Q    Do any of those operators perform work for Bunn
23   Enterprises that is not covered work under the collective
24   bargaining agreement?
25   A    Rephrase that for me, please.  What was your question
```

1    again?

2    Q   Of the four to five current operating engineers

3    employed by Bunn Enterprises, do any of those individuals

4    perform work for Bunn Enterprises that is not covered work

5    under the collective bargaining agreement between Bunn

6    Enterprises and Local 18?

7    A   It would be covered work.

8    Q   All of the work is covered work?

9    A   Yeah.

10    Q   And the contributions that Bunn Enterprises has paid

11    to the fringe benefit fund office based on the hours worked

12    by its current employees, have those contributions been

13    based on all hours paid to those employees?

14    A   The hours that was covered, yes.

15    Q   Are there hours that are not covered that were not

16    covered work?

17    A   I think the majority of them is covered work.

18    Q   How many hours of work did your -- have your current

19    operating engineers done, say, in 2013 that is not covered

20    work under the collective bargaining agreement?

21    A   So far I'd say -- of course, we really haven't got

22    started good for the year, either, but really not many.

23    It's pretty much been covered work.

24    Q   Do you have an idea of what percentage of the work is

25    not covered work?

```
1    A    I wouldn't be able to guess.

2    Q    Has Bunn Enterprises paid fringe benefit contributions

3    to the Ohio Operating Engineers Fringe Benefit Funds based

4    on the non-covered hours of worked by your operating

5    engineers in 2013?

6    A    For non-covered work, no.

7    Q    You've understood, since you received the audit

8    findings from the fringe benefit fund office, that it is --

9    it's the position of the fringe benefit funds that

10   contributions are to be paid based on all hours paid to

11   operating engineers regardless of whether or not they're --

12   spend their time performing covered work or non-covered

13   work, correct?

14   A    I understand that is the operators' understanding.

15   Q    And you have understood that that's the position of

16   the fringe benefit funds since when?

17   A    Since I guess the audit.

18   Q    And you dispute that interpretation, correct?

19   A    I'd say we're in disagreement.

20   Q    So if this Court were to find that the collective

21   bargaining agreement in effect between Bunn Enterprises and

22   Local 18 requires the contributions be paid based on all

23   hours paid to operating engineers, you would agree that

24   Bunn Enterprises has not paid all the contributions that it

25   was required to pay in 2013?
```

1          MR. MASON:  Objection, Your Honor.  That calls for a

2     legal conclusion.  He's making the assumption of the

3     Court's ruling -- the legal issues involved, not a fact

4     question.

5          THE COURT:  Overruled.  You may answer, Mr. Bunn.

6          THE WITNESS:  Repeat the question again.

7     BY MR. CLARK:

8     Q    Certainly.  If this Court determines that the

9     collective bargaining agreement in effect between Bunn

10    Enterprises and Local 18 requires Bunn Enterprises to make

11    contributions to the fringe benefit fund based on all hours

12    paid to its operating engineers and not just based on work

13    spent on covered hours, that Bunn Enterprises has not paid

14    all the required contributions to the fund during 2013?

15    A    I understand whatever ruling the Court issues is what

16    we will do, if that answers your question.

17    Q    I don't know that it does.

18    A    All right.

19    Q    You testified on direct examination that Bunn

20    Enterprises has paid all the hours in 2013, all the

21    contribution hours that are owed, correct?

22    A    That we paid all the hours that are owed, yes, that's

23    what I feel.

24    Q    But if the Court were to find that the collective

25    bargaining agreement requires contributions be paid not

1    just for covered hours but for all hours paid to your

2    operating engineers, that that testimony is no longer

3    correct?

4    A    I mean, I feel we've paid all that's owed.

5    Q    I understand that's your position.  What I'm trying to

6    confirm is that there are hours out there that have been

7    paid to Bunn Enterprises' operating engineers for which no

8    contributions have been made to the fringe benefit fund in

9    2013?

10   A    I would have to review the records to give you a

11   definite answer on that, to be honest with you.

12   Q    You haven't done that?

13   A    Probably not in depth for 2013, no.

14   Q    Let's go back to 2012.

15   A    Okay.

16   Q    You received notice that the fringe benefit funds

17   calculated delinquency.  What was the amount that you

18   recall of the audit finding?

19   A    Which audit?

20   Q    The last figure.

21   A    Roughly, the last figure that I received from the

22   operators was in the neighborhood of somewhere -- 50,000 is

23   sticking in my head.

24   Q    So when did you receive that audit finding?

25   A    I couldn't tell you what date.

1   Q    Do you know what month?

2   A    I sure don't.

3   Q    So you received an audit from the fringe benefit fund

4   indicating a delinquency that exceeded $50,000.  At what

5   point did Bunn Enterprises conduct the self-audit that

6   you've referred to?

7   A    It would have been after we received that notice.

8   Q    In that self-audit, Bunn Enterprises determined under

9   its own interpretation of the contract that $4,500 in

10  contributions were due based on hours worked by Mr. Newlon;

11  is that correct?

12       MR. MASON:  Objection, Your Honor.  I think the

13  witness testified it was just over $4,100.

14       THE COURT:  Mr. Mason has objected to the form of

15  the question.  I'm going to allow the question to stand, if

16  you understand the question, Mr. Bunn.

17       Mrs. Evans, would you read the question back.

18   (Thereupon, the last question was read by the court

19  reporter.)

20       THE WITNESS:  We determined, rough numbers, $4,107

21  was due.

22  BY MR. CLARK:

23  Q    And it's your testimony that that amount was paid

24  today?

25  A    That is right.

1    Q    That is the amount that was paid today?

2    A    Yes.

3    Q    And when was the self-audit conducted?

4    A    As I answered previously, after we received the notice

5    from the operators on their audit.

6    Q    In 2012?

7    A    I believe it was in 2012.

8    Q    Why did Bunn Enterprises not pay the approximate

9    $4,100 in contributions that it determined were due in 2012

10   until May of 2013?

11   A    After the correspondence between the operators, I

12   handed it over to my attorneys and really that is the last

13   dealing I had with it.

14   Q    Do you know why Bunn Enterprises paid $4,100 today?

15   A    I was advised to.  We feel that's what we owe.

16   Q    When Bunn Enterprises conducted the self-audit that

17   you described in 2012, did you verify that operating

18   engineers employed by Bunn Enterprises had in fact

19   performed a number of hours of non-covered work that were

20   captured in the audit?

21   A    Yes.

22   Q    And if contributions were due to the fringe benefit

23   fund based on all hours paid as opposed to just based upon

24   covered hours worked, did you determine that the fringe

25   benefit fund's audit was correct?

1    A    You know, I didn't dive into their audit to that

2    extent, to answer your question.  I didn't have my

3    accountant or anything look at it.

4    Q    Since 2012, have you dove into the audit in greater

5    detail to determine if the $50,000-plus calculation is

6    accurate?

7    A    It's been in attorneys' hands, so I don't know if they

8    have or not.

9    Q    But you haven't?

10   A    No, not personally.

11   Q    Now, Mr. Newlon -- Delbert Newlon?

12   A    Correct.

13   Q    You testified he was retired, a retired operating

14   engineer, correct?

15   A    Right.

16   Q    Do you know when Mr. Newlon retired?

17   A    No, I don't know what year it was.

18   Q    Did he retire as an employee of Bunn Enterprises?

19   A    I don't know if we were the last company he worked

20   for.  I know he retired, I believe it was from Bunn

21   Enterprises.

22   Q    So Mr. Newlon had worked for Bunn Enterprises as an

23   active member of Local 18?

24   A    Yes.

25   Q    And then at some point Mr. Newlon retired, correct?

1    A    Yes.

2    Q    After his retirement date, Mr. Newlon continued to be

3    employed by Bunn Enterprises?

4    A    Part-time.

5    Q    After his retirement date, Mr. Newlon continued to

6    perform operating engineer work for Bunn Enterprises,

7    correct?

8    A    A portion of the work.

9    Q    Did Bunn Enterprises notify the fringe benefit fund

10   office that it was employing a retired operating engineer?

11   A    I'm sure we didn't.  I didn't know we had to.

12   Q    Were you aware that Mr. Newlon was collecting a

13   pension from the Ohio Operating Engineers Pension Benefit

14   at the time he was working part-time for Bunn Enterprises?

15   A    I don't know anything about his personal finances.

16   Q    So you don't know if he was receiving a pension

17   benefit at all?

18   A    I don't know anything about his personal finances.

19   Q    So, for the period of time that Mr. Newlon was a

20   retired operating engineer but still working for Bunn

21   Enterprises performing, I guess, according to you some of

22   the time he was doing operating engineer work, was Bunn

23   Enterprises making fringe benefit contributions based upon

24   any of the hours worked by Mr. Newlon?

25   A    When he was doing worked covered, we paid him the

1    fringe benefits and not the fund office.

2    Q    You paid Mr. Newlon just a check?

3    A    Yes.

4    Q    Did you believe that that arrangement was appropriate

5    under the collective bargaining agreement?

6    A    I had no information to tell me otherwise.

7    Q    Did you ask the union if that was appropriate, to

8    employ a retired operating engineer?

9    A    No, I did not ask the union.

10   Q    Did you ever contact the fringe benefit fund office to

11   inquire if it was appropriate for Bunn Enterprises to

12   employ a retired operating engineer and to pay fringe

13   benefit contributions directly to the employee?

14   A    We never contacted the fringe office.

15   Q    Did Bunn Enterprises ever notify the fringe benefit

16   fund office that it was contributing contributions to the

17   fringe benefit fund only based upon covered hours worked by

18   Bunn Enterprises' operating engineers?

19   A    We had no conversations with the fund's office.

20   Q    Is that a no?

21   A    That's a no.  We have not had any conversations with

22   the fund's office.

23   Q    Did you ever inform the fund's office in writing that

24   Bunn Enterprises was only making contributions for covered

25   hours and not for all hours paid?

1    A    We didn't have any communications with the fund's

2    office.

3    Q    Is Bunn Enterprises a member in any trade association?

4    A    For example?  Give me an example.

5    Q    Is Bunn Enterprises a member of the Ohio Contractors

6    Association?

7    A    I believe we currently are.

8    Q    How long has Bunn Enterprises been a member of the

9    Ohio Contractors Association?

10   A    I don't know the date we joined.

11   Q    Been more than five years?

12   A    I'd say neighborhood of five years, could be more,

13   could be less.  I'm not sure of the exact join date.

14   Q    Mr. Bunn, have you ever received -- let me take that

15   back.  Mr. Bunn, are you familiar with the Ohio Operating

16   Engineers Health and Welfare Fund?

17   A    Certain portions of it I'm vaguely familiar with.

18   Q    What are you familiar with?

19   A    They provide insurance.

20   Q    And they provide insurance to you, correct?

21   A    Correct.

22   Q    How long have you been receiving health insurance from

23   the health and welfare fund?

24   A    I joined in, I believe, roughly 1996; so I'm assuming,

25   you know, probably had insurance '96, '97 in that range.

1    Q    And you've had health insurance with the health and

2    welfare fund from that date, the mid '90s through the

3    present, correct?

4    A    Correct.

5    Q    Have you ever had your benefits suspended?

6    A    I mean, it sounds like they're suspended now.  They're

7    not getting applied, and they're going to run out in July,

8    is my understanding.

9    Q    Sitting here today, you have health insurance through

10   the health and welfare fund, correct?

11   A    Currently right now, yes.

12   Q    And from '96 or '97 when your coverage started through

13   today, has there ever been a period where your coverage had

14   lapsed?

15   A    No.

16   Q    Have you received any notification in writing from the

17   fringe benefit fund office that your health and welfare

18   coverage is in danger of lapsing?

19   A    No.  I haven't received anything from them.

20   Q    We heard some testimony this morning from other

21   individuals who received a self-pay letter from the fringe

22   benefit fund.  Have you ever received a self-pay letter

23   from the fund office?

24   A    I've personally not seen that.

25   Q    Additionally, we heard testimony from individuals who

1    have received a COBRA election form giving them the

2    opportunity to elect COBRA when their coverage expired.

3    Have you received a COBRA election form from the fringe

4    benefit fund office?

5    A    No.  I've never received basically anything from them.

6    Q    You are the president of Bunn Enterprises, correct?

7    A    Yes.

8    Q    Are you the individual responsible for making a

9    determination as to the amount of fringe benefit

10   contributions to be paid to the health and welfare fund

11   each month?

12   A    Are you asking do I prepare the documents?

13   Q    Do you make the decision as to whether and how much

14   will be paid in contributions each month?

15   A    I guess ultimately, yeah, it would come back to me.

16   Q    Is it your plan, as you sit here today, for Bunn

17   Enterprises to continue to pay monthly contributions to the

18   fringe benefit fund into 2013?

19   A    Yes.

20   Q    And is it your intention to make contributions only

21   for covered hours worked by operating engineers as opposed

22   to all hours paid?

23   A    I'm sure all covered work we're going to pay.

24   Q    How many hours per week or month in contributions do

25   you make on your own behalf?

