UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


BUNN ENTERPRISES, INC.,          .
et al.,                          .
                                 .
  PLAINTIFFS.                    .        CASE NO. 2:13-CV-357
                                 .
        vs.                      .        COLUMBUS, OHIO
                                 .        MAY 3, 2013
OHIO OPERATING ENGINEERS         .        8:00 A.M.
FRINGE BENEFIT PROGRAMS,         .
                                 .
  DEFENDANT.                     .
. . . . . . . . . . . . . . . .  .


**VOLUME II**


***TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS***
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE PLAINTIFFS:          RONALD L. MASON, ESQ.
                             AARON TULENCIK, ESQ.


FOR THE DEFENDANT:           BRYAN C. BARCH, ESQ.
                             DANIEL J. CLARK, ESQ.


– – –

VOL. II    123

```
 1                      FRIDAY MORNING SESSION

 2                         MAY 3, 2013

 3                            -  -  -

 4          THE COURT:  Good morning.

 5          Ms. Glenn, would you resume the stand?  Please be

 6    seated.

 7          Mr. Mason.

 8          MR. MASON:  Your Honor, we have no further

 9    questions.

10          THE COURT:  Mr. Clark, any redirect?

11          MR. CLARK:  I believe just one.

12                            -  -  -

13                   REDIRECT EXAMINATION

14    BY MR. CLARK:

15    Q    Ms. Glenn, could you return to the document marked

16    Defendant's Exhibit 2?

17    A    Mark Morgan?

18    Q    Yes.

19    A    Yes.

20    Q    Looking at the first page of Exhibit 2 on the right

21    side of the top half of the document there is some

22    handwritten notes.

23    A    Yes.

24    Q    Can you identify those notes?

25    A    Those are notes that I took after reviewing the audit
```

1    reports, the unpaid audit finding hours for Mark Morgan.

2    June 2012 through November 2012, the hours listed by those

3    dates are the hours that have yet to be credited to his

4    account.

5    Q    Are those the hours that you considered when

6    evaluating whether Mr. Morgan would be eligible for health

7    and welfare benefits after January 31st of 2013 with the

8    Bunn Enterprises' hours included?

9    A    Yes, they are.

10         MR. CLARK:  I have no additional questions, Your

11   Honor.  Thank you.

12         THE COURT:  Thank you, Mr. Clark.

13         Ms. Glenn, thank you very much, ma'am.  You may be

14   excused.

15         MR. MASON:  Your Honor, if I could, just one

16   question, too?

17         THE COURT:  I'm sorry.  Sure.

18         One last question.

19                        - - -

20                 RECROSS-EXAMINATION

21   BY MR. MASON:

22   Q    What was the total hours that Mr. Morgan worked in the

23   year of 2012 from the beginning of the time period, I guess

24   April through the end of November?  What was the total

25   hours?

```
 1    A     April through the end of November?

 2    Q     Yes.  You know, for the year 2012.

 3    A     Well, not having a pen, it's -- they're all written

 4    here, but I can't --

 5    Q     Isn't it a fact there are over 900 hours that he

 6    worked in that time frame?

 7    A     There may be, but even if there are, his eligibility

 8    would still not extend past January, in accordance to our

 9    eligibility rules.

10          MR. MASON:  That's all the questions I have.

11          THE COURT:  Thank you.  Thank you, ma'am.  You may

12    be excused.

13          Mr. Clark, your next witness.

14          MR. CLARK:  Our next witness is Carol Wilson.

15          THE COURT:  Ms. Wilson, please come forward and be

16    sworn.

17      (Witness sworn.)

18          THE COURT:  Ms. Wilson, bend the microphone toward

19    you and speak clearly into it, please.

20

21

22

23

24

25
```

```
 1                        - - -

 2                     CAROL WILSON

 3   Called as a witness on behalf of the Defendant, being first

 4   duly sworn, testified as follows:

 5                  DIRECT EXAMINATION

 6   BY MR. CLARK:

 7   Q    Could you state your name for the record, please?

 8   A    Carol Lanette Wilson.

 9   Q    And are you currently employed, Ms. Wilson?

10   A    Yes, I am.

11   Q    And where are you employed?

12   A    With the Ohio Operating Engineers Fringe Benefit

13   Programs.

14   Q    What is your job title with the fringe benefit

15   programs?

16   A    Assistant administrator.

17   Q    When we use the term Ohio Operating Engineers Fringe

18   Benefit Programs, is there a legal entity with that name?

19   A    No, there is not.  It is comprised of four

20   Taft-Hartley Trust Funds of which they include the Ohio

21   Operating Engineers Health and Welfare Plan, the Ohio

22   Operating Engineers Pension Fund, the Ohio Operating

23   Engineers Apprenticeship and Training Fund, and the Ohio

24   Operating Engineers Education and Safety Fund.

25   Q    And do each of the four funds share trustees?
```

1    A    No, they do not.

2    Q    Who are the trustees -- not by name, but where do the

3    trustees come from for the fringe benefit fund?

4    A    Half of the trustees are labor trustees and the other

5    half are from management, which are contractor trustees.

6    There is an equal number of labor and management.

7    Q    Could you take a look at the exhibits to your right

8    and direct your attention towards the document marked

9    Defendant's Exhibit 1?

10   A    Okay.

11   Q    What is Defendant's Exhibit 1?

12   A    This is the Ohio Operating Engineers Health and

13   Welfare Plan plan document.

14   Q    Does the plan document address the appeal process that

15   a member of the health and welfare fund would use for

16   appealing eligibility determination?