```
 1    A    Right now, none.

 2    Q    When was the last time you made fringe benefit

 3    contributions on behalf of Bunn Enterprises?

 4    A    For myself is what you're asking?

 5    Q    When was the last time Bunn Enterprises submitted

 6    contributions to the fund office?

 7    A    For any employee?

 8    Q    For anybody.

 9    A    I don't know the exact date.  Whenever the forms are

10    due.

11    Q    Have contributions been paid in 2013?

12    A    I'd have to check.  I don't know.

13    Q    What type of work does Bunn Enterprises do?

14    A    Highway construction.

15    Q    Is that a seasonal business?

16    A    Yes.

17    Q    Has Bunn Enterprises -- you said you're just getting

18    to your active season.  Has there been projects that Bunn

19    Enterprises has been working on during the winter months?

20    A    I'm not sure when our last project was, off the top of

21    my head.

22    Q    You don't know when the last time your company had

23    worked?

24    A    We worked last week.  Is that your question?

25    Q    Yes.
```

1    A    Yes.  We worked last week.

2    Q    And before last week, have there been any weeks of

3    work that Bunn Enterprises performed in 2013?

4    A    Yes.

5    Q    When were those?

6    A    Spring, roughly.  I'm not sure of the exact dates.

7    Q    Is it fair to say that Bunn Enterprises' business is

8    dormant through most of the winter?

9    A    Yeah.  Our work season starts in spring and ends in

10   fall.

11   Q    So, for the months where you're not actively working,

12   am I correct that there are no contributions paid to the

13   fringe benefit fund for those months because there's no

14   hours worked?

15   A    If there's no hours worked, correct.

16   Q    Do you anticipate that in the month of May, Bunn

17   Enterprises will be more fully engaged in highway

18   construction?

19   A    Weather permitting, yes.

20   Q    And once Bunn Enterprises is working here in the month

21   of May, do you anticipate making fringe benefit

22   contributions on behalf of yourself?

23   A    Undecided.

24   Q    In 2012 when Bunn Enterprises was working, you said

25   the summer of 2012, how many hours per month did Bunn

1    Enterprises report on behalf of you, Kevin Bunn, to the

2    fringe benefit fund office?

3    A    I don't have the hours in front of me.  I don't know.

4    Q    I thought on your direct testimony you indicated it

5    was 40 hours per week?

6    A    Average, that's the average paying.  But the grand

7    total number for last year, I don't have that in front of

8    me.  I don't know.

9    Q    So the 40-hours-per-week figure is an average?

10   A    It's an average.

11   Q    So there's some weeks where it's less than 40 and some

12   weeks where it's more than 40; is that correct?

13   A    Yeah, it could be less than 40; it could be more than

14   40, but it's averaged at 40.

15   Q    As president of Bunn Enterprises, do you spend 40

16   hours per week, sometimes more, engaged in work as an

17   operating engineer?

18   A    As an operating engineer, probably no.

19   Q    So for yourself, for its president, Bunn Enterprises

20   pays contributions to the fringe benefit funds for work

21   that you perform as an operating engineer plus some

22   additional hours; is that right?

23   A    Correct.

24   Q    But that's not the same calculation used when paying

25   contributions based upon -- paying contributions for the

1      employees of Bunn Enterprises?

2      A    I don't know if I'd say that.

3      Q    Well, you do non-covered work and pay contributions

4      based on those hours, and your employees of Bunn

5      Enterprises do non-covered work and Bunn Enterprises

6      doesn't make contributions; is that right?

7      A    I don't know if I would agree with that either.

8      Q    How is that incorrect?

9      A    Well, do I operate equipment every day is what I'm

10     interpreting you're asking me?

11     Q    Yes.

12     A    No.

13     Q    But contributions nonetheless are paid for you on a

14     full-time basis?

15     A    Well, they're not being paid now.

16     Q    Now, you testified that when Bunn Enterprises submits

17     monthly contribution reports to the fringe benefit fund

18     office, that Bunn designates individuals for whom the

19     contribution should be credited?

20     A    I believe that's right on the forms that are required

21     to be sent to the operators.

22     Q    And are you aware of any provision in the collective

23     bargaining agreement that Bunn Enterprises has with Local

24     18 that gives Bunn Enterprises the right to determine the

25     individual operator to whom the hours will be credited?

1    A    You know, I don't know everything that's in the

2    collective bargaining agreement, I guess would be my

3    answer.

4    Q    Do you know of any aspect of the collective bargaining

5    agreement that allows Bunn Enterprises to make the

6    determination as to which of its employees' hours of

7    service will be credited towards?

8    A    I don't know if there is or isn't anything in the

9    collective bargaining agreement that says that.

10   Q    Have you reviewed the health and welfare fund plan

11   document?

12   A    No.

13   Q    Are you aware of any aspect of the health and welfare

14   fund plan document that gives Bunn Enterprises the right to

15   determine which of its employees should be credited for

16   hours of service?

17   A    I haven't reviewed that document.

18   Q    So you don't know?

19   A    I haven't reviewed it.

20   Q    You understand, though, that the health and welfare

21   fund has determined that contributions submitted by Bunn

22   Enterprises should be credited towards the oldest unpaid

23   hours?

24   A    That's my understanding how the operators is viewing

25   it.

1    Q    You understand that the health and welfare fund has --

2    views it that way?

3    A    That's the way I understand it.

4    Q    Do you have any reason to question the appropriateness

5    of that determination by the health and welfare fund?

6    A    I'm not following your question on that.

7    Q    You understand that the health and welfare fund has

8    made a determination that contributions submitted by Bunn

9    Enterprises should be credited towards the oldest hours

10   outstanding of Bunn Enterprises' employees, correct?

11   A    That's -- I understand that's how they're viewing it,

12   yes.

13   Q    And as a result, Bunn Enterprises' contributions are

14   going -- are being credited towards the account of Delbert

15   Newlon, correct?

16   A    That's what I've been told.

17   Q    As a result of that, contributions submitted by Bunn

18   Enterprises are also going to the account of Kevin Bunn; is

19   that correct?

20   A    Repeat that.  I'm losing you again.

21   Q    As a result of the fringe benefit fund's policy to

22   credit contributions to the oldest delinquent contribution,

23   current contributions are being credited towards older

24   amounts attributable to Kevin Bunn.  Are you aware of that?

25   A    Attributed to me?  The way I understand it, the

VOL. I    72

1    operators is taking mine and everyone else's benefits and

2    applying it to this Newlon situation.

3    Q    So your understanding is dollars paid in 2012 or 2013

4    are being credited towards the delinquency that the fringe

5    benefit fund has identified on Mr. Newlon's time, correct?

6    A    That's what I've been told.

7    Q    We're here today because it's Bunn Enterprises'

8    position that that policy of the health and welfare fund to

9    credit Mr. Newlon as opposed to Mr. Morgan, for example,

10   that that policy is somehow inappropriate.  And my question

11   to you is do you have any basis to contend that that policy

12   is inappropriate?

13        MR. MASON:  Your Honor, I object.  I mean, he's

14   asking for --

15        THE COURT:  What is the legal basis for your

16   objection?

17        MR. MASON:  The legal basis is that he's asking the

18   witness --

19        THE COURT:  What I'm trying to avoid is the

20   declarative sentence.  I just want to know the legal basis.

21   Is it the form of the question?

22        MR. MASON:  Asking the witness for a legal opinion

23   on a case that is pending.

24        THE COURT:  Okay.  I understand.

25        Mrs. Evans, would you read the question back,

1    please.

2    (Thereupon, the last question was read by the court

3    reporter.)

4    THE COURT:  On the state of the record now, I'm

5    going to sustain Mr. Mason's objection.  Now, you may

6    establish a foundation as to how he would know that.  He is

7    the president of the company, so the Court could presume

8    that he would know that.  I have no basis to indulge that

9    presumption.  But if you can establish a foundation for the

10    question, you may ask it.

11    MR. CLARK:  I guess the point of my question was

12    simply to establish that there is no foundation, that he

13    doesn't have that knowledge.  I don't know that he -- I

14    just --

15    THE COURT:  All right.  Well, rephrase your

16    question.

17    MR. CLARK:  Certainly.

18    BY MR. CLARK:

19    Q    Mr. Bunn, the policy that you understand of the health

20    and welfare fund to credit contributions towards the oldest

21    delinquency, you testified you're not aware of any aspect

22    of the collective bargaining agreement that prohibits such

23    a policy and you're not aware of any aspect of the health

24    and welfare fund plan document that prohibits such a

25    policy.

1    My question to you simply is, is there any other

2    document, or source of knowledge, that you have that allows

3    you to testify that the policy of the fund office is

4    somehow inappropriate or inconsistent?

5         MR. MASON:  Your Honor, I'm going to object.

6         THE COURT:  Overruled.  You may answer, Mr. Bunn, if

7    you know.

8         THE WITNESS:  You mention Mark Morgan.  I don't know

9    if this answers your question.  But, you know, if he works

10   a hundred hours, he should get his benefit for the hundred

11   hours that we pay into them, if that answers your question

12   or not.

13   BY MR. CLARK:

14   Q    I don't believe it does.  But if contributions on

15   Mr. Morgan are made -- if Bunn Enterprises pays

16   contributions that it would like to go to Mr. Morgan, and

17   the fund -- the fringe benefit fund office determines that

18   those contributions should in fact go to Mr. Newlon,

19   another employee of Bunn Enterprises, are you aware of any

20   policy, procedure, contract, or plan, that prohibits that

21   decision being made by the fringe benefit fund?

22   A    I don't know what's in their policies.

23   Q    Okay.  You testified that you believe that the --

24   total amount sought by the fund office was just in excess

25   of $50,000 and that about $4,100 was paid today?

```
1    A    Yes.

2    Q    First of all, how was that payment made?

3    A    Check.

4    Q    And was it mailed?

5    A    Mailed.

6    Q    From where?

7    A    Our office.

8    Q    Where is Bunn Enterprises' office?

9    A    Fleming, Ohio.

10   Q    So once those funds are received and accredited, the

11   delinquency sought by the fringe benefit funds would be

12   between 40 and $50,000, approximately.  Is that fair?

13   A    I don't know what the operators is claiming.

14   Q    But just based on your recollection, you think that

15   they were looking for a little more than 50 and you've now

16   paid four, right?

17   A    Exact numbers I'm not sure.  Fifty something thousand

18   was sticking in my mind, and I testified as to what we paid

19   today.

20        MR. CLARK:  I don't have any further questions, Your

21   Honor.

22        THE COURT:  Thank you, Mr. Clark.

23        Mr. Mason, do you have any redirect?

24        MR. MASON:  Yes, sir.  Can I take a couple of

25   minutes to confer with my counsel?
```

```
 1              THE COURT:  You're going to have to stand.

 2              MR. MASON:  I'm sorry.  Can I have just a couple of

 3    minutes to confer?

 4              THE COURT:  Yes.  During that time, maybe I can

 5    bring my jury back in and give them the Allen charge.

 6              You can't confer, at this time, Mr. Bunn, with your

 7    counsel because you're still on the stand, but we're going

 8    to take a brief recess before any redirect.  All right?

 9              THE WITNESS:  Do you want me to step down?

10              THE COURT:  Yes, sir.

11       (Recess taken from 2:26 p.m. to 2:48 p.m.)

12              THE COURT:  Mr. Mason.

13              Mr. Bunn, you're still under oath.  Please resume

14    the stand.  Let me say in open court, Mr. Mason and

15    Mr. Clark, and for all of the witnesses, I really

16    appreciate your patience as I've been managing the one case

17    and this case.  So thank you very much, lady and gentlemen.

18              Please proceed, Mr. Mason.

19              MR. MASON:  Thank you, Your Honor.

20                              - - -

21                     REDIRECT EXAMINATION

22    BY MR. MASON:

23    Q    Mr. Bunn, with respect to the witnesses that have

24    testified earlier here today as operating engineers, you

25    heard their testimony, correct?
```

```
1    A    Yes.

2    Q    And you heard them testify that they did operators'

3    work and have been fully paid as operators for their work

4    and that's all they do for you, correct?

5    A    Yes.

6    Q    With respect to that, can you tell me whether or not

7    the only dispute here that you're aware of is the

8    non-operators' work of Mr. Newlon?

9    A    As far as I know, yes.

10   Q    And that when you did your self-audit, you were

11   looking at the work -- can you tell me whether or not you

12   were looking at the work only of Mr. Newlon?

13   A    Primarily, yeah, only Mr. Newlon.

14   Q    When you say primarily, what do you mean?  Was there

15   anybody else that you're aware of that was doing anything

16   other than operators' work, or was your audit limited to

17   Mr. Newlon because that was the only one at issue?

18         MR. CLARK:  Objection.

19         THE COURT:  Sustained.  Rephrase your question.  It

20   was leading, Mr. Mason.

21   BY MR. MASON:

22   Q    Can you tell me whether or not you're aware of anyone

23   working for Bunn Enterprises where the issue is they're

24   working part-time for operating engineers and part-time

25   someplace else?
```

1    A    No, only Mr. Newlon.

2    Q    Now, Mr. Newlon stopped work for you when?

3    A    I'm not sure of the exact year that he retired.

4    Q    Okay.  With respect to that, when you were testifying

5    earlier about 2012 or 2013 and some work that was not

6    operators' work that the company was not paying for, can

7    you tell me whether or not you're referring to Mr. Newlon?

8    A    2012?

9    Q    And 2013, in your testimony, was there anybody other

10   than Mr. Newlon that you were referring to regarding

11   non-operators' work that you weren't paying for?

12   A    No.

13   Q    If, as the record has already -- is there any document

14   that I can hand you that can refresh your recollection as

15   to when Mr. Newlon stopped working for Bunn Enterprises?

16   A    I'm sure there is.

17   Q    Do you recall in the complaint it was alleged as to

18   when Mr. Newlon stopped work for Bunn Enterprises that you

19   verified?

20        MR. CLARK:  Objection.

21        THE COURT:  Basis, Mr. Clark?

22        MR. CLARK:  Leading again.

23        THE COURT:  Your question is, "Do you recall in the

24   complaint it was alleged as to when Mr. Newlon stopped work

25   for Bunn Enterprises that you verified."