17   A    Yes, it does.

18   Q    Can you identify the portion of the plan document that

19   addresses that?

20   A    It's on page 44 under "I" at the bottom, Appeals of

21   Eligibility Determinations.

22   Q    We've also heard the term SPD.  What is an SPD?

23   A    This is a summary plan description.

24   Q    What is a summary plan description?

25   A    It is more of a layman's -- puts into layman's term

1    the plan for the members.  And that is distributed to all

2    of the members.  We actually did a mailing in late 2011 to

3    all participants.  And that is also given to any new

4    members who become initially eligible under the plan.  And

5    if we would have a member who has been without coverage for

6    more than 12 months and then they reestablish their

7    eligibility, they would then receive another summary plan

8    description.

9    Q    Ms. Wilson, you've been handed a two-page document

10   marked Defendant's Exhibit 6.  Can you identify the first

11   page of Exhibit 6?

12   A    This is the cover of the current summary plan

13   description.

14   Q    Can you identify page two of Exhibit 6, please?

15   A    Yes.  That is the page which includes the appeals of

16   eligibility determinations.

17   Q    To your knowledge, have any of the plaintiffs in this

18   case appealed an eligibility determination of the fund --

19   A    Not to my --

20   Q    -- pursuant to this procedure described in the SPD?

21   A    Not to my knowledge.

22   Q    Ms. Wilson, we've also heard some testimony yesterday

23   regarding the crediting of contributions that are received

24   from an employer when there is a delinquency on that

25   employer's account.  Can you explain the practice of the

1    fringe benefit fund office and how those contributions are

2    credited?

3    A    Yes.  There is a fund office policy of applying

4    payments to the oldest outstanding balance when there has

5    been an audit that results in delinquencies.  And that

6    predates my time with the office.  I think it goes back to

7    the beginning of each of these trust funds.  They've

8    administered the plan like that from day one, and it is

9    administered to all contractors the same way.

10    Q    How long have you been with the fringe benefit funds?

11    A    Twenty-eight years.

12    Q    What is the reason or the rationale behind the

13    practice of crediting contributions towards the oldest

14    delinquency?

15    A    Well, there needs to be a uniform rule that applies to

16    all contractors where we cannot ignore an older liability

17    in order to pay a more recent one.  We can't pick and

18    choose who we're giving credit to.  So, in that case, we

19    would apply any payments that come in, once there has been

20    an audit resulting in delinquencies, and that money would

21    first be applied to the oldest balance and carry forward.

22         THE COURT:  Ms. Wilson, what rules require you to

23    allow payments to be made in that manner, or I should say

24    what rules require you to make payments in that manner?

25         THE WITNESS:  Well, I believe it's the trustees'

1    fiduciary responsibility under ERISA that this policy has

2    been implemented.

3         THE COURT:  Is there a particular section of the

4    code to which you refer, or upon which you rely in making

5    the determination to credit certain payments to delinquent

6    accounts as opposed to the current employee?

7         THE WITNESS:  I do not know specifically where it

8    would be.

9         THE COURT:  That's just the way that you do it?

10        THE WITNESS:  Yes.

11        THE COURT:  Did anyone tell you that you were

12   required to do it that way?

13        THE WITNESS:  When I was first hired, that was what

14   was taught to me.  That was the practice.  So we've

15   continued that on since I've been there.

16        THE COURT:  Okay.  Please continue, Mr. Clark.

17        MR. CLARK:  Thank you, Your Honor.

18   BY MR. CLARK:

19   Q    Ms. Wilson, has that practice been utilized with every

20   delinquent employer?

21   A    Yes.

22        MR. CLARK:  I have no additional, Your Honor.

23        THE COURT:  Thank you, Mr. Clark.

24        Mr. Mason.

25

```
 1                          - - -

 2                    CROSS-EXAMINATION

 3    BY MR. MASON:

 4    Q     How long have you worked with the fund?

 5    A     Twenty-eight years.

 6    Q     Twenty-eight years.  And in this 28 years, you say

 7    this policy, procedure, that you have of allocating funds

 8    to the oldest balance due has been even before your

 9    presence, right?

10    A     That's correct.

11    Q     And that this is a policy that you believe is

12    appropriate and that should be applied uniformly to all

13    companies, correct?

14    A     Yes.

15    Q     Therefore, I have a real simple question.  With

16    respect to these individuals who you're asserting did not

17    exhaust their administrative remedies by filing with you,

18    seeking to have credit to deviate from a policy that has

19    been in effect for more than 28 years, isn't it a fact that

20    their exhaustion of administrative remedies would have been

21    futile because of your policy you're seeking to uniformly

22    enforce for the past 28 years?

23          THE COURT:  Would you repeat that question back,

24    Mrs. Evans?

25      (Thereupon, the last question was read by the court
```

```
1    reporter.)

2          THE COURT:  Do you understand the question,

3    Ms. Wilson?

4          MR. WILSON:  I do.  But I don't think I can answer

5    that question.  They certainly have the right to appeal.

6          THE COURT:  Please continue, Mr. Mason.

7    BY MR. MASON:

8    Q    As a matter of fact, I believe we've got a lot of

9    cases where the operating engineers have sought to defend a

10   position that the all-hours worked should be charged to the

11   companies for many years.  Is it your position that in all

12   that litigation that you have done to defend a policy that

13   has been challenged sometimes successfully, that these

14   gentlemen, by filing an appeal when you're trying to take

15   their money to apply to a balance that you claim is owed,

16   that they would have any chance in your administrative

17   process to get what you guys have been litigating for years

18   and holding and even we're here today fighting over, that

19   they would have an administrative process, an ability to

20   actually get a decision that would be different than the

21   position that you're taking in this litigation?

22         MR. CLARK:  Objection, Your Honor.

23         THE COURT:  I'm going to sustain it as to form of

24   the question.  It was compound multiple times.  So I'm

25   going to have Mrs. Evans read the question back so that you
```

1    can capture the essence of what you were asking and break

2    it down into its parts.