```
1              I'm going to overrule the objection.

2              Do you recall when it was based on the complaint?

3              THE WITNESS:  I'm not sure of the exact date or

4    year, but as, you know, 2008 or seven, I believe.

5    BY MR. MASON:

6    Q    That's when he started work.  When did he quit?  Do

7    you recall that was in the complaint?

8    A    I can't recall.

9              MR. MASON:  Your Honor, can I approach the witness

10   and refresh his recollection with a copy of the complaint

11   and the paragraph?

12             THE COURT:  Any objection, Mr. Clark?

13             MR. CLARK:  I guess if there's some foundation

14   established that the complaint is refreshing his

15   recollection.  It's not a document that he has drafted.

16             THE COURT:  In a jury trial or in a -- even in a

17   bench trial, I might require him to lay the foundation for

18   refreshing recollection.  But given the nature of this

19   proceeding, to expedite matters, I will allow him to

20   provide the complaint to the witness.

21             MR. MASON:  Permission to approach the witness, Your

22   Honor?

23             THE COURT:  Yes, you may.

24   BY MR. MASON:

25   Q    Mr. Bunn, I'm going to ask you to read to yourself.
```

1    Would you read paragraph 16.

2    A    Mr. Newlon --

3    Q    Not out loud, just to yourself.

4    A    Okay.

5    Q    Does that refresh your recollection as to when

6    Mr. Newlon quit work for Bunn Enterprises?

7    A    Yes.

8    Q    Okay.  When did Mr. Newlon quit work for Bunn

9    Enterprises?

10   A    In 2012.

11   Q    With respect to any testimony that you may have made

12   with respect to the year 2013 and Mr. Newlon and not

13   receiving full compensation for operators' work, was that

14   testimony in error?

15   A    Yes.

16   Q    Let's turn with respect to your hours for a moment.

17   As president of a company, do you work a lot of hours?

18   A    Several.

19   Q    I understand.

20        Do you work more than typically 40 hours a week?

21   A    Yes.

22   Q    With respect to that and with respect to the moneys

23   that you pay into the fund for your health insurance and

24   pension, you're only paying 40 hours a week on average,

25   right?

1    A    That's correct.

2    Q    So therefore you're not paying hour for hour for all

3    the hours you actually work, correct?

4    A    No.

5    Q    With respect to that, can you tell me whether or not

6    you are engaged in what the union says is self-pay so that

7    you can have health insurance?

8    A    Yes, that's right.  I do self-pay to have health

9    insurance.

10         MR. MASON:  Can I confer with counsel just a minute,

11   Your Honor?

12         THE COURT:  Yes, you may.

13         MR. MASON:  I have no further questions.

14         THE COURT:  Any recross?

15         MR. CLARK:  Yes, Your Honor.

16                          -  -  -

17                   RECROSS-EXAMINATION

18   BY MR. CLARK:

19   Q    Mr. Bunn, you testified that the 40 hours a week is an

20   average, correct, that you contribute?

21   A    Average, yes.  I pay myself 40 hours a week.

22   Q    And you make contributions you said on average 40

23   hours a week to the fringe benefit fund, correct?

24   A    Yes.

25   Q    I believe your testimony on cross was that some weeks

1    it's higher and some weeks it's lower, correct?

2    A    I work more than 40 hours a week every week.

3    Q    But some weeks you contribute more than 40 hours of

4    contributions to the fund office, correct?

5    A    No.  I always contribute 40.

6    Q    What benefits do you obtain from the fringe benefit

7    funds as a result of those contributions?

8    A    Health insurance and pension.

9    Q    And by contributing 40 hours per week to the fringe

10   benefit funds, you receive an increased pension benefit,

11   correct?

12   A    What's your question?

13   Q    You receive a pension benefit from the pension fund by

14   virtue of making contributions on behalf of yourself; is

15   that correct?

16   A    I was until the operators stalled it.

17   Q    When you contribute -- when you report 40 hours per

18   week on the contribution report for Kevin Bunn, you're

19   sending in that check to credit yourself with 40 hours of

20   service to go towards your pension; is that correct?

21   A    And health insurance.

22   Q    And you're not working 40 hours per week as an

23   operating engineer for Bunn Enterprises, correct?

24   A    Well, I mean, in the course of the week my duties vary

25   pretty significantly.

```
1    Q    I understand that.  And you are not a full-time

2    operating engineer for Bunn Enterprises, correct?

3    A    It depends, honestly, what day it is and what my

4    duties are that day.

5    Q    There are days that you do not work as an operating

6    engineer for Bunn Enterprises, correct?

7    A    There are days I don't; there are days I do.

8    Q    I understand there's days you do.  But you pay

9    contributions to the fund for your pension based on 40

10   hours a week, not just based on your operating hours,

11   correct?

12   A    I pay 40 hours a week to maintain health insurance.

13   Q    Do you maintain a time card for yourself?

14   A    No.

15   Q    Do you track your hours worked?

16   A    No.

17   Q    Do you track the duties that you engage in on a daily

18   basis for Bunn Enterprises?

19   A    On paper, no.

20   Q    Is there any document that Bunn Enterprises maintains

21   that we could look at to determine how many hours you,

22   Kevin Bunn, spent doing operating engineer work in a given

23   week?

24   A    I don't know.  I'd have to look at that.  I'm sure

25   there would be certified payroll reports sometimes.
```

1   Q    Do you know if your hours are broken out as an

2   operator on the certified payroll?

3   A    I don't know if they would be listed as operator or

4   supervisor.

5   Q    You testified that you've made self-pay contributions

6   to the fund office to continue your health coverage?

7   A    I did not -- I have not made self-pay.

8   Q    I thought you said a moment ago that you had made

9   self-pay contributions.  You have not?

10  A    I pay myself 40 hours a week for health insurance.

11  Q    Those dollars that are paid that are sent to the

12  fringe benefit fund office, they come from Bunn

13  Enterprises, correct?

14  A    Correct.

15  Q    They're not Kevin Bunn personal funds?

16  A    From Bunn Enterprises.

17  Q    Are you the owner of Bunn Enterprises?

18  A    Yes.

19       THE COURT:  Just a second.

20       You may continue, Mr. Clark, within what Mr. Mason

21  redirected about.  I find you're a bit afield.  Note I

22  didn't say adrift.  But if you continue to go afield, you

23  become adrift.  Continue.

24  BY MR. CLARK:

25  Q    So Mr. Bunn, you have not made self-pay contributions

```
1      to the health and welfare fund; is that correct?

2           MR. MASON:  Objection, Your Honor.  That has got to

3      be definitely asked and answered more than once.

4           THE COURT:  Sustained.

5      BY MR. CLARK:

6      Q    Why not?

7      A    Why not what?

8           MR. MASON:  Objection.

9           THE COURT:  Sustained.

10     BY MR. CLARK:

11     Q    Are you aware that you have the option to make

12     self-pay contributions?

13          MR. MASON:  Objection.

14          THE COURT:  Sustained.

15          MR. CLARK:  On what basis, Your Honor?

16          THE COURT:  It's beyond the scope.

17          MR. CLARK:  I believe Mr. Mason asked the witness if

18     he had, in effect, made self-pay contributions.

19          THE COURT:  And I believe it's been asked and

20     answered.  I understand your position and it's duly noted

21     for the record.  Please continue.

22          MR. CLARK:  I don't have any additional questions.

23          THE COURT:  All right.

24          Thank you, Mr. Bunn.  You may be excused.

25          Mr. Mason, do you have any additional witnesses?
```

1          MR. MASON:  Your Honor, we had one other person who

2     is a plaintiff in the case who could not make the hearing.

3     And I know that as a preliminary injunction hearing, I have

4     seen where affidavits have been submitted and the Court's

5     considered it for whatever they're worth.  I realize it's

6     not subject to cross-examination.

7          THE COURT:  That's true.

8          MR. MASON:  I would like to submit an affidavit from

9     David Welch who could not be here today on this short

10    notice, and submit it and let the Court consider it for

11    whatever it may be worth.

12         THE COURT:  Mr. Clark, any objection?

13         MR. CLARK:  Yes.  We object, obviously, as to the

14    hearsay aspects of it.

15         THE COURT:  Your objection is sustained.

16         MR. CLARK:  Thank you, Your Honor.

17         THE COURT:  Do you have any additional witnesses,

18    Mr. Mason?

19         MR. MASON:  No, Your Honor.

20         THE COURT:  Does the plaintiff rests?

21         MR. MASON:  Plaintiff rests.

22         THE COURT:  Mr. Clark, does the defense have any

23    witnesses?

24         MR. CLARK:  Yes, Your Honor.  Our first witness is

25    in the hallway.  Just give me one second.