3         Mrs. Evans would you read that question back,

4    please?

5    (Thereupon, the last question was read by the court

6    reporter.)

7         MR. MASON:  I will break that down, Your Honor.

8    BY MR. MASON:

9    Q    Are you aware of the fact that the operating engineers

10   has been involved in numerous lawsuits involving hours

11   worked?

12   A    Yes.

13   Q    Are you aware of the fact that the operating engineers

14   has taken the position on a number of cases that all hours

15   worked, regardless of whether or not it's covered under the

16   collective bargaining agreement, should be charged to the

17   company?

18   A    Can you rephrase that?  I don't understand.

19   Q    Are you aware that the position that the operating

20   engineers funds was taking was that regardless of whether

21   it was work under the collective bargaining agreement, if

22   they worked hours, the fund had a right to the proceeds,

23   the fringe benefits?

24   A    Specifically, I can't answer that.

25   Q    Are you aware of the facts in this litigation with

1    respect to the claims that Bunn has been making?

2    A    I believe so.

3    Q    And as a matter of fact, Mr. Bunn I believe himself

4    has actually called you regarding this matter, right?

5    A    I think I spoke to him one time.

6    Q    Have you spoke to any of these other individual

7    employees with respect to their individual claim?

8    A    Not to my knowledge.

9    Q    And in that, you understood the position of Bunn was

10   that they didn't owe this money and that they should not be

11   getting charged and that these men should be getting

12   credit?

13   A    I understood Mr. Bunn's position.

14   Q    And when he made that position, did you change your

15   mind that, oh, we've made a mistake here and we should not

16   be charging Bunn?

17   A    No, I didn't change my mind.

18   Q    Then the question to you is, what appeal rights that

19   these individuals have, as far as the administrative

20   process on this determination that you've testified exists,

21   what good is it for them if you've already made the

22   decision when Mr. Bunn there -- that your position is the

23   same?

24   A    I am not the person who would hear the appeal.  That

25   would be the board of trustees.

1   Q    With respect to the board of trustees, are they

2   separate from the union?

3   A    As I mentioned before, half of those trustees are from

4   the union side, labor.  The other half are contractor

5   trustees.

6   Q    So, when an audit is done, it's not done under the

7   auspices of the operating engineer logo.  It's done under

8   the auspices of the trustees and the funds.  Correct?

9   A    The fringe benefit programs.

10  Q    So, when an auditor goes out to audit a company, he

11  doesn't work for the union at the direction of the union,

12  correct?

13  A    No, he does not.

14  Q    So, when a union is involved in this, they don't

15  follow the directions of whatever the union tells them;

16  they follow whatever the directions are of the fund?

17  A    Yes.

18  Q    Can you explain to me, then, in this case why the

19  local business agent of District 6 instructed your auditor

20  to change his audit report?

21  A    I cannot say that that happened.  I think we did a

22  re-audit.

23  Q    At whose instructions?

24  A    I would have to check our files.

25  Q    I happen to have those.  Just a second.

```
1              MR. CLARK:  Your Honor, I'm going to object to this

2       line of questioning.  It's beyond the scope of direct.

3              THE COURT:  Your objection is noted, but overruled.

4              MR. MASON:  Approach the witness, Your Honor?

5              THE COURT:  Yes, you may.

6              MR. MASON:  I am handing the witness documents that

7       have been previously marked, identified and in evidence, LL

8       and KK.

9              MR. CLARK:  I have a question on the exhibit.  You

10      indicate you believe this is already in evidence?

11             MR. MASON:  Yes.

12             MR. CLARK:  I see it's been filed.  I don't know

13      whether it was previously marked.

14             MR. MASON:  It was attached to the complaint that we

15      stipulated.

16             MR. TULENCIK:  It was attached to their response in

17      opposition to TRO.

18             MR. MASON:  It's your document that you attached.

19             MR. CLARK:  We're not going to dispute authenticity.

20      I don't think everything that's been filed in the case is

21      in evidence.

22             THE COURT:  That's true.

23             MR. CLARK:  I wanted to be clear what's in evidence.

24             THE COURT:  This is not yet in evidence.  It was

25      filed, but it's not in evidence in this hearing.
```

1    Mr. Mason had moved at the beginning of the hearing

2    for everything that was attached to the various pleadings

3    to be a part of the evidence in this case.  But because you

4    weren't aware of what -- Mr. Clark, you knew all of the

5    pleadings that had been filed.  I think your response to

6    Mr. Mason was that you were not aware at that moment of

7    everything that would be included in that broader sweep,

8    and so you did not agree to it.

9    No one has moved anything into evidence yet, I don't

10   believe.  I was assuming that everyone was going to move it

11   in at the end of the case.

12   MR. MASON:  Actually, Your Honor, I believe that

13   counsel reviewed all the documents.  You might remember he

14   flipped through it and said these look like ours, and he

15   did agree to a stipulation that all of the documents would

16   be admitted into evidence.  You will have to look back at

17   the record itself, but I believe we have that as a

18   stipulation at the beginning.