```
 1              THE COURT:  Certainly.
 2        (Witness sworn.)
 3              THE COURT:  Mr. Clark, please proceed.
 4              MR. CLARK:  Thank you, Your Honor.
 5                           -  -  -
 6                        AMANDA GLENN
 7    Called as a witness on behalf of the Defendant, being first
 8    duly sworn, testified as follows:
 9                     DIRECT EXAMINATION
10    BY MR. CLARK:
11    Q    Good afternoon.  Could you state your full name for
12    the record, please?
13    A    Amanda Rae Glenn.
14    Q    Pull the microphone a little bit closer to you.
15              THE COURT:  Would you spell your last name for the
16    record, please.
17              THE WITNESS:  Yes.  G-L-E-N-N.
18              THE COURT:  Is Rae R-A-E?
19              THE WITNESS:  Yes.  Amanda Rae Glenn.
20    BY MR. CLARK:
21    Q    Ms. Glenn, are you currently employed?
22    A    I am.
23    Q    Where are you employed?
24    A    Ohio Operating Engineers Fringe Benefit Programs.
25    Q    How long have you been employed at the Ohio Operating
```

```
 1    Engineers Fringe Benefit Programs?

 2    A    Nine years and four months.

 3    Q    What is your current job title?

 4    A    I'm the contributions department supervisor.

 5    Q    Can you explain to the Court what that means?

 6    A    Sure.  I receive all incoming contributions from

 7    employers' monthly or weekly remittances and process them,

 8    as well as track delinquency for employers.  I inform

 9    members through correspondence if their eligibility appears

10    as if it's about to expire.  And I also accept their

11    self-payments should they decide to pay them.

12    Q    Okay.

13        MR. CLARK:  Your Honor, may I approach the witness?

14        THE COURT:  Yes.  You can hand them to Mrs. Clark.

15    Thank you.

16    BY MR. CLARK:

17    Q    Ms. Glenn, I've just handed you a document that we

18    have marked as Defendant's Exhibit 1.  Can you take a look

19    at Exhibit 1?  Do you recognize this document?

20    A    Yes, I do.

21    Q    What is Exhibit 1?

22    A    It is Ohio Operating Engineers Health and Welfare

23    Summary Plan Description.

24    Q    How is this document used?

25    A    It's used to explain the ins and outs of the plan, to
```

1    inform members, as well as ourselves, what our plan rules

2    are.

3    Q    Is this a document that you consult in the course of

4    your duties as a contributions department supervisor?

5    A    Yes, it is.

6    Q    One of the job duties that you identified was

7    determining eligibility?

8    A    Yes.

9    Q    Are you aware if eligibility is addressed anywhere

10   within the plan?

11   A    Yes, it is.

12   Q    Can you direct us to the appropriate location?

13   A    Page six.

14   Q    Page six, the heading is Class 1?

15   A    Yes.

16   Q    Explain what Class 1 is.

17   A    Class 1 is an active member, one who is not retired,

18   who is an operating engineer and is a member of Local 18;

19   generally, a member of Local 18.

20   Q    We've heard a term today "senior member"?

21   A    Yes.

22   Q    Is that a -- can you explain what that term is in the

23   context of the wealth and welfare plan?

24   A    Senior member is not a Class 1.  They're a Class 3A or

25   C.  That means they're retired and receiving a pension

 1    benefit through the plan.

 2    Q     Focusing back on Class 1.  Can you explain for the

 3    Court what it -- what the plan requires for an operating

 4    engineer to become initially eligible for benefits?

 5    A     Yes.  When an operating engineer is just beginning to

 6    work, has not established eligibility before or has gone 12

 7    consecutive months without being eligible, they're required

 8    to have 450 hours within 12 consecutive months to be

 9    eligible.  So basically you start out, you start working,

10    you need to have an accumulative amount of 450 hours, and

11    then you're eligible the first day of the month following

12    your 450th hour once your hours have been credited to your

13    account.

14          THE COURT:  Eligible to participate in the plan at

15    that point, Ms. Glenn?

16          THE WITNESS:  You're actually eligible for benefits.

17    You're eligible for medical and prescription benefits.  Not

18    only speaking of health and welfare, you're eligible for

19    medical and prescription benefits at that time.

20          THE COURT:  So that's after about ten weeks of work,

21    a little bit over ten weeks of work, assuming a 40-hour

22    work week?

23          THE WITNESS:  Yes.

24          THE COURT:  I didn't mean to cut you off.  You were

25    saying what?

```
 1          THE WITNESS:  It usually takes about two-and-a-half

 2     months.  So usually the first day of their fourth month is

 3     when they're eligible.

 4     BY MR. CLARK:

 5     Q    Once an operating engineer achieves -- works enough

 6     hours to gain that initial eligibility, what do they need

 7     to do to maintain that eligibility going forward?

 8     A    We can reuse those same hours and we can continue

 9     eligibility based on three different parameters of hours.

10     So the first we're reusing those hours, if you have 225

11     hours in the previous three months of any given month when

12     you're eligible for benefits.  So if working 450 within

13     two-and-a-half months gives you one month of eligibility,

14     we reuse those hours and it can give you several more

15     months of eligibility.

16          But, in the short term, as long as you maintain 225

17     hours every three months, you're eligible for the following

18     two months of benefits.