19   MR. CLARK:  I believe what I stated was that we were

20   not going to dispute the authenticity of our own documents,

21   and that --

22   MR. MASON:  I think the record will speak for

23   itself.

24   MR. CLARK:  Nor do we dispute the authenticity of

25   this document.  We just want some clarity as to what is in

VOL II 138

```
 1    evidence and what is not.

 2         THE COURT:  All right.  Please proceed, Mr. Mason.

 3    BY MR. MASON:

 4    Q    If you would, please, turn your attention to the

 5    Exhibit KK.  Who is the auditor here that did this report?

 6    A    Douglas Baker.

 7    Q    How long has Mr. Baker worked for the fund?

 8    A    I'm sorry.  How long?

 9    Q    How long has he worked for the fund?

10    A    I don't know exactly.  I would probably guess eight or

11    nine years.

12    Q    Is he an experienced auditor?

13    A    Yes, he is.

14    Q    He knows the procedures?

15    A    Yes.

16    Q    He follows the procedures, to your knowledge?

17    A    Yes.

18    Q    In this audit, then, on this first one, he in fact

19    noted that there was a finding regarding the hours worked,

20    right?

21    A    Yes.

22    Q    He also noted, did he not, on page two that there were

23    certain hours that were not picked up in the audit?

24    A    Hours that were not picked up?

25    Q    Yes, ma'am.  If you will look on page two about
```

1    two-thirds of the way down where it says, "These hours were

2    not picked up in the audit."  Do you see that notation,

3    indention, about two-thirds of the way down as a lead

4    sentence?

5    A    I'm with you now.

6    Q    And you see where it says service rate at 16 an hour?

7    A    Yes.

8    Q    And then, "This notation is different than the hourly

9    description of the operating hours"?

10   A    Uh-huh.

11   Q    And "The pay rate was not close to an operator"?

12   A    Yes.

13   Q    And that there weren't any payroll records describing

14   the duties that these hours performed, correct?

15   A    Yes.

16   Q    And so he did not count these hours that were worked

17   by Mr. Newlon as operator hours and, therefore, he did not

18   add fringe numbers to those hours, correct?

19   A    Yes.

20   Q    Now, let's look to the next revised audit.  Turn to

21   page two.  Now, this is the revised audit that finds a much

22   larger number, correct?

23   A    Yes.

24   Q    On page two, do you see where it says "These hours

25   were picked up in the audit"?

1    A    Yes.

2    Q    Do you see that line?

3    A    I do.

4    Q    Do you see at the request of District 6, J. Lucas?

5    Who is J. Lucas of District 6?

6    A    Joseph Lucas.

7    Q    Who is he?

8    A    I believe he is the field representative for District

9    6.

10   Q    And what is District 6?

11   A    It's one of the districts that comprises Local 18.

12   Q    So he is a business representative for Local 18?

13   A    Yes.

14   Q    And he is telling the auditor what the auditor is to

15   pick up and put in hours?

16   A    He must have contacted our office and --

17   Q    Now you don't know that, do you?

18   A    I don't know it, no.

19   Q    Thank you.  The notations made by your auditor, who

20   has been working for you for eight years, was that he did

21   this not at the request of the fund but at the request of

22   Mr. Lucas, correct?

23   A    Our office would have reassigned this to him.

24   Q    Did the notation reflect that he did it at the request

25   of Mr. Lucas?

```
 1    A    I don't have the audit assignment that was given to

 2    the auditor so I cannot answer that question.

 3    Q    Are you arguing with the document that he wrote?

 4    A    No.  I am indicating that our office would give the

 5    auditor an audit assignment that would explain what he is

 6    to do, and that is not included here.

 7         MR. MASON:  I have no further questions.

 8         THE COURT:  Thank you.

 9         Mr. Clark, do you have any redirect?

10         MR. CLARK:  I do not, Your Honor.

11         THE COURT:  Ms. Wilson, thank you very much, ma'am.

12    You may be excused.

13         THE WITNESS:  Thank you.

14         THE COURT:  One thing, Ms. Wilson.  What did you

15    indicate your position is at operating engineers?

16         THE WITNESS:  Assistant administrator.

17         THE COURT:  Thank you, ma'am.

18         MR. CLARK:  Your Honor, we have no additional

19    witnesses at this time.  I move for the admission of

20    Defendant's Exhibits 1 through 6.

21         THE COURT:  Any objection?

22         MR. MASON:  I do have objections to Defendant's

23    Exhibits 2, 3, and 4 on the basis of the testimony of the

24    witness which clearly indicated that these documents were

25    not accurate and that --
```

1    THE COURT:  In what way were the documents not

2    accurate, Mr. Mason?

3    MR. MASON:  She was saying when she was

4    cross-examined that the audit department was taking care of

5    and handled all of the issues involved with respect to the

6    disputed funds from Local 18.  And these documents, Your

7    Honor, simply do not reflect the hours that are total that

8    these individuals actually worked and were credited, and

9    are actually misrepresenting the facts here.

10   THE COURT:  Doesn't that go to weight, though, and

11   not to admissibility?

12   MR. MASON:  The Court's free to obviously enter --

13   it would certainly be over our objection.

14   THE COURT:  I understand that.  But as a matter of

15   law -- your argument is that the document is inconsistent

16   with the testimony.  That's the sum and substance of your

17   argument.  The argument is not that the document is not

18   what it purports to be, that it has been altered, that it's

19   somehow not authentic.  It's that the document conflicts

20   with the testimony.  Isn't that your argument?