19     Q    Are there other --

20     A    There are other rules that will make you eligible.

21     There's also a 900-hour rule which can push you several

22     months into the future.  If, in any given month you look

23     back in the previous 12 months and you have 900 hours, then

24     you're eligible for benefits; also, if you look back in the

25     first 12 of the previous 13 months, then you're eligible
```

1    for benefits.  So it basically means, saying that as a

2    whole, if in any given month in the previous 12 months you

3    have 900 hours, you're eligible for two months.

4    Q    And who at the health and welfare fund office is

5    responsible for these monthly calculations to determine

6    eligibility?

7    A    My department keys the hours in.  We have set up a

8    schedule in our software system that will auto-calculate

9    whether you're eligible or not.  But if there is a dispute,

10   that is something I can look at to make sure it's

11   functioning properly.

12   Q    And these eligibility requirements, are they addressed

13   in the plan document?

14   A    Yes, they are.  There's also one more.  There is a

15   1,200-hour rule.  And that's what we call our annual

16   eligibility rule.  If you have 1,200 hours from June 1st of

17   one year through May 31st of the following year, then

18   you're eligible for the next year through July 31st.  For

19   example, June the 1st of 2011 through May 31 of 2012, if

20   you have 1,200 hours, then you're eligible through

21   July 31st, 2013.

22        Does that make sense?  It's a lot easier to understand

23   if you're picturing it or if you have the dates and the

24   numbers written down in front of you.

25        THE COURT:  After reading back your answer, I

1    understand.  Thank you.

2            MR. CLARK:  Your Honor, may I approach the witness?

3            THE COURT:  You can give them to Ms. Clark.

4    Ms. Clark can give them to the witness.

5    BY MR. CLARK:

6    Q    Ms. Glenn, you've been handed a document marked

7    Defendant's Exhibit 2.  This is a multipage exhibit.

8    A    I have it.

9    Q    Do you recognize Exhibit 2?

10   A    I do.

11   Q    What is Exhibit 2?

12   A    It is a screen print of Mark Morgan's demographic and

13   eligibility information.  It's from our software system.

14   Q    This is a software system maintained by the health and

15   welfare fund?

16   A    Yes, it is.  And it also has notes on it that I've

17   made regarding his hours and eligibility.

18   Q    If you could take a look at -- let me take a step

19   back.  We've heard the term used today of a self-pay

20   letter?

21   A    Yes.

22   Q    What is a self-pay letter?

23   A    Once a month I will run a list that tells me who is

24   not eligible for the upcoming month that is eligible for

25   the current month.  On May 15th I will run a report.  It

1    will tell me who is not eligible effective June the 1st.

2    With that report, I will generate letters to inform the

3    members that it appears as though they're not going to be

4    eligible due to insufficient work hours.  It will list the

5    hours that they need and the dollar amount they can pay to

6    remain eligible.

7    Q    If you could turn to page two of Exhibit 2, do you

8    recognize page two?

9    A    Yes.  This is a self-pay letter.

10   Q    This is a self-pay letter addressed to Mark A. Morgan?

11   A    Yes.

12   Q    The letter is dated July 16, 2012.  How are self-pay

13   letters issued?

14   A    What do you mean: how are they issued?

15   Q    Are they mailed?

16   A    Yes.  They are mailed in combination with other

17   information on how to continue benefits.

18   Q    What other documents or information would be included

19   with a self-pay letter mailing?

20   A    There's also notification that COBRA continuation of

21   benefits coverage is available in place of self-pay.  So

22   you have two options to continue your coverage, either by

23   paying COBRA which is a flat monthly rate, or by paying a

24   self-pay which is based upon the number of hours you need

25   to be eligible.

1    Q    Focusing still on page two of Exhibit 2, the self-pay

2    letter to Mr. Morgan, does this letter reflect the amount

3    that Mr. Morgan would have to pay as a self-pay

4    contribution to continue his coverage?

5    A    It does.  For the month of August, $26.64 was due on

6    July 16th.  So it reflects what his account was on

7    July 16th of 2012.

8    Q    If you could turn now to page six of Exhibit 2, what

9    document is located on page 6?

10   A    This is Mark A. Morgan's self-pay notice.  It was

11   mailed on January 14th, 2013, and it was regarding

12   February 2013's eligibility.

13   Q    And in the upper right-hand corner of page six of

14   Exhibit 2, there is a handwritten notation?

15   A    Yes.

16   Q    Do you recognize the handwriting?

17   A    Yes.  That's my handwriting.

18   Q    And what is this -- what does your handwriting

19   indicate on page six?

20   A    It indicates that I mailed the letter to him and he

21   did not respond to it in any way, and that this was also

22   mailed prior to November 2012's hours being posted.  We had

23   received 56.16 hours on January the 16th from Local 841

24   which reduced his amount that would be due for the month of

25   February to $70.46.

1    Q     So sometime after the mailing of this letter,

2    additional hours were contributed on Mr. Morgan's behalf?

3    A     Yes.  They did not make him eligible, but, yes.

4    Q     Those hours were insufficient to make him eligible?

5    A     That's correct.

6    Q     But it reduced the amount of self-pay contribution he

7    would have to make?

8    A     That is correct.

9    Q     So had Mr. Morgan made a self-pay contribution of

10   $70.46 in January of 2013, what coverage would that have

11   gained for him?

12   A     It would have given him the exact same coverage he had

13   during the month of January.  It would have extended

14   through the month of February of 2013.

15   Q     Are you aware that there are hours that Bunn

16   Enterprises reported to the fringe benefit fund office of

17   having been worked by Mr. Morgan for which he was not

18   credited with hours for purposes of the health and welfare

19   fund?

20   A     Yes, I am.

21   Q     Let's assume that Mr. Morgan were to be credited with

22   those hours of service that he worked for Bunn

23   Enterprises -- that were reported by Bunn Enterprises.

24   Would those hours have been sufficient to extend his

25   coverage beyond January 31st of 2013?

1    A    No, they would not have been.

2    Q    And why not?

3    A    Because it does not meet any of the eligibility

4    requirements for the month of February.  Looking back on

5    the previous three months, there are not 225.  Looking back

6    on the previous 12, there are not 900; and the period of

7    June the 1st of 2011 through May 31st of 2012, there were

8    not 1,200 hours.

9    Q    Ms. Glenn, you've been handed a document marked

10   Defendant's Exhibit 3.  Can you review the document, and

11   once you have, let me know if you recognize it?

12   A    I do recognize it.

13   Q    What is Exhibit 3?

14   A    It is a printout of the information we have for

15   Mr. Schau.  It's from our software system where we store

16   our information.

17   Q    Did Mr. Schau ever achieve initial eligibility with

18   the Ohio Operating Engineers Health and Welfare Fund?

19   A    No, he did not.

20   Q    We had some testimony earlier about a transfer of

21   hours from one local to another.  Is it possible for one

22   health and welfare fund to transfer contributions made on

23   behalf of one employee to another operating engineer health

24   and welfare fund in a different state?

25   A    Yes, it is.  It's quite common.

1    Q    If an operating engineer in Ohio desires to have the

2    Ohio Health and Welfare Fund transfer contributions to

3    another health and welfare fund on their behalf, what is

4    the process that that individual would go through?

5    A    There are two transfer authorization forms that we

6    would need them to complete, sign and return.  One is a

7    health and welfare transfer authorization.  The other is a

8    pension transfer authorization, as those are the only two

9    funds that are reciprocated between locals.

10   Q    I'm sorry.  Which of the two funds?

11   A    Health and welfare and pension.

12   Q    Are you familiar with Operating Engineers Local 181?

13   A    Yes, I am.

14   Q    Does the Ohio Operating Engineers Health and Welfare

15   Fund have a reciprocal relationship with the health and

16   welfare fund with Local 181?

17   A    841 and 181, yes.

18   Q    Do you have any record of Mr. Schau requesting that

19   contributions be transferred to Local 181's health and

20   welfare fund on his behalf?

21   A    No.

22   Q    Ms. Glenn, if you could take a look at the document

23   marked Defendant's Exhibit 4 and let me know if you

24   recognize this document?

25   A    Yes, I do.

1    Q    What is Exhibit 4?

2    A    It is Danny J. Lantz's demographic and eligibility

3    information, as well as self-pay information and some of my

4    own handwritten notes.

5    Q    So the handwriting contained on Exhibit 4 is yours?

6    A    Yes, it is.

7    Q    Based on Exhibit 4, can you identify for the Court at

8    what point Mr. Lantz's Class 1 coverage ceased?

9    A    It ended March 31st, 2013.  He elected senior member

10   coverage on April the 1st, 2013.

11   Q    And how is senior member coverage paid for?

12   A    It's a monthly premium, flat monthly rate.  If you

13   have a pension check that is sufficient to cover it, it's

14   usually deducted from your pension check.

15   Q    That's from the Ohio Operating Engineers Pension Fund?

16   A    Yes.

17   Q    So Mr. Lantz's senior member benefits started as of

18   April 1st of 2013?

19   A    His senior member benefits did, yes.

20   Q    Once again, there are -- you understand that there are

21   some hours that Bunn Enterprises reported to the fringe

22   benefit fund office of having been worked by Mr. Lantz

23   prior to his retirement that have not been credited to his

24   health and welfare account?

25   A    Yes.

1    Q    If those hours had been credited in full to

2    Mr. Lantz's health and welfare account, would his Class 1

3    coverage be extended beyond the March 31st, 2013, date that

4    they ended on?

5    A    No, they would not.

6    Q    Why not?

7    A    Because he does not meet the annual eligibility rule

8    of 1,200 hours, 900 in the previous 12 months, or 225 in

9    the previous three.

10   Q    Now, if Bunn Enterprises were to pay the delinquent

11   contributions to the fringe benefit funds in full, would

12   Mr. Lantz be eligible to receive any type of refund?

13   A    Yes, he would be.

14   Q    On what basis would Mr. Lantz be entitled to a refund?

15   A    He would be entitled to -- can you rephrase that so I

16   can answer you, make sure I understand?

17   Q    Sure.  If Bunn Enterprises were to pay the delinquent

18   fringe benefit contributions to the fund office in full,

19   would Mr. Lantz be entitled to a refund of any of his

20   contributions that he paid in?

21   A    Yes.

22   Q    And on what basis would Mr. Lantz be entitled to a

23   refund?

24   A    He would be entitled to a refund based on the number

25   of hours that are paid.  However many hours are still due

1    to his account would be the number of hours that we can

2    refund back to him.

3    Q    Hour-for-hour refund?

4    A    Yes.

5    Q    What's a medical reimbursement account?

6    A    It's an account that's set up for reimbursement of

7    medical expenses that aren't typically covered by

8    insurance.  It's employer contributed.  Fifty cents for

9    every hour that an employer pays on your behalf is put into

10   this account for your use.

11   Q    Are Class 1 members permitted to utilize their medical

12   reimbursement account funds to make self-pay contributions

13   to extend health and welfare coverage?

14   A    Yes.

15   Q    Based on Exhibit 4, can you tell if Mr. Lantz made any

16   self-pay contributions from his medical reimbursement

17   account?

18   A    Yes, he has.

19   Q    Can you identify in what year those payments were

20   made?

21   A    2012.

22   Q    Ms. Glenn, you've just been handed a document marked

23   Defendant's Exhibit 5.  Do you recognize Exhibit 5?

24   A    Yes, I do.

25   Q    What is it?

1     A     It's Kevin W. Bunn's demographic and eligibility

2     information generated from Ohio Operating Engineers

3     software program.

4     Q     Is Kevin Bunn currently eligible for health and

5     welfare benefits?

6     A     Yes, he is.

7     Q     Based on Exhibit 5, can you determine the last time

8     Mr. Bunn's eligibility lapsed?

9     A     April and May of 2003.

10    Q     So Mr. Bunn's health and welfare coverage has been

11    current since May of 2003?

12    A     June the 1st, 2003 through current he has not had a

13    lapse in coverage.

14    Q     Thank you.

15          Has Mr. Bunn been issued a self-pay letter by your

16    office?

17    A     No.

18    Q     Why not?

19    A     Because he's currently eligible for benefits.

20    Q     If at some point in the future Mr. Bunn is at risk of

21    having -- of losing his continued eligibility for benefits,

22    will he receive a self-pay notice at that point?

23    A     Yes, he will.

24    Q     What options would he have upon receiving a self-pay

25    notice to continue his coverage?

1    A    He can make a self-payment based on the number of

2    hours he needs.  He could elect COBRA continuation of

3    coverage and pay a flat monthly rate.  He could also

4    dispute -- if he has hours, he could dispute that fact.

5         MR. CLARK:  Your Honor, I have no additional

6    questions for Ms. Glenn.

7         THE COURT:  Thank you.

8         Mr. Mason, cross?

9         MR. MASON:  Yes, Your Honor.

10                        - - -

11                  CROSS-EXAMINATION

12   BY MR. MASON:

13   Q    Is the health and welfare plan the document that your

14   operation uses with respect to how to operate and

15   procedures to follow, the summary plan description Exhibit

16   1?

17   A    Is it what?

18   Q    Is that the document you follow for your policies?

19   A    Yes.

20   Q    Where in this document does it show that if an

21   employee has worked and the company has paid for those

22   hours that that employee works that you divert that money

23   to another account?

24   A    I'm not qualified to answer that question.

25   Q    Do you know anywhere in that document that it allows

VOL. I    104

```
1    you to do that?