21   MR. MASON:  To a certain extent.

22   THE COURT:  So why does that not go to weight, the

23   weight that the Court should give the document, as opposed

24   to the admissibility of it?  The document --

25   MR. MASON:  The document purports to be the totality

1     of the hours that these gentlemen worked and what they're

2     entitled to, as far as the payments of their health

3     insurance or not, without counting those other hours and,

4     therefore, they misrepresent the actual facts.

5          THE COURT:  Where did the actual facts come from,

6     Mr. Mason?

7          MR. MASON:  By the testimony of the individuals.

8          THE COURT:  Isn't that what I just kind of said?

9          MR. MASON:  Yes.

10         THE COURT:  I think the short answer is yes.

11         So I'm not saying that the documents themselves are

12    dispositive.  I'm simply saying that the documents conflict

13    with the testimony.  And what if I disbelieve the testimony

14    but chose to believe the documents?  What you're asking me

15    to do is believe the testimony, not to believe the

16    documents; and because the documents don't comport with the

17    testimony, exclude the documents as opposed to weighing

18    evidence which is conflicting and determining that the

19    testimony should take precedence over the documents

20    themselves.

21         Did I miss the essence of your argument?

22         MR. MASON:  No, sir.

23         THE COURT:  Your objection is noted but it will be

24    overruled.  The documents will come in.  I'm not saying the

25    amount of weight that I will give the documents in light of

```
1    the testimony to which you just referred.  Defendant's

2    Exhibits 1 through 6 will be admitted.

3              MR. CLARK:  With that, the defense rests.

4              THE COURT:  Mr. Mason, do you have any rebuttal?

5              MR. MASON:  I do have a little bit of rebuttal, but

6    I would like to have a short break to look with the court

7    reporter with respect to what the parties agreed to at the

8    beginning of the hearing on the documents, that I seem to

9    have a different recollection as to what we agreed to at

10   the beginning of the hearing, as opposed to what counsel on

11   the other side has a recollection.

12             THE COURT:  We might be able to short circuit that.

13   Are there certain documents that you want to offer,

14   because --

15             MR. MASON:  We already have a verified complaint

16   with the documents attached, and counsel has attached with

17   their brief documents.  We would just like to have all of

18   those documents admitted for this Court to consider if it

19   wants to have us brief the case, that we could make

20   reference to it as exhibits in this hearing.

21             THE COURT:  All right.  Mr. Mason, I'm going to

22   invoke the dog-bite rule here.  Do you remember the

23   dog-bite rule from torts?

24             MR. MASON:  The what rule?

25             THE COURT:  The dog-bite rule.
```

1    Here's how it works.  This is my recollection of

2    first-year torts and the dog-bite rule.  The keeper of a

3    dog is not liable for the first bite because the keeper

4    would argue that he was unaware of the dog's violent

5    propensities, and so the first bite was gratis, almost.

6         But the keeper of the dog would be liable for

7    subsequent bites because he was now on notice as to the

8    dog's violent propensities; so liability could be

9    attributed to the keeper of the dog.  Do you remember that?

10         MR. MASON:  Yes, sir.

11         THE COURT:  Mr. Clark, do you remember the dog-bite

12    rule?

13         MR. CLARK:  I believe there was a wolf in the case,

14    but, yes.

15         THE COURT:  Mr. Clark remembers the dog-bite rule,

16    and I'm going to tell you why.  I have indicated

17    repeatedly, as has Mrs. Evans, that you have to stand when

18    you are addressing the Court.  But you explained to me your

19    theory on these evidentiary matters while seated.  When I

20    asked Mr. Clark if he understood the dog-bite rule, what

21    did Mr. Clark do?  He stood and answered the question.

22         So we'll keep that first statement that you made

23    about the documents, and we'll let that slide because of

24    the dog-bite rule.  But in the future, we can't hear you,

25    Mr. Mason.  Mrs. Evans can't hear you because we have that

1    fan that's going there.  And besides that, the ghost of

2    Judge Kinneary would never let me sleep if he knew I

3    allowed a lawyer to address the Court while seated, which

4    is totally incongruous with the rules for the Southern

5    District of Ohio located in Columbus.

6         Now, what did you want to tell the Court further?

7         MR. MASON:  At this point, Your Honor, we would like

8    to have all of the documents that were attached to the

9    complaint, and all of the documents that the defendants

10   have attached to theirs, admitted into evidence so that the

11   Court can hear and review the entire record that it has

12   before it in order to make any determinations it chooses to

13   make in this matter.

14        THE COURT:  All right.  I think that what I was

15   saying was there may be documents that you want to admit

16   that were attached to the pleadings that weren't covered by

17   the testimony, that are not germane to this particular

18   proceeding, this PI hearing.  I don't know whether there

19   would be any documents that fall in that category.

20        But before we have Mrs. Evans go all the way back

21   to, you know, like a 30-second colloquy at the beginning of

22   yesterday's proceeding, maybe you and Mr. Clark can get

23   together for about five or ten minutes, go over the

24   documents that you believe should come into evidence in

25   this PI hearing, and that might obviate the need and might

1      make for a more efficient process.  Because either way,

2      Mr. Clark took the position that "I'm not objecting to

3      authenticity."  He still has the right to object to the

4      foundation.  Maybe you didn't establish the foundation.

5      Maybe it's not relevant to the issues that were raised in

6      this particular hearing.  Maybe there are some issues that

7      were raised by the pleadings that were issues reserved for

8      the trial on the merits, because there was no motion made

9      by either party at the beginning of yesterday's hearing, at

10     least that I recall, that asked for there to be a merger of

11     the PI hearing with a trial on the merits.