2    A    You will have to restate the question.

3    Q    Are you the supervisor for this fund?

4    A    No.  For a fund, no.

5    Q    What was your position?

6    A    I am the contributions department supervisor.

7    Q    And you were the one that handles the contributions

8    that come in?

9    A    As long as there's not an audit issue, yes.

10   Q    You're the one that allocates where that money goes?

11   When it comes in, it goes somewhere, right?

12   A    It does.

13   Q    They come to you and say where does this money go,

14   right?

15   A    Right.

16   Q    When it comes in and it says that Mr. Morgan is to

17   receive a hundred hours for the month of June, you're the

18   person that they go to, to say where do we put this money,

19   right?

20   A    As long as there's not an audit issue, yes.

21   Q    And where did you put Mr. Morgan's money when that

22   money came in in 2012?

23   A    I don't understand what you're asking me.

24   Q    Do you follow this summary plan description?

25   A    Yes, I do.
```

1    Q    Okay.  Where in the summary plan description does it

2    say that Mr. Morgan's money does not go to Mr. Morgan but

3    it goes to another employee named Delbert Newlon?

4    A    I believe that Mr. Morgan and Delbert Newlon are not

5    specified in the summary plan description.

6    Q    It doesn't allow you anywhere in the summary plan

7    description to take money allocated from one employee and

8    give it to another, does it, to your knowledge?

9    A    You will have to rephrase that.

10   Q    To your knowledge, does this document allow a transfer

11   from one employee's credit – Mr. Morgan – to another

12   employee's credit – Mr. Newlon?

13   A    If you're asking me if I credited money to one

14   person's account, can I just decide to take it away from

15   him and give it to someone else?  No.

16   Q    Where does it say in this document that you have the

17   power to give Mr. Morgan's money to Mr. Newlon's account?

18   A    Mr. Morgan and Mr. Newlon aren't in this summary plan

19   description.

20   Q    I know.  They're two different employees, right?

21   A    Yes.

22   Q    Okay.  Where does it show in the summary plan

23   description that you can take money allocated for

24   Mr. Morgan and allocate it to Mr. Newlon as a different

25   employee?  Forget the names.  One employee's name comes in,

1    you allocate it to another employee's account.  Where in

2    the summary plan description does it say you can do that?

3    A    I don't know.

4    Q    Do you need time to look at it?  I will give you all

5    the time in the world.  We are here on a big, important

6    issue and "I don't know" doesn't cut it with a supervisor

7    allocating the benefits.

8         Now, do you know of any authority you have to allocate

9    funds to another employee?

10        MR. CLARK:  Your Honor, I object.  The witness has

11   testified "I don't know."  That's a -- that's her answer.

12        THE COURT:  I'm going to sustain your objection in

13   part to the preamble to the question because it was not the

14   question.  And I don't know that the preamble was necessary

15   for the witness to understand the question.

16        I'm going to have you, Mr. Mason, rephrase your

17   question devoid of the preamble.

18        MR. MASON:  Yes, sir.  It's only the third or fourth

19   time I've tried to get the answer.

20   BY MR. MASON:

21   Q    With respect to the summary plan description -- and

22   you're the supervisor allocating the benefits -- where does

23   it say in the summary plan description that when Bunn

24   Enterprises says here is money for Mr. X that you can

25   allocate the money to Mr. Y?

1            MR. CLARK:  Objection.

2            THE COURT:  Overruled.

3            THE WITNESS:  It does not.

4  BY MR. MASON:

5  Q    Thank you.  Now, let's take Mr. Morgan as your Exhibit

6  No. 2, Defendant's Exhibit No. 2.  How many hours did Bunn

7  pay for Mr. Morgan that your department allocated to

8  another account?

9  A    None.

10  Q    None at all?

11  A    No.

12  Q    So all of the moneys that Bunn has paid into this

13  account has been all fully credited to Mr. Morgan?

14  A    Outside of an audit --

15  Q    I did not ask you to qualify with an audit, ma'am.  I

16  simply asked a simple question.  How many hours has your

17  department transferred from Mr. Morgan to another

18  employee's account that was paid by Bunn on behalf of

19  Mr. Morgan?

20  A    None.

21  Q    None?

22  A    None.

23  Q    When Mr. Morgan called up and asked your department

24  why he wasn't receiving the credit and the hours, your

25  department misrepresented to him that when he testified

1   earlier that you had, in fact, transferred hours?

2   A    We don't transfer hours from one employee to another.

3   Q    You transferred the money.  Did money come in

4   allocated to Mr. Morgan that did not get credited to

5   Mr. Morgan's account?

6   A    I did not receive a report with a check that told me

7   to allocate money to someone and I credited it to someone

8   else.  If that check came in and we gave it to audit and it

9   was applied to the oldest balance due, that was how it was

10  done.  But I was not handed a check with a report and told

11  to post hours to someone and I posted it to someone else.

12  No.

13  Q    So the way I understand your testimony, then, is that

14  because Bunn is in an audit situation, you personally do

15  not handle where that money goes?

16  A    Yes.

17  Q    Okay.  That being the case, then, you have no idea how

18  much hours or money that Bunn paid on behalf of Mr. Morgan

19  because you didn't handle it, correct?

20  A    That seems like a trick question to me.

21  Q    I'm a lawyer.  What can I say?  I ask a question.  I'm

22  asking for an answer.  Do you need the court reporter to

23  read it back to you?

24  A    If they have a balance due and they send a payment in,

25  it goes towards that balance due.  It doesn't matter if

1    there is a different sheet of paper attached to it, if you

2    owe fringes for someone else that are older, you have to be

3    fair to everyone and have that applied to that person.

4    Q    Do you need the court reporter to read the question

5    back to you, ma'am?

6    A    No.

7         MR. MASON:  I need the question read back.  Can you

8    please read the question back?

9         THE COURT REPORTER:  "Question: Okay.  That being

10   the case, then, you have no idea how much hours or money

11   that Bunn paid on behalf of Mr. Morgan because you didn't

12   handle it, correct?"

13        THE WITNESS:  I have no knowledge of Mr. Morgan not

14   being credited with hours that he worked in accordance to

15   the plan rules, no.

16   BY MR. MASON:

17   Q    You say you have no knowledge, so you don't know.  Is

18   that right?  You don't know how much money came in that

19   Mr. Bunn paid on behalf of Mr. Morgan?

20   A    I know what's been credited to his account.

21   Q    That's all you know, and the only way you know that is

22   what you got from the audit department as to what they

23   wound up crediting Mr. Morgan, correct?

24   A    Not every hour that Mr. Morgan has worked has come

25   from the audit department, no.

1    Q    It's come from other locals where they showed up as a

2    credit on it because he was working on a different local

3    and the money got referred from a different local?

4    A    Correct.

5    Q    And that came in and was credited to his account,

6    correct?

7    A    Correct.

8    Q    But any moneys that came from Bunn went to audit,

9    right?

10   A    During a certain time period, and I'm not sure what

11   that time period is.

12   Q    You don't know how much money that was or how many

13   hours that was, correct?

14   A    No, I don't have a running total.

15   Q    So, when you just testified earlier that Mr. Bunn --

16   or I'm sorry, Mr. Morgan wasn't entitled to insurance, you

17   were basing it on a fact that you didn't know how much

18   money Bunn had paid on his behalf, correct?

19   A    I don't know what the dollar amount is, but I do have

20   the hours that were picked up on the audit.  And based on

21   the hours, he is not eligible.

22   Q    How do you know the hours that they credited for

23   Mr. Morgan? -- because that money and hours was given to