12            So you're painting with a broad brush when you ask

13     that all of the documents come in when all of them may not

14     be relevant, the foundation may not have been adequately

15     laid for all of them, et cetera.  So go over that with

16     Mr. Clark first, and then you can narrow your focus.

17     There's no need to argue about the documents to which no

18     objection is being made, only those documents to which an

19     objection is being made.

20            So that's how we're going to do it.  It's a quarter

21     to nine now.  We'll stand in recess until -- how much time

22     do you think you will need to go over the documents,

23     Mr. Mason?

24          MR. MASON:  I don't know.  There's at least, if

25     we're dealing with the documents that they submitted --

1       THE COURT:  No need to deal with the documents --

2   you're not talking about the documents that they moved into

3   evidence?

4       MR. MASON:  No, sir.  We're talking about the

5   documents that were part of the briefs that they submitted

6   on these issues.

7       THE COURT:  We're going to stand in recess until

8   nine o'clock because I have a criminal calendar that starts

9   at 9:30.  You said you have a brief rebuttal case?

10       MR. MASON:  Just three witnesses with just a few

11   questions for each one.

12       THE COURT:  Well, then, what we're going to do is

13   we're going to do that right now, then we can deal with the

14   documents later.  I just don't want this to run into my

15   calendar.

16       MR. MASON:  Okay.  Then we'll call Mr. Morgan to the

17   stand first.

18       THE COURT:  Mr. Morgan, please come back to the

19   stand.  You're still under oath.

20

21

22

23

24

25

                            -  -  -

                        MARK MORGAN

Called as a witness on behalf of the Plaintiff, on

rebuttal, being previously duly sworn, testified as

follows:

                    DIRECT EXAMINATION

BY MR. MASON:

Q    Mr. Morgan, did you hear the testimony of Ms. Glenn

with respect to your insurance and qualifications?

A    I did.

Q    Were her statements true with respect to insurance if

your Local 18 hours had been credited?

A    Not based on the conversation I had with Local 18.

        MR. CLARK:  Your Honor, I object to the form of that

question.

        THE COURT:  To the form of the question?

        Would you read the question back, Mrs. Evans.

    (Thereupon, the last question was read by the court

reporter.)

        MR. CLARK:  I'm not clear to what testimony the

question is referring to.

        THE COURT:  I was researching my mental files for

that same answer.  I'm going to sustain the objection

because of the broad nature of the question.  It could

invite a narrative response.  So could you be more

1    specific, Mr. Mason?

2    BY MR. MASON:

3    Q    Do you recall Ms. Glenn testifying that you would not

4    be qualified for health insurance if the hours that you had

5    for Local 18 had actually been credited to your account?

6    A    Run that by me one more time, please.

7    Q    Do you recall Ms. Glenn testifying with respect to

8    your hours for Local 18 and whether or not, if they had

9    been credited, you would still not be entitled to health

10   insurance?

11   A    I do recall that testimony, yes.

12   Q    Was that testimony true?

13   A    It was not.

14   Q    Why was it not true?

15   A    Based on my conversation with Local 18, when I had

16   called about questioning if my hours had transferred over

17   and whether or not the hours that were removed from me,

18   they had told me -- because I had the doctor's appointment

19   coming up -- told me if they had not taken those hours, I

20   would have health insurance.

21          MR. MASON:  I have no further questions for this

22   witness.

23          THE COURT:  Thank you, Mr. Mason.

24          Mr. Clark, cross?

25

1                              - - -

2                        CROSS-EXAMINATION

3     BY MR. CLARK:

4     Q    Mr. Morgan, you don't know who you spoke to at the

5     fringe office?

6     A    I don't remember a name.  Karen sticks out in my mind,

7     but I don't honestly remember who it was I spoke with.

8     Q    You also heard Ms. Glenn testify that she's the

9     individual at the fund office charged with determining

10    eligibility?

11    A    Right.

12    Q    Did you speak with Ms. Glenn when you called the

13    fringe office?

14    A    Again, I couldn't tell you who I spoke with.  The name

15    Karen sticks out in my mind but I don't a hundred percent

16    remember.

17    Q    Do you believe you ever spoke to Ms. Glenn?

18    A    I do not.

19    Q    Have you reviewed the eligibility provisions of the

20    plan document to determine for yourself whether or not you

21    believe you would be eligible for benefits if your hours

22    from Bunn were included?

23    A    Are you asking me if I looked through the plan

24    summary?

25    Q    Have you looked at the eligibility portion of the

1    plan?

2    A   Is that in the plan summary?

3    Q   Have you reviewed the eligibility portion of the plan

4    to determine whether or not you would be eligible for

5    benefits if the Bunn hours were included?

6    A   Is it in the book that describes everything, that has

7    all our rules of regulations?

8    Q   I'm asking questions of you, not the other way around.

9    A   I'm trying to understand your question.

10    Q   My question is, have you reviewed the eligibility

11    portion of the health and welfare fund plan to determine

12    whether or not you would be eligible for benefits if the

13    hours -- all of your hours for Bunn Enterprises were

14    included?

15    A   I have looked through the plan book, and to the best

16    of my knowledge, I read through it several times. I don't

17    know it inside and out. I've glanced at sections that I

18    thought would best apply to me, is the best answer I can

19    give you.

20    Q   So you haven't looked at the eligibility provisions?

21    A   Is it in the book? I can't tell you if I specifically

22    looked at it. I've glanced through it and read certain

23    section. I don't have it memorized. I'm not sure what

24    you're asking of me.