24   Mr. Newlon.  How do you know that?  It doesn't make any

25   sense to me.  You just testified earlier that when it comes

1    in as an audit, you don't deal with it.

2    A    Right.

3    Q    How do you now know something just earlier you

4    testified you don't deal with and you don't know because

5    the audit department handles it?

6    A    They were audited.  There is a listing of the hours

7    that Mr. Morgan worked.  I can take that listing of hours

8    and see what's on his account and write down what's not and

9    calculate his eligibility.  It's not difficult.

10   Q    When I asked you how many hours have you not credited

11   to Mr. Morgan, you can't tell me?

12   A    You're telling me -- you're saying to me that Mr. Bunn

13   is sending in hours for him that we're not giving him.  So

14   I don't know if you mean the hours that are on the audit

15   you're thinking that they're not right or that they're not

16   paid.  You're asking me questions about audit and I'm

17   telling you that I don't work in audit and I don't know the

18   answers to those questions.

19   Q    And I understand that, and if you don't know, then you

20   don't know.  And you don't know if Mr. Morgan is entitled

21   to insurance or not because you don't know what the

22   auditing department is doing?

23   A    Yes, I do.  I know what the hours are that were picked

24   up on the audit.  I know the hours that we have due for

25   Mr. Morgan.  What I don't understand is why you're telling

1    me that Mr. Bunn is paying for hours that we're not giving

2    him.

3    Q    Aren't you taking the moneys and the credit that

4    Mr. Morgan worked and applying it to another person, as you

5    said, the back moneys owed?  Isn't that what's happening

6    with the money that Bunn pays, is the money that he pays in

7    is not being credited to the current workforce?  Isn't that

8    correct?

9    A    I am not qualified to answer that question.  I do not

10   work in the audit department.

11   Q    Let me ask another question, then.  Let's turn to the

12   July 16, 2012 letter.  Do you have that there in front of

13   you?  I believe it's the second page of Defendant's Exhibit

14   No. 2.

15   A    Yes.

16   Q    Do you know how many hours prior to July 16 of 2012

17   that the audit department held and took and paid and

18   credited that was coming in from Mr. Morgan by Bunn in that

19   time frame?

20   A    I do not work in the audit department.

21   Q    So you don't know?

22   A    Right.

23   Q    If you can assume for a moment as a fact that

24   Mr. Morgan testified that he was owed 180-some hours, I

25   believe -- the record will show something.  Whatever the

1    record shows – it was certainly more than four – that if in

2    fact he had been credited those four hours, he would have

3    gotten insurance and that letter would not have gone out,

4    right?

5    A    He was eligible for August after the fact.  We

6    received additional hours.  There is a note there that says

7    eligible for August after receiving a total of 45.95 hours

8    for April and May.

9    Q    Why don't you finish the sentence?

10   A    From Local 841 on February 12th, 2013.

11   Q    Thank you.  So it was from a different local, not

12   Local 18?

13   A    The employer listed on Local 841's report is Bunn

14   Enterprises.

15   Q    And you just earlier testified that anything that

16   comes in from Local 18 goes to audit and you don't know how

17   many hours were not credited because of that, right?

18   A    Right.  These are from Local 841.

19   Q    If there were four hours that came in from Local 18,

20   he'd have gotten insurance on that date, right?

21   A    If Bunn Enterprises had paid enough money for him to

22   be credited with four hours, yes.

23   Q    Thank you.  It must be my need of glasses or

24   something, because on page three the following items I

25   can't read anything, the font is so small.  What was this

1    document?

2    A    It's a transfer authorization -- it's a reciprocal

3    report from Local 841 listing the members and hours that

4    they're paying for.

5    Q    So what you have circled at the top, that is 841?

6    A    Yes.

7    Q    And all of the numbers reflect credit for Mr. Morgan

8    that came in from a different local?

9    A    Not all of the numbers, no.  There are several other

10   people listed on this report as well.

11   Q    I'm sorry.  Where are --

12   A    Mike Morgan is underlined.

13   Q    That's what's underlined?

14   A    I can't help the size of the document.  That's the

15   size when I received it.

16   Q    I understand.  I can't help it either.  I do think

17   there's something called blowup.  But, in any event, are

18   you saying that what's underlined on the left is

19   Mr. Morgan?

20   A    That is his name, yes.

21   Q    And then all of the other underlines reflect payments

22   that came in from different locals for him?

23   A    No.

24   Q    Or just one local?

25   A    There are two months that are underlined, April of

 1    '12 and May of '12.  And those are hours and money that

 2    Local 841 is reporting to us and paying to us.

 3    Q    And then the following page, what local is that coming

 4    from?

 5    A    That's Local 841 as well.  And it's their -- they call

 6    it an HRA but it's like our MRA.  That $13.50 is added with

 7    the prior page.

 8    Q    And MRA stands for?

 9    A    Theirs is HRA.  But MRA stands for Medical

10    Reimbursement Account.

11    Q    And HRA stands for?

12    A    Health Reimbursement Account.

13    Q    And what is this check for that is something about a

14    benefit fund?

15    A    It pays for the hours.  It's the check from Local 841

16    paying for the health and welfare hours listed on the

17    reports.

18    Q    With respect to that, then, the next document comes in

19    February 2013, right?  Or January 2013?

20    A    The next document is a self-pay letter that was mailed

21    January 14th, yes.

22    Q    Let's go back, if we can.  Where is the report from

23    Mr. Morgan for all of the hours that he would have worked

24    in the year 2012 that is similar, I guess, with respect to

25    the document for 841?

VOL. I    116

1    A    The audit reports, I don't have those.  These are

2    reports from a different local.  They don't get combined

3    with another company's audit reports.

4    Q    So we just don't know what that number is?

5    A    I don't know, personally.

6    Q    Okay.

7    A    I don't have those reports.  I didn't say I don't know

8    what those numbers are.  I said I don't have the reports.

9    Q    Let's go then to the January 2013 report.

10   A    The self-pay letter?

11   Q    Yes, ma'am.

12   A    Okay.

13   Q    Now we're saying that he needs another 66 hours to

14   have health insurance, right?

15   A    For February he did 66.74 hours.

16   Q    And again, your testimony with respect to the audit

17   and whatever Bunn paid, you don't know because that's not

18   your department?

19   A    No.  I don't know what they were paying at the time.

20   Q    Thank you.

21        The next page on this same set of documents of -- paid

22   to us on 3-11 of '13 is from Local 181; is that correct?

23   A    That is correct.

24   Q    And again, those would be for payments for hours for

25   Mr. Morgan of 132 hours for Local 181?

VOL. I      117

1    A    It converted to 148.65 hours, but, yes.

2    Q    Okay.  Why don't you explain that one to me.

3    A    Sure.

4    Q    It says 132, but you have a multiplier factor.

5    A    Right.  Different locals have different hourly rates

6    for health and welfare, so our hourly rate is $6.66 per

7    hour.  Because Local 181's rate is obviously more than

8    ours, we take the money that they pay us, the $990, and

9    convert it to hours.  So $990 paid for 148.65 hours at

10   Local 18.

11   Q    Of Local 181?

12   A    Yes.

13   Q    Not Local 18?

14   A    Yes.

15   Q    Local 18 has the ultimate 148-hour credit, but the

16   money came from Local 181?

17   A    Right.

18   Q    And the credit's coming from Local 181?

19   A    Right.

20   Q    And you're not taking that money and diverting it to

21   Bunn's old account; you're giving it directly to

22   Mr. Morgan?

23   A    We can't take money from one entity and apply it to

24   another.

25   Q    Oh, you can't?

VOL. I    118