25    Q   You testified that you would be eligible for benefits

1    if those hours were included?

2    A    Based on what I was told by the person I spoke with at

3    the benefits.

4    Q    But you have no personal knowledge of the eligibility

5    provisions of the plan?

6    A    I have some knowledge of it.  I have an idea of what

7    hours were required.  I can't recite it back.  I haven't

8    done it for nine years.  But I have an idea of where I need

9    to be, the time frames versus the hours and so on and so

10    forth.

11    Q    How many hours do you believe you're entitled to

12    credit for that you haven't been credited for?

13    A    The number I remember speaking with them was

14    approximately 280, 285, somewhere in that ballpark.

15    Q    But you have not reviewed the eligibility portion to

16    calculate an additional 285 hours?

17    A    No, I have not, I guess.

18    Q    The only indication you have that -- the only reason

19    you're testifying today that you think you would be

20    eligible for additional benefits under the health and

21    welfare fund is because you spoke with someone you think

22    might be named Karen?

23    A    If you have a question about your benefits or funds or

24    retirement, wouldn't you call the benefits office and ask

25    them?  Isn't that what you guys are there for, to stand

1    behind your members, say this is where you're at, these are

2    the hours you have, not take them away from you after

3    you've worked X number of hours and hand them to somebody

4    else?

5         MR. CLARK:  I have no further questions.

6         THE COURT:  Mr. Mason, I take it you have nothing

7    further.

8         MR. MASON:  No further questions for this witness.

9         THE COURT:  Mr. Morgan, thank you very much, sir.

10   You may be excused.

11        MR. MASON:  Danny Lantz.

12        THE COURT:  Mr. Lantz, please come forward.

13        Mr. Lantz, you're still under oath.

14                          - - -

15                      DANNY LANTZ

16   Called as a witness on behalf of the Plaintiff, in

17   rebuttal, being previously duly sworn, testified as

18   follows:

19                    DIRECT EXAMINATION

20   BY MR. MASON:

21   Q    Mr. Lantz, were you in the room yesterday when

22   Ms. Glenn testified with respect to the hours that should

23   be credited to your account?

24   A    Yes.

25   Q    Do you recall her testimony regarding the fact that

VOL. II - 155

```
1    even if your hours with Local 18 had been counted that you

2    would not have insurance through June of 2013?

3    A    Yes.

4    Q    To your knowledge, was that statement true?

5    A    No.

6    Q    How do you know that?

7    A    If I had the hours that was due me, I would have had

8    insurance for -- I knew how many hours, you know, roughly

9    that we needed to have.  I called the fringe benefits,

10   talked to them up there, and she told me that I would have

11   enough hours if they was credited, but they was frozen and

12   they wouldn't be credited.  And when they was credited,

13   they would reimburse me.

14   Q    And if you had the hours that was properly credited,

15   how far -- how long would your health insurance have gone

16   through till, according to what she told you?

17   A    The fringe benefit office told me till July of '13,

18   2013.

19        MR. MASON:  Thank you.  No further questions, Your

20   Honor.

21        THE COURT:  Mr. Clark, cross?

22                        - - -

23                  CROSS-EXAMINATION

24   BY MR. CLARK:

25   Q    Mr. Lantz, who did you speak to at the fringe benefit
```

1    office?

2    A    Whoever was answering the phone.  I didn't get her

3    name.  She's supposed to be working for us.  I shouldn't

4    have to get her name.  She shouldn't be lying to me.

5    Q    And you don't know when you spoke to her?

6    A    Yes.

7    Q    When was it?

8    A    It was the seventh month, right around the 15th when I

9    got the letter.  I called the company that I work for.  I

10   thought that was the problem.  She told me that all the

11   hours was turned in.  I called the fringe benefits office

12   immediately when I got the letter, and she told me that I

13   was eligible but our funds was froze until the audit was

14   completed.

15   Q    So I think the seventh month, then, July of 2012?

16   A    Yes.

17   Q    Have you had any subsequent conversations with anyone

18   at the fringe office regarding your eligibility?

19   A    No.

20   Q    Since your conversation in July of 2012 with someone

21   at the fringe office, have you reviewed the eligibility

22   portions of the plan?

23   A    No.

24   Q    Have you reviewed the hours credited to you in the

25   quarterly reports you received?

1    A    Yes.

2    Q    Have you -- I guess you haven't looked at the

3    eligibility portion.

4         MR. CLARK:  I don't have any additional questions.

5         MR. MASON:  No further questions, Your Honor.

6         THE COURT:  Thank you very much, Mr. Lantz.  You may

7    be excused.

8         MR. MASON:  We'll call Mr. Schau.

9         THE COURT:  Mr. Schau, please come forward.  You're

10   still under oath.

11                         -  -  -

12                      MICHAEL SCHAU

13   Called as a witness on behalf of the Plaintiff, in

14   rebuttal, being previously duly sworn, testified as

15   follows:

16                    DIRECT EXAMINATION

17   BY MR. MASON:

18   Q    Mr. Schau, do you recall the testimony of Ms. Glenn

19   yesterday regarding your health insurance credit hours for

20   Local 18?

21   A    Yes.

22   Q    With respect to that, can you tell me whether or not

23   you contacted every local that you worked for to have your

24   hours transferred to your current local?

25   A    Yes, I did.

1    Q    Did those contacts also include Local 18?

2    A    Yes.

3    Q    To your knowledge, did you fill out whatever paperwork

4    every local required of you to transfer those hours to your

5    new local in Kentucky?