```
1    A    Not from one company to apply to another company, no.

2    Q    So he's not working for Bunn when this money is coming

3    in from Local 181?

4    A    To us it's money from Local 181.  They handle Bunn's

5    fringes the way their plan says to handle it.  This is

6    money from another local, not directly from Bunn

7    Enterprises, so it would not be fair to that other local to

8    give Bunn Enterprises their money.

9    Q    Okay.  I got it.  I can't leave that one.  It's not

10   fair to Mr. Morgan when he works for Bunn at a different

11   local that he doesn't get credit for it.  But it is fair to

12   take the same Bunn money contribution that comes directly

13   to 18 and not give credit to Mr. Morgan, but rather take

14   that money and give that to Mr. Newlon.  That's fair?

15            MR. CLARK:  I have an objection.

16            THE COURT:  What is your objection, Mr. Clark?

17            MR. CLARK:  Relevance.

18            THE COURT:  Overruled.

19            THE WITNESS:  You're assuming that Bunn Enterprises

20   does not have a balance due with Local 181.  Their affairs

21   with Local 181 are not their affairs with Local 18.  This

22   money came to us from Local 181.  We are being fair to

23   Local 181 by applying money that they're sending in because

24   they don't have a balance due with us.

25            THE COURT:  Just a second, Mr. Mason.
```

1          Lets take a break here for 15 minutes.  I have a

2    matter that has arisen in my other case.  Bring in the

3    other lawyers.

4          Ms. Glenn, you may step down off the stand.  You

5    can't confer with counsel since you're in

6    cross-examination, but you may step down while I resolve

7    this other matter in the unlikely event it takes more than

8    15 minutes.

9      (Proceedings concluded at 5:00 p.m.)

10                          – – –

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              -  -  -

2                           INDEX

3                              -  -  -

4     WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS

5     PLAINTIFF'S:

6  Mark Morgan                 5        10        19
   Michael Schau              20        24        26          27
7  Danny Lantz                28        33        37
   Kevin Bunn                 39        53        76          81
8

9                              -  -  -

10    DEFENDANT'S:

11 Amanda Glenn                87       103

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3          I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the

5    proceedings before the Honorable Algenon L. Marbley, Judge,

6    in the United States District Court, Southern District of

7    Ohio, Eastern Division, on the date indicated, reported by

8    me in shorthand and transcribed by me or under my

9    supervision.

10

11

12                              s/Shawna J. Evans
                                Shawna J. Evans, RMR
13                              Official Federal Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25