6    A    Yes.

7    Q    With respect to that, have the hours from Local 18

8    been transferred to your new local in Kentucky?

9    A    No, they haven't.

10    MR. MASON:  No further questions.

11                          - - -

12                    CROSS-EXAMINATION

13   BY MR. CLARK:

14    Q    Mr. Schau, are you changing your testimony of

15   yesterday that you did not fill out a transfer of hours

16   authorization form?

17    A    No.

18    Q    You did not fill out such a form?

19    A    I'm not changing my testimony.

20    Q    I believe your testimony was that you did not fill out

21   an authorization form for Local 18 to transfer your hours.

22   Is that true?

23    A    I may have; I may haven't.  I'm not really sure.

24    Q    Well, you don't have such a form to produce today, do

25   you?

```
 1    A    No.

 2              MR. CLARK:  Nothing further.

 3              MR. MASON:  Just a couple of quick questions.

 4              THE COURT:  All right.

 5                              -  -  -

 6                    REDIRECT EXAMINATION

 7    BY MR. MASON:

 8    Q    Do you have copies of any of the forms that you

 9    submitted to any of the locals with respect to transferring

10    any of your hours to your current local?

11    A    No, I don't.

12              MR. MASON:  No further questions.

13              THE COURT:  Mr. Schau, thank you very much, sir.

14    You may be excused.

15              Any more witnesses, Mr. Mason?

16              MR. MASON:  No other witnesses.  We do have exhibits

17    LL and KK that were identified.  We'd like to move those

18    into evidence.

19              THE COURT:  Any objection, Mr. Clark?

20              MR. CLARK:  No objection, Your Honor.

21              THE COURT:  LL and KK will be received.

22              Now, it's a couple of minutes till nine.  I'll give

23    you until 9:10.  Will that give you enough time to --

24              MR. MASON:  I'll certainly confer with him.  We'll

25    see if we can get it done.
```

 1          THE COURT:  I wanted to just save some time for you

 2    to make your arguments as well, in the event there are

 3    objections.

 4       (Recess taken from 8:58 a.m. to 9:15 a.m.)

 5          THE COURT:  Mr. Mason, are there any exhibits to

 6    which there are objections that the plaintiff wishes to

 7    offer into evidence?

 8          MR. MASON:  No, Your Honor.  We've got an agreement

 9    with respect to the documents between us and counsel that

10    we feel is what's proper before this Court for this

11    hearing.

12          THE COURT:  And what's your position?  Which

13    documents are they?

14          MR. MASON:  We have them here.  We'll --

15          THE COURT:  Well, I'll tell you what, maybe the

16    easiest way to do it would be to -- since the defense

17    numbered its exhibits, you can letter yours.  So they will

18    be Plaintiff's Exhibits A through what?

19          MR. MASON:  Well, I have them with some specific

20    numbers on them, and I can just give you -- or letters.

21    I'm sorry.

22          It would be Exhibit A, F --

23          THE COURT:  What is A?

24          MR. MASON:  "A" would be the Ohio Highway Heavy

25    Agreement from 2010 through 2013.

1          Exhibit F, which is the Ohio Operating Engineers

2     determination of their audit on the first audit dated

3     January 19 of 2012.

4          THE COURT:  All right.

5          MR. MASON:  Exhibit G, which is the second audit

6     dated March 9 of 2012.

7          THE COURT:  Okay.

8          MR. MASON:  And that's it.

9          THE COURT:  All right.  No objection to those,

10    Mr. Clark?

11         MR. CLARK:  No objections, Your Honor.

12         THE COURT:  Those exhibits will be admitted.

13         Is there anything else from the plaintiff?

14         MR. MASON:  No, sir.

15         THE COURT:  Anything further from the defense?

16         MR. CLARK:  No, Your Honor.

17         THE COURT:  I will take this matter under

18    advisement, obviously.  I will issue an opinion forthwith.

19    During the pendency of the Court's deliberations, the TRO

20    remains in place.  I will try to get this out within the

21    next week, and further briefing will not be necessary.

22         Thank you very much, everyone.

23      (Proceedings concluded at 9:17 a.m.)

24                          - - -

25

1                                – – –

2                               INDEX

3                                – – –

4      WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS

5      DEFENDANT'S:

6    Amanda Glenn                                  123        124
     Carol Wilson              126     131
7

8                                – – –

9      PLAINTIFF'S:

10   Mark Morgan (rebuttal)    149     151
     Danny Lantz (rebuttal)    154     155
11   Michael Schau (rebuttal)  157     158      159

12                               – – –

13

14     EXHIBITS                        MARKED        RECEIVED

15     PLAINTIFF'S:

16   A – Ohio Highway Heavy Agreement               161
     F – audit                                      161
17   G – audit                                      161
     LL – audit review                             159
18   KK – audit review                             159

19     DEFENDANT'S:

20   1 – health and welfare plan                    144
     2 – member info Morgan                         144
21   3 – member info Schau                          144
     4 – member info Lantz                          144
22   5 – member info Bunn                           144
     6 – summary plan description                   144

23

24                               – – –

25

1                    C E R T I F I C A T E

2

3          I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the

5    proceedings before the Honorable Algenon L. Marbley, Judge,

6    in the United States District Court, Southern District of

7    Ohio, Eastern Division, on the date indicated, reported by

8    me in shorthand and transcribed by me or under my

9    supervision.

10

11

12                              s/Shawna J. Evans
                                Shawna J. Evans, RMR
13                              Official Federal Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